1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ETHAN MORSE,                              No. 1:16-cv-00142-DAD-SKO

12                Plaintiff,

13        v.                                   ORDER GRANTING IN PART AND
                                               DENYING IN PART MOTIONS FOR
14   COUNTY OF MERCED, CHARLES                 SUMMARY JUDGMENT
     HALE, ERICK MACIAS, and JOSE SAM
15   SANCHEZ, individually and as officers of  (Doc. Nos. 61, 65, 66)
     the Merced County Sheriff's Department,
16   and DOES 1–100,

17                Defendants.

18

19          Pending before the court are three separate motions for summary judgment, all of which

20   were filed on May 9, 2017. The first of these motions was submitted by the defendant County of

21   Merced, the second was submitted by defendant Erick Macias, and the third was submitted by

22   defendants Charles Hale, Jose Sam Sanchez, and—again—the County of Merced. (Doc. Nos. 61,

23   65, 66.)[1] A hearing on these motions was held on June 6, 2017. Attorneys Jayme Walker and

24   Gary Gwilliam appeared at that hearing telephonically on behalf of plaintiff. Attorney Dawn

25   Flores-Oster appeared telephonically for defendants County of Merced, Hale, and Sanchez.

26   _____

27   [1]  It is unclear why defendant County of Merced is denominated as a moving party in two motions
     for summary judgment. Moreover, it appears these two separate motions for summary judgment
28   are exactly the same. Therefore, the court will address them jointly throughout this order.

                                             1

Attorneys Mark Rutter and Danielle Foster appeared telephonically on behalf of defendant Macias.

Having considered the parties' briefs and oral arguments and for the reasons stated below, the court will grant in part and deny in part the defendants' motions for summary judgment.

## BACKGROUND

Despite many of the core facts in this case being undisputed, the parties have submitted a voluminous amount of evidentiary material in connection with the pending motions for summary judgment. The court has reviewed the evidence before it on summary judgment, and now summarizes the facts as established by that evidence.[2] Plaintiff Ethan Morse and a group of friends—Jacob Tellez, Robert Tern, Sabrina Ceccoli, Jacob Delgadillo, Andrew Masengale, Tony Gomes, and Cameron Johnson, all teenagers—attended a house party at 9258 Westside Boulevard in Atwater, California, on the evening of March 30, 2013. Plaintiff drove the group in his father's Land Cruiser. He parked west of the house, on the southern side of the road. The group was in attendance at the party for only between ten and twenty minutes, before deciding to leave. The group had left the party and re-entered plaintiff's car when gunfire erupted at the house shortly after 11:00 p.m. Hearing this gunfire, plaintiff drove east on Westside Boulevard before heading south on Highway 99. He dropped off Tellez and Tern before the rest of the group returned to plaintiff Morse's house for the night.

The gunfight at the party resulted in three fatalities—Matthew Fisher, Samantha Parreira, and Bernabed Hernandez Canela—and injuries to two other individuals, Anthony Wiggins and Orasio Fierro. Fisher and Hernandez died at the scene, while Parreira later died at Doctors Hospital in Modesto, California. Hernandez, in particular, was shot with both .25-caliber and .38-caliber bullets. Fisher and Parreira were shot in the yard of the house, Hernandez's body was found approximately 100 yards to the west of the house. (Doc. No. 72-11 at 2.) It appears

---

[2] This factual summary is drawn from the parties' separate statements of fact. Since many facts were stipulated to for the purposes of the pending motions, citations to specific evidence are provided only as to facts to which the parties have not stipulated to as undisputed. *Block v. City of Los Angeles*, 253 F.3d 410, 419 n.2 (9th Cir. 2001) (noting in reviewing summary judgment grant that "[a] party is normally bound by its stipulation of facts").

Hernandez was found somewhere near, albeit across the street from, where plaintiff's vehicle was likely parked during the party.

Tellez became an initial suspect in the shooting of Hernandez because of a cell phone call inadvertently placed to the local 911 dispatch at approximately 11:52 p.m. that same evening. The 911 operator who answered the call received no response, but could hear a male voice talking in the background about a shooting. It is a matter of considerable dispute what the individual actually said on the phone, but the accidental call was at least sufficient for the 911 dispatcher to conclude the person might have been talking about the shooting that had just occurred in Atwater. The telephone number of the phone from which this inadvertent call was made was ultimately traced to Tellez. Based on that 911 call and what a Merced County Sheriff's Department ("MCSD") detective—Detective Ruben Orozco—claimed he could hear in the recording of it, an arrest warrant was issued for Tellez on April 3, 2013. Tellez was arrested on April 14, 2013, and was subsequently interviewed by MCSD Detective Duane Pavelski. During that interview, Tellez admitted to Detective Pavelski he was at the party with several people and had a .22-caliber revolver with him. According to Tellez, the group was leaving the party as the shooting started, and Tellez tried to pull his revolver. However, Tellez reported, the gun became caught on the seatbelt, and Masengale grabbed Tellez's arm and told him not to pull out the gun. Tellez stated during his April 2013 interview that he did not shoot a gun that night. (Doc. No. 68-20 at 5–6.) Ultimately, Detective Pavelski released Tellez, with the request that he retrieve the gun for a ballistics comparison. (Doc. No. 68-20 at 47–49.)

Tellez was not detained following his interview. Detective Pavelski commented in his police report that, following his interview with Tellez, he "listened to the 9-1-1 tape again and was able to make more sense of the story told on the tape. Jacob's story seemed to fit the story being told on the tape." (Doc. No. 75-12 at 3.) Pavelski testified at his deposition in this case that he was not comfortable arresting Tellez for homicide solely on the basis of the accidental 911 call, because "there's just not enough evidence." (Doc. No. 86-17 at 16.) Additionally, Pavelski noted that during the interview, Tellez sought to contact Masengale and have him speak to the police, even though "he knew he wasn't going to have the opportunity to say anything to

3

[Masengale]." (*Id.* at 17.) This, too, bolstered Tellez's credibility in Detective Pavelski's eyes. (*Id.*) Pavelski also noted that the MCSD "had a snitch that was associated with his [Tellez's] family poking around and nothing they were coming forward with was lent towards his guilt." (*Id.* at 18.)

Detective Erick Macias—one of the defendants in this action—was assigned as the lead detective in the Hernandez homicide in May 2013. Macias testified at his deposition that he did virtually no work on the Hernandez homicide until July 2014, because of his large caseload of other homicide investigations.[3] (Doc. No. 68-6 at 3–7.) In January 2014, plaintiff's father, District Attorney Larry Morse, appeared at a meeting of the Merced County Board of Supervisors and criticized the lack of attention paid by the MCSD to gang-related homicides in Merced County, particularly highlighting differences in gang enforcement strategies employed by the Merced Police Department and the MCSD. (*See* Doc. No. 86-15 at 25–26.) This criticism upset some members of the MCSD. In particular, defendant Detective Jose Sam Sanchez testified at his deposition that, while he was un sure whether he would say he was offended by District Attorney Morse's comments, he "wasn't expecting for him to make such comments to the public about an agency that he works hand-in-hand with and who's constantly bringing cases for his deputy DA's to file on." (Doc. No. 86-20 at 8.) Detective Sanchez did not think District Attorney Morse's statement "created a good working relationship." (*Id.*) Defendant Sergeant Charles Hale stated that the comments "created a stir in upper administration maybe," but denied most staff, including himself, were affected by the comments. (Doc. No. 86-7 at 19.)[4]

On July 15, 2014, Detective Macias signed a new affidavit in support of an application for an arrest warrant for Tellez for the Hernandez murder, again based solely on Tellez's accidental

---

[3] Detective Macias did interview an individual named Marcus Whittaker in June 2014 about the Atwater shooting, after Detective Paul Johnson of the Merced Police advised that Whittaker had information about the murders. (Doc. No. 71-15.) This interview is discussed below.

[4] Shortly after plaintiff's eventual arrest, former MCSD Sheriff Mark Pazin called District Attorney Larry Morse at home early in the morning, leaving a voicemail message stating that Pazin hoped Morse would apologize to the MCSD in his first public comments following the arrest of his son. (Doc. No. 86-15 at 22.)

911 call. (Doc. No. 67-14; Doc. No. 86-11 at 12.)[5] Tellez was arrested and interviewed again, this time by defendant Detective Sanchez—also a defendant here—on July 17, 2014. Tellez recited a largely similar story to Detective Sanchez as he had earlier related to Detective Pavelski: he had a loaded .22-caliber revolver with him the night of the party; the group had climbed into the vehicle to leave when they heard gunshots; he attempted to draw the revolver only to have it get stuck on the seatbelt; Masengale then prevented him from drawing the gun.

The next day, July 18, 2014, MCSD officials held a press conference to announce Tellez's arrest. Immediately after the press conference, District Attorney Larry Morse contacted defendant Sergeant Hale and advised that his son, plaintiff Ethan Morse, had information about Tellez's involvement in the Hernandez murder. Two days later, on July 20, 2014, Detective Macias and Sergeant Hale interviewed plaintiff. Plaintiff told the detectives essentially the same version of the events that Tellez had told: the group of teenagers had gone to the party together; Tellez had a gun; the group did not stay very long at the party; after they returned to their car, gunfire erupted at the party; plaintiff drove away, at one point slamming on his brakes to avoid hitting someone fleeing the party; and then they got on Route 99 and drove back to Merced. Plaintiff recalled Masengale telling Tellez to chill. Most importantly, plaintiff stated he was 100 percent sure Tellez did not shoot anyone from the car—all of the car windows were rolled up and he would have heard the shot because Tellez was seated immediately behind him. Plaintiff offered to try to persuade the other individuals in the group to contact the detectives to verify his

/////

---

[5] It is unclear whether Detective Macias himself independently listened to the recording of Tellez's accidental 911 call and attempted to discern what was said, or simply copied Detective Orozco's original account of that call. Detective Macias testified at his deposition that he listened to the 911 call several times before transcribing what he thought he heard. (Doc. No. 65-9 at 39–40.) However, Macias was unable to articulate at that deposition why he believed Tellez could be heard admitting to shooting Hernandez on the tape, rather than simply describing a shooting he had witnessed. (Doc. No. 86-11 at 13–21.) Further, the transcription of the call presented in the affidavit in support of the second arrest warrant for Tellez is exactly the same as that presented in the first affidavit in support of the arrest warrant for Tellez, including punctuation, capitalization, and misspellings. (*Compare* Doc. No. 67-14 at 3–4 (Macias affidavit) *with* Doc. No. 68-18 at 20 (Orozco affidavit) ("I cocked that shit back and so it was ready..Im gonna [sic] shoot that nigga in the dirt.").) This creates a reasonable inference that the transcription was merely copied from the first affidavit into the second.

version of the events.  Plaintiff also offered to take a polygraph test, though the detectives neither

took him up on this offer nor documented that it had been made.  (Doc. No. 86-7 at 36.)

At plaintiff's urging, most of the other individuals who had been in the car that night

spoke with police in the coming days.  Only Masengale was not interviewed, after his parents

refused to allow him to speak to the MCSD detectives without a lawyer present.  Each of these

witnesses corroborated the account of the events that evening given by plaintiff and Tellez.

However, after significant police persuasion, two witnesses—Robert Tern and Jacob

Delgadillo—made statements inculpating plaintiff and Tellez.  One other witness, Sabrina

Ceccoli, made statements that were presented as inculpatory by the detectives in the affidavit,

though a review of her interview by police does not support the account presented in the affidavit.

Robert Tern was interviewed by Detectives Macias and Sanchez on July 22, 2014 around

8:15 a.m.  (Doc. No. 65-10 at 8.)  Tern told the detectives that he was "hammered" before the

group arrived at the party.  Throughout the interview, despite his corroboration of the other

accounts, the detectives pressured Tern to tell a different story, employing what they describe as

"ruses."[6]  Eventually, the detectives succeeded in getting Tern to say that Tellez had

---

[6]  During their interview of Tern, the detectives exaggerated the extent of their knowledge of the case (*see* Doc. No. 68-26 at 108–09 ("[Y]ou guys stopped somewhere before you got dropped off. . . . I know where you stopped at."); *id.* at 117 ("Who else got out?  There was one person that I know for a fact got out."); *id.* at 154–55 ("Robert, listen, he tells everything.  We have a lot of evidence, dude.  He tells it all to us.")), were untruthful about who had already been interviewed (*see* Doc. No. 68-26 at 75 ("We've talked to [Ceccoli] too.")), threatened Tern with arrest (Doc. No. 68-26 at 76 ("I don't want to have to put cuffs on anybody."); *id.* at 77–78 ("I don't want to get you into problems that you don't need to be"); *id.* at 78 ("[A]t this point, you need to decide what's more important; right? . . . Your freedom . . . or these people that you thought were probably your friends that are getting you in this situation.")), repeatedly accused Tern of lying to them (*see* Doc. No. 68-26 at 101 ("Your memory's not actually that bad, dude."); *id.* at 123 ("[D]on't lie to me."); *id.* at 125 ("Listen here, dude, and this is the last time I'm probably going to tell you this before -- before I say fuck it and be done with; right?"); *id.* ("I'm not a dumbass. Don't sit here and try to lie to me.")), suggested plausible ways Tern might make incriminating statements about others while diminishing his own culpability (*see* Doc. No. 68-26 at 76 ("[I]f this was something stupid . . . I need to know that it was something stupid."); *id.* at 94 ("And I'm not saying you shot anybody. . . . Otherwise you'd be in handcuffs and you'd be in jail right now; right?"); *id.* at 103 ("But you just said that you were so drunk . . . that you don't remember . . . a lot of this.  So is it possible that he did and you just don't remember?")), implored Tern to be "honest" (Doc. No. 68-26 at 81–82 ("I need you to be 100 percent honest with me and tell me when you saw that gun.")), and suggested to Tern that only the officers could help him (*see* Doc.

6

fired the gun twice out of the window of the vehicle. (Doc. No. 68-26 at 152.) They also got

Tern to say that Tellez had fired the gun at somebody running out of the party. (Doc. No. 68-26

at 158.)

Beyond the detectives' employment of "ruses," the evidence suggests that the

detectives—intentionally or unwittingly—provided details about their theory of the shooting to

Tern through the use of leading questions and affirmative statements throughout the interview.

For example, Tern only began to acknowledge the possibility that Tellez might have fired a gun

from the car after the detectives told him they already had evidence Tellez had done so. (*See*

Doc. No. 68-26 at 100.) Additionally, Tern acknowledged that another individual in the car—

which the detectives would later allege was plaintiff—verbally encouraged Tellez, after the

detectives offered the encouragement as fact. (*See id.* at 170.)

Tern testified later at his deposition in this civil action that when he had tried to leave

during the police interrogation, one of the detectives grabbed him by his neck and "put me back

in the room." (Doc. No. 86-25 at 8.) Tern also testified that he had attempted to leave the police

station because he felt uncomfortable with the interview, and was chased down in the parking lot

by the officers and handcuffed.[7] (*Id.* at 11.) In his deposition testimony, Tern reiterated his

original statement that Tellez never fired a gun from the car. (*Id.* at 9.) He said he was "scared

for [his] life" during the police interview, because the detectives told him they were "going to put

[him] for attempted murder." (*Id.*) He told the detectives Tellez had fired a gun because they

No. 68-26 at 116 ("[I]f I can clear your name, you need to help me do that."); *id.* at 120 ("[T]his
is Robert's opportunity . . . and I really don't want you to piss it away, because after today, there
isn't going to be any more opportunities."); *id.* at 153 ("This is saving your ass from going to jail
right now."); *id.* at 158 ("[I]f you don't use this time to clear your name, we're -- our hands are
tied.")). These are all tactics employed pursuant to the Reid Technique, a method of interrogating
individuals for the purpose of eliciting specific information—typically confessions—which has
been linked to a high number of false confessions. *See, e.g.*, Laurel LaMontagne, *Children Under
Pressure*, 41 W. St. U. L. Rev. 29, 43–45 (2013); Melissa B. Russano, *et al.*, *Investigating True
and False Confessions Within a Novel Experimental Paradigm*, 16 Psych. Science 481, 484
(2005) (concluding that, based on a controlled experiment, when both minimization tactics and
the suggestion of leniency were used by interrogators, 87 percent of test subjects truthfully
confessed to wrongdoing while 43 percent of test subjects falsely confessed to wrongdoing).

[7] It is unclear whether these refer to separate attempts to leave or the same attempt.

said "they were going to lock [him] up." (*Id.* at 13.) According to Tern, he felt as though the detective made him say that Tellez had fired the gun. (*Id.*)

Detective Macias and Sergeant Ruiz interviewed Jacob Delgadillo on July 24, 2014. The detectives employed similar "ruses" on Delgadillo as the ones they had used on Tern, including accusing him of lying, misleading him regarding what they had evidence of, and minimizing any culpability he may have had. (*See* Doc. No. 68-24.) Delgadillo largely persisted throughout his interrogation in maintaining that there were no shots fired from plaintiff's car that night. (Doc. No. 68-24 at 80–81, 86, 92, 95–97, 114, 128, 133–34, 140.) However, after the interrogating officers led him to believe that other witnesses were implicating him and Tellez had already confessed to the shooting (*id.* at 78), Delgadillo told the detectives he saw Tellez with his hand out the window holding a gun (*id.* at 136). Eventually, Delgadillo agreed with the detectives' statement that "there's a possibility that maybe [a bullet] might've come from Jacob's gun and you just didn't hear the -- the bang?" (Doc. No. 68-24 at 141.) Delgadillo told detectives he "guess[ed]" he "did hear a pop," "maybe one or two." (Doc. No. 68-24 at 173–74.) Delgadillo then related to the officers he saw a flash come from Tellez's gun. (*Id.* at 174, 179–80.) He also told the officers, after further repeated questioning by detectives, that the group had made up their story together to try to protect Tellez. (Doc. No. 68-24 at 201.)[8]

Detective Macias and Sergeant Ruiz interviewed Sabrina Ceccoli on July 23, 2014. Despite her general corroboration of the events of that evening given by Tellez and plaintiff, Ceccoli did tell detectives that as the vehicle was driving past the house, it slowed down, Tellez rolled down his window, and plaintiff asked Tellez, "[A]re you going to do it? Are you going to do it?" (Doc. No. 68-23 at 54–57.) Ceccoli's statement in this regard was not prompted by the detectives. Nevertheless, Ceccoli maintained that no shots were fired from the car. (Doc. No. 68-23 at 55, 64, 76.) According to Ceccoli, there was an initial burst of gunfire and then, as the group was driving past the house and had slowed down, two additional, louder shots. (Doc. No. 68-23 at 47–50, 81–83.) Ultimately, the officers convinced Ceccoli to acknowledge that

---

[8] The court notes that no party has offered deposition testimony from Delgadillo in connection with the pending summary judgment motions.

"probably" the two later shots "could" have been fired from the car, and that she was only "95 percent sure" no gunshots were fired from the car. (Doc. No. 68-23 at 76, 92.) However, Ceccoli testified at her deposition in this action that no gun was fired from plaintiff's vehicle. (Doc. No. 86-3 at 7 ("I've been around guns all my life. I would know if a gun was shot inside of a vehicle. . . . I'm not an idiot.").)

In addition to the law enforcement interviews described above, the detectives also interviewed Cameron Johnson and Tony Gomes, the remaining two passengers in the vehicle driven by plaintiff that night, on July 22 and July 24, 2014, respectively. Both corroborated plaintiff's account of the events in question and denied that Tellez had fired a gun from the vehicle, despite pressure from the detectives to say otherwise. (*See, e.g.*, Doc. No. 65-4 at 109–19; Doc. No. 68-25 at 129, 133–34, 158, 164–65, 178, 191–93.) Gomes testified at his deposition in this action that he felt uncomfortable during the police interview. (Doc. No. 86-6 at 7–9 ("The more I leaned one way, the more they tried to push me the other way.").)

Plaintiff was arrested on July 25, 2014 for the murder of Hernandez. Detective Macias authored the affidavit in support of the arrest warrant for plaintiff under Sergeant Hale's supervision. (*See* Doc. No. 86-7 at 21–22.) Plaintiff was charged by complaint with the two felony offenses of murder in violation of Penal Code § 187 and knowingly permitting the use or discharge of a firearm from his vehicle in violation of Penal Code § 26100(b), arraigned on July 29, 2014, and denied bail. (Doc. No. 65-11 at 162–63.) Each charge was accompanied by various gang and firearm enhancement allegations. (*Id.*) On September 11, 2014, plaintiff entered pleas of not guilty to all charges. (*Id.* at 65-11 at 166–67.) The case was prosecuted by the California Deputy Attorney General Barton Bowers, in light of the conflict of interest posed by the fact that plaintiff's father was the Merced County District Attorney.

Plaintiff's preliminary hearing was held from November 10, 2014 to November 14, 2014. At the close of the evidence, the Merced County Superior Court Judge presiding over the preliminary hearing concluded, largely on the basis of the in-court testimony of Masengale and the judge's own review of the tape recording of the accidental 911 call, "[t]hat Mr. Logan [Tellez] did not fire a gun from the Morse vehicle while on Westside Boulevard the evening of March 30,

9

1    2013.  Therefore, Mr. Morse [plaintiff] is not held to answer."  (Doc. No. 86-18 at 25–31.)

2         Plaintiff filed suit in Merced County Superior Court on November 19, 2015, and the

3    action was removed by defendants to this federal court on January 28, 2016.  (Doc. No. 1.)  As

4    noted above, motions for summary judgment were filed by the various defendants on May 9,

5    2017.  (Doc. Nos. 61, 65, 66.)  Plaintiff filed one consolidated opposition[9] to these various

6    motions on May 23, 2017.  Defendants replied on May 30, 2017.  (Doc. Nos. 91, 94.)

7                              **LEGAL STANDARD**

8         Summary judgment is appropriate when the moving party "shows that there is no genuine

9    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

10   Civ. P. 56(a).

11        In summary judgment practice, the moving party "initially bears the burden of proving the

12   absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

13   (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party

14   may accomplish this by "citing to particular parts of materials in the record, including

15   depositions, documents, electronically stored information, affidavits or declarations, stipulations

16   (including those made for purposes of the motion only), admissions, interrogatory answers, or

17   other materials" or by showing that such materials "do not establish the absence or presence of a

18   genuine dispute, or that the adverse party cannot produce admissible evidence to support the

19   fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at

20   trial, "the moving party need only prove that there is an absence of evidence to support the

21   nonmoving party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325.).  *See*

22   *also* Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate

23   time for discovery and upon motion, against a party who fails to make a showing sufficient to

24   establish the existence of an element essential to that party's case, and on which that party will

25   bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof

26   _____

27   [9]  This consolidated opposition to the three motions exceeded the page limitation set by the court
     in a prior order.  Defendants moved to strike the excess pages of plaintiff's opposition.  (Doc. No.
28   87.)  Under these circumstances, that motion to strike was denied by the court from the bench at
     the hearing on the pending motions for summary judgment.

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Wool v. Tandem Computs., Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." *Walls v. Central Costa County Transit Authority*, 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be

11

drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). Finally, the granting of summary judgment may still be inappropriate even where the material facts are largely undisputed, if "the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## ANALYSIS

Plaintiff here alleges that: (1) the detective defendants—Sergeant Hale, Detective Macias, and Detective Sanchez—violated his Fourth Amendment right to be free from unreasonable seizures by arresting him without probable cause; (2) the detective defendants violated his Fourteenth Amendment due process rights by detaining him following his arrest until his preliminary hearing despite being aware of exculpatory evidence; (3) the detective defendants maliciously prosecuted plaintiff under 42 U.S.C. § 1983; and (4) all defendants violated the Bane Act, California Civil Code § 52.1, by making material misstatements to the court in seeking the issuance of the warrant for his arrest and in using intimidating and coercive interrogation tactics.[10] Plaintiff also alleges a state law claim of false arrest against all defendants and intentional infliction of emotional distress against the detective defendants. (*See* Doc. No. 37 at 13–17 (Second Amended Complaint).)[11] Defendants seek summary judgment in their favor with respect to each of plaintiff's claims. The arguments of the parties are addressed in turn below.

### A. Fourth Amendment Claims Against Detective Defendants

"A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Dubner v.*

---

[10] Plaintiff has not alleged a claim of municipal liability for any constitutional violations against the County of Merced under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

[11] Plaintiff initially stated a defamation claim as well, but this claim was previously dismissed by stipulation of the parties. (*See* Doc. No. 84.)

*City & Cty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001); *see also Velazquez v. Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015). "Probable cause exists when there is a fair probability or substantial chance of criminal activity." *Velazquez*, 793 F.3d at 1018 (quoting *United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir.2004)). In order to prevail on such a claim, the plaintiff must "demonstrate that there was no probable cause to arrest him." *Norse v. City of Santa Cruz*, 629 F.3d 966, 978 (9th Cir. 2010) (quoting *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998)); *see also Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008) ("An arrest without probable cause violates the Fourth Amendment and gives rise to a claim for damages under § 1983."). Generally, "[w]here the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury." *Harper*, 533 F.3d at 1022.

Plaintiff's theory of liability with respect to Detective Macias, who signed the affidavit in support of the warrant for plaintiff's arrest, is a "judicial deception" claim that while the affidavit might support a finding of probable cause within its four corners, important information was deliberately omitted or misrepresented so as to mislead the approving magistrate. *See KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004); *see also Smith v. Almada*, 640 F.3d 931, 937 (9th Cir. 2011); *Ewing v. City of Stockton*, 588 F.3d 1218, 1223-24 (9th Cir. 2009). Plaintiff's theories of Fourth Amendment liability as to Sergeant Hale and Detective Sanchez are, however, less clear.[12] The court understands plaintiff to be alleging that Sergeant Hale is subject to Fourth Amendment liability in his role as the supervisor who signed off on Detective Macias's arrest warrant affidavit, and Detective Sanchez is subject to liability for threatening Tern and leading him to make statements inculpating plaintiff. Finally, plaintiff alleges that the state court findings at his preliminary hearing have preclusive effect in this litigation. The court will address plaintiff's issue preclusion argument before turning to whether summary judgment is appropriate

/////

---

[12] At oral argument, plaintiff's counsel described the claim with respect to defendants Hale and Sanchez largely in general terms, asserting they were a party to plaintiff's arrest which was unsupported by probable cause.

with respect to plaintiff's claims against defendants Detective Macias, Sergeant Hale, and Detective Sanchez, respectively.

      1.    <u>Issue Preclusion</u>

      Plaintiff claims defendants are collaterally estopped from asserting that probable cause existed in support of the arrest warrant for plaintiff on the charge of murder, given that the Merced County Superior Court's ultimate decision not to hold him to answer on any charges. (Doc. No. 85 at 32.) "The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute." *Marrese v. American Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985). By statute, a state's judicial proceedings "shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. § 1738. This court must look to the preclusion law of California in order to decide whether preclusion applies in this case. *Marrese*, 470 U.S. at 380. Therefore, the court looks to California law concerning whether issue preclusion applies in this case.

      Issue preclusion prevents the relitigation of certain issues argued and decided in a previous case. *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 824 (2015). To establish issue preclusion, a party must show there was (1) a final adjudication (2) of an identical issue (3) that was actually litigated and necessarily decided in the first suit and (4) that issue preclusion is being asserted against "one who was a party in the first suit or one in privity with that party." *Id.* at 825; *see also Lucido v. Superior Court of Mendocino Cty.*, 51 Cal. 3d 335, 341 (1990). Generally, a prior judicial determination at a preliminary hearing to hold a criminal defendant over for trial has preclusive effect as to whether probable cause existed for the arrest. *McCutchen v. City of Montclair*, 73 Cal. App. 4th 1138, 1144–47 (1999); *see also Wige v. City of Los Angeles*, 713 F.3d 1183, 1185 (9th Cir. 2013) (adopting *McCutchen*).[13]

---

[13] Contrary to defendants' contention, there "is no intrinsic difference between 'offensive' as distinct from 'defensive' issue preclusion, although a stronger showing that the prior opportunity to litigate was adequate may be required in the former situation than the latter." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 n.16 (1979) (quoting Restatement (Second) of Judgments § 88, Reporter's Note, at 99).

Nonetheless, this court finds that the superior court's decision not to hold plaintiff to answer at the conclusion of his preliminary hearing has no preclusive effect on the claims he has presented in this civil action. The core of each of plaintiff's Fourth Amendment claims is that the affidavit supporting the warrant for his arrest omitted material information and that Detective Macias omitted that information from his affidavit with deliberate or reckless disregard for the truth. *See Chism v. Washington State*, 661 F.3d 380, 386 (9th Cir. 2011) ("For the Chisms' judicial deception claim to survive summary judgment, the Chisms 'must 1) make a substantial showing of [the officers'] deliberate falsehood or reckless disregard for the truth and 2) establish that, but for the dishonesty, the [searches and arrest] would not have occurred.'"); *see also Smith*, 640 F.3d at 937; *Ewing*, 588 F.3d at 1223-24; *KRL*, 384 F.3d at 1117. In plaintiff's preliminary hearing in state court, however, the court decided based upon the evidence presented that as a factual matter Tellez did not fire a gun from the vehicle on the evening in question, and therefore there was no probable cause to hold Morse over for trial. (*See* Doc. No. 86-18 at 31.) The issues in dispute in this civil action—whether Detective Macias included material misstatements in or omitted material facts from his affidavit in support of the arrest warrant for plaintiff, and whether Sergeant Hale and Detective Sanchez are liable for supervising or assisting him while doing it— were simply never addressed by the state court and were not necessary to that court's decision not to enter a holding order. Therefore, issue preclusion is inapplicable here.[14]

### 2. Summary Judgment as to Defendant Detective Macias

Detective Macias maintains that the undisputed evidence on summary judgment establishes that he had probable cause to arrest plaintiff. (Doc. No. 65 at 14–19.)[15] Plaintiff

---

[14] Because the court concludes that issue preclusion is inapplicable, the court need not address defendant Macias's argument that California law bars this court's consideration of the state court's finding of factual innocence in order to decide that particular issue. (Doc. No. 92 at 5) (contending that California Penal Code § 851.8(i) bars consideration of the state court finding).

[15] Detective Macias maintains that plaintiff's Fourth Amendment claims under § 1983 and false arrest claims under state law stand or fall together. (*See* Doc. No. 65 at 14, n.2.) California courts appear to generally recognize that view. *See Wood v. Emmerson*, 155 Cal. App. 4th 1506, 1519–23 (2007). Therefore, the court will not separately analyze plaintiff's false arrest claim under state law. Defendants Hale and Sanchez make a separate argument that they are immune from liability under California Government Code §§ 821.6 and 820.2. (Doc. No. 66 at 45–46;

15

alleges Detective Macias violated his Fourth Amendment rights when he deliberately or recklessly omitted material information probative to a determination of probable cause from the affidavit supporting the arrest warrant.

To be valid, a warrant for either search or arrest "must be supported by an affidavit establishing probable cause." *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir. 1985). It is well-established that "a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165 (1978). Because of the need for judicial independence in the determination of probable cause, a warrant may be invalid where an affiant deliberately or recklessly includes statements or omits information that are material to the probable cause determination. *See Franks*, 438 U.S. at 155–56 (requiring an evidentiary hearing where there is a substantial showing that a false statement "was included by the affiant in the warrant affidavit"); *United States v. Perkins*, 850 F.3d 1109, 1116 (9th Cir. 2017) ("An officer presenting a search warrant application has a duty to provide, in good faith, all relevant information to the magistrate."); *United States v. Flores*, 679 F.2d 173, 177 n.1 (9th Cir. 1982) ("A magistrate cannot adequately determine the existence of probable cause with the requisite judicial neutrality and independence if the police provide him or her with a false, misleading, or partial statement of the relevant facts."); *United States v. Craighead*, 539 F.3d 1073, 1080–81 (9th Cir. 2008). "It is clearly established that judicial deception may not be employed to obtain a search warrant." *KRL*, 384 F.3d at 1117. "To support a § 1983 claim of judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause." *Id.* While an affiant officer need not include all of the information known in the supporting affidavit, omitting facts that "cast doubt on the existence of probable cause" makes such omissions material. *See United States v. Johns*, 948 F.2d 599, 606–07 (9th Cir. 1991); *see also Perkins*, 850 F.3d at 1117–18 (noting

---

Doc. No. 85 at 41.) The court already addressed immunity under § 821.6 in denying defendants' motion to dismiss. (*See* Doc. No. 31 at 24–26.) In short, § 820.2 does not bar liability for false arrest under California law. *Gillan v. City of San Marino*, 147 Cal. App. 4th 1033, 1051 (2007).

16

affiant "selectively included information bolstering probable cause, while omitting information that did not" and concluding this "usurped the magistrate's duty to conduct an independent evaluation of probable cause").

Where the plaintiff bringing such a claim can make a "substantial showing" of "deliberate falsehood or reckless disregard for the truth," and but for the misstatement or omission, probable cause would have been lacking, "the matter should go to trial." *Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (quoting *Hervey v. Estes*, 65 F.3d 784, 788-89 (9th Cir. 1995)); *see also Bravo v. Santa Maria*, 665 F.3d 1076, 1083 (9th Cir. 2011). "Put another way, the showing necessary to get to a jury in a 1983 action is the same as the showing necessary to get an evidentiary hearing under *Franks*." *Liston*, 120 F.3d at 973. (internal quotations omitted). "Materiality is for the court, state of mind is for the jury." *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002). Thus, a plaintiff need not establish that the defendant officers had the intent to mislead the court issuing the warrant, but rather must only show the officers "intentionally or recklessly made false statements or material omissions" to the authorizing magistrate. *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1124 (9th Cir. 1997); *see also Bravo*, 665 F.3d at 1083 ("To survive summary judgment, the Bravos need only make a substantial showing of a deliberate or reckless omission, not provide 'clear proof.'").

False statements and omissions contained in an affidavit are material if "'the affidavit, once corrected and supplemented,' would not have provided a magistrate judge with a substantial basis for finding probable cause." *Chism*, 661 F.3d at 389 (quoting *Stanert*, 762 F.2d at 782); *see also Bravo*, 665 F.3d at 1084. Probable cause is determined by a "totality-of-the-circumstances analysis," and requires "only the probability, and not a prima facie showing, of criminal activity." *Illinois v. Gates*, 462 U.S. 213, 233–35 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)); *Velazquez*, 793 F.3d at 1018. The standard is inherently "incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Nevertheless, "the substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or

seized." *Id.* (citations and quotations omitted).[16] In light of the totality-of-the-circumstances standard for determining probable cause, reckless omissions or misleading statements can be "considered material and misleading to a magistrate judge under circumstances where the omitted information bears strongly on the credibility of that witness and there is inadequate independent corroborating evidence." *United States v. Ruiz*, 758 F.3d 1144, 1153–54 (9th Cir. 2014).

Here, construing the evidence before the court on summary judgment in favor of plaintiff, as the court must, the undersigned finds that a reasonable jury could conclude that defendant Detective Macias acted deliberately or with reckless disregard for the truth in connection with the misstatements included in, or material omissions from, his affidavit in support of this arrest warrant. In order to establish probable cause to arrest plaintiff for murder, it was necessary to establish at a minimum that there was reasonable cause to believe Tellez shot someone from plaintiff's vehicle and that plaintiff had done something—slowing down and providing verbal encouragement—to support or aid Tellez in doing so. *See* Cal. Penal Code § 31 (defining principal of a crime as any person who "aid[s] and abet[s] in its commission"); Cal. Penal Code § 187 (defining murder as "the unlawful killing of a human being, or a fetus, with malice aforethought").[17]

The evidence before the court on summary judgment establishes that Detective Macias authored the affidavit in support of the arrest warrant for plaintiff, and was supervised by Sergeant Hale in doing so. (*See* Doc. No. 86-7 at 21–22.) The affidavit's probable cause

---

[16] It has been said that the probable cause determination requires looking to "the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." Ornelas v. United States, 517 U.S. 690, 696 (1996).

[17] Counsel for defendant Detective Macias argues briefly, "at a minimum, there was probable cause to arrest plaintiff for violation of Penal Code § 21600(b), which provides that '[a]ny driver . . . who knowingly permits any other person to discharge any firearm from the vehicle,' is guilty of a felony." (Doc. No. 65 at 18.) While plaintiff was ultimately charged with violating this code section as well, the arrest warrant was specifically issued for murder. (*Compare* Doc. No. 65-11 at 162 *with* Doc. No. 67-15 at 2.) Since plaintiff's theory of liability as to Detective Macias is predicated on the affidavit supporting the arrest warrant, the ultimate charges brought against plaintiff are immaterial. Nevertheless, the court notes that, with a full and fair accounting of the information in the affiant officers' possession, there would not appear to have been probable cause supporting his arrest for violating § 21600(b).

showing was based on the accidental 911 call—the text of which was repeated in this affidavit verbatim from the earlier affidavits in support of the arrest warrants for Tellez—as well as statements made by Ceccoli, Tern, and Delgadillo in their interviews with the detectives. (Doc. No. 67-15 at 3–4 (Arrest Warrant).) However, the affidavit did not reveal that the recording of the 911 call is garbled or that what Tellez said in that call is not clear; rather, the affidavit simply describes Tellez as confessing to the shooting. (Doc. No. 67-15 at 3.)[18] The reviewing magistrate issued the arrest warrant for plaintiff based solely upon the contents of Detective Macias's affidavit. (Doc. No. 86-11 at 43.)

Detective Macias did not acknowledge in his affidavit that Tellez denied shooting the gun he possessed that evening. Nor did Detective Macias include reference to the statements of several occupants of the car—plaintiff, Johnson, and Gomes—who repeatedly affirmed, despite pressure from the officers to say otherwise, that no shots were fired from the vehicle. Furthermore, the affidavit omitted the fact that Masengale—the witness with the best view of Tellez's actions—declined to speak to the officers without a lawyer present, and the officers thereafter made no attempt to determine whether he had secured counsel. Finally, the affidavit did not address the fact that plaintiff came forward voluntarily, despite a lack of any information linking him to Tellez, the party, or the homicides.[19] This failure to include exculpatory evidence in the arrest warrant affidavit is consistent with defendant Macias's deposition testimony that his practice was to only include information supporting probable cause in affidavits he drafted in support of the issuance of arrest warrants. (Doc. No. 86-11 at 36–37.)

By contrast, defendant Detective Macias's affidavit only included witness statements by Ceccoli,

---

[18]  The court has listened to both the unenhanced and enhanced versions of the accidental 911 call, and it is clear that many of the statements attributed to Tellez in the affidavit in support of plaintiff's arrest warrant cannot be heard on the tape. It does not appear to the undersigned that there was any basis upon which to claim that Tellez can be heard confessing his involvement in the shooting on the tape.

[19]  The undersigned does view plaintiff's offer to voluntarily submit to a polygraph examination as irrelevant here. Any references to offers or refusals to take such tests are barred from admission into evidence by statute in California. Cal. Evid. Code § 351.1; *see People v. Wilkinson*, 33 Cal. 4th 821, 927 (2004). This specifically includes "pretrial and post conviction motions and hearings." Cal. Evid. Code § 351.1(a).

Tern, and Delgadillo inculpating plaintiff. While Tern and Delgadillo made some statements in their interviews inculpating Tellez and plaintiff, they both did so only after repeated denials to detectives that any shots were fired from the car, and only after the detectives misleadingly told them Tellez had already confessed. There is also no reference in the affidavit to the "ruses" employed by the officers or to the fact that these witnesses were teenagers. Indeed, the affidavit does not suggest that these witnesses initially told any story but the one defendant Detective Macias described to the judge considering the affidavit. Further, only one witness—Ceccoli—made an inculpatory statements about plaintiff giving Tellez verbal encouragement to shoot without it first being suggested by the detectives. Nevertheless, even Ceccoli maintained that no gunshots were fired from the car. Only by cherry-picking from her interview could her statements be fairly presented as supporting a finding of probable cause supporting plaintiff's arrest for murder. Of critical importance, the affidavit did not inform the reviewing magistrate that the calibers of the bullets found in the victim did not match the caliber of the gun Tellez possessed that night, as confirmed by every witness interviewed. There is also no mention that the victim's body was found lying to the west of the house across from where plaintiff's vehicle was parked, despite the fact that even the inculpatory statements obtained by detectives indicated Tellez fired after the vehicle had already passed the house driving east.[20]

This is not to suggest the officers were required to ensure that each and every one of these facts were set forth in Detective Macias's arrest warrant affidavit in the same painstaking detail that they have been presented in the pending motions for summary judgment. However, because defendant Detective Macias's affidavit omitted *all* such facts and arguably included separate misstatements, plaintiff has made a substantial showing that Detective Macias presented the reviewing magistrate with a one-sided account that failed to disclose significant evidence known to the affiant undercutting probable cause. *See Perkins*, 850 F.3d at 1116–18; *Stanert*, 762 F.2d at 781 ("By reporting less than the total story, an affiant can manipulate the inferences a magistrate

---

[20] Indeed, even the statements the detectives pressed Tern and Delgadillo to make did not fit their theory of the crime—i.e., that Tellez confessed on the accidental 911 call to shooting Hernandez in the dirt across the street from where the car was parked.

will draw.").[21]  Such misstatements in and omissions from the affidavit were material to the probable cause determination.  At a minimum, the reviewing magistrate should have been informed: (1) of the garbled nature of the accidental 911 call and its content; (2) that the bullets Hernandez was shot with did not match the gun Tellez reportedly had that night; and (3) that police interviewed seven of the eight teenage occupants of the car, with only two making any statements inculpating plaintiff and those being made only after they were subjected to a number of ruses including being threatened with jail.  Simply put, the probable cause showing was nowhere near as strong as the affiant led the reviewing magistrate to believe.  Had even a generic summary of the evidence been provided, a reasonable jury could conclude that the warrant authorizing plaintiff's arrest for murder would not have issued.

As noted above, where a "substantial showing" of "deliberate falsehood or reckless disregard for the truth," is made and but for the misstatement or omission, probable cause would have been lacking, "the matter should go to trial."  *Liston*, 120 F.3d at 973 (quoting *Hervey*, 65 F.3d at 788-89); see also Bravo, 665 F.3d at 1083; Butler, 281 F.3d at 1024 (9th Cir. 2002).  Defendants' motion for summary judgment will therefore be denied as to plaintiff's Fourth Amendment claim against Detective Macias.[22]

/////

/////

---

[21]  Again, this is unsurprising given that both the affiant, Detective Macias, and Deputy Attorney General Bowers have now testified they would not have included anything that did not support probable cause in an affidavit for an arrest warrant.

[22]  Each defendant raises qualified immunity as a defense to plaintiff's Fourth Amendment claims.  (Doc. No. 61 at 43–44; Doc. No. 65 at 41.)  Qualified immunity is, practically speaking, virtually unavailable with respect to a judicial deception claim.  Because "no reasonable officer could believe that it is constitutional to act dishonestly or recklessly with regard to the basis for probable cause in seeking a warrant," the claim either stands or falls on whether there is sufficient evidence to raise a jury question with respect to the officer's state of mind.  *Butler*, 281 F.3d at 1024; *see also Chism*, 661 F.3d at 393 ("We have consistently applied the rule that summary judgment on the ground of qualified immunity is not appropriate once a plaintiff has made out a judicial deception claim.").  Therefore the court finds qualified immunity inapplicable to plaintiff's Fourth Amendment claims here and will deny defendants' motions for summary judgment in their favor on qualified immunity grounds.

3.     Summary Judgment as to Defendant Sergeant Hale

There is no real dispute on summary judgment that defendant Sergeant Hale supervised and signed off on Detective Macias's seeking of the arrest warrant for plaintiff.  (*See* Doc. No. 86-7 at 21–22.)  At oral argument on the pending motions, plaintiff's counsel took the position that the Fourth Amendment claim against Sergeant Hale is predicated on his supervisory role in the submission of Detective Macias's affidavit.

As a general matter, "[u]nder Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability." *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (quoting *Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012) *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (2014)).  However, "a supervisor is liable for the acts of his subordinates 'if the supervisor participated in or directed the violations, or knew of the violations [of subordinates] and failed to act to prevent them.'" *Preschooler II v. Clark Cty. Sch. Bd. of Tr.*, 479 F.3d 1175 (9th Cir. 2007) (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)).

Here, while defendant Sergeant Hale only personally participated in plaintiff's interview, he was familiar with the evidence on which Macias's affidavit was based, and he nonetheless both signed off on that affidavit and supervised plaintiff's arrest pursuant to the warrant that issued based upon it.  (Doc. Nos. 67-16–20 (e-mails between Deputy Attorney General Bowers and Sergeant Hale); Doc. No. 86-7 at 22 ("I made a decision to allow him to be arrested."); *id.* at 28; *id.* at 42 (testifying regarding sending e-mails to Deputy Attorney General Bowers about the Delgadillo interview while it was ongoing); *id.* at 43–48 (recalling directing Detective Macias to begin drafting a warrant).)  Under similar circumstances, the Ninth Circuit has found that such evidence of supervisory involvement precludes the granting of summary judgment in favor of the supervising officers on a judicial deception claim.  *See, e.g.*, *Chism*, 661 F.3d at 383–85 (reversing the grant of summary judgment in favor of both officers on such a claim, even though one merely reviewed the supporting affidavit prepared by the other); *see also Whitaker v. Garcetti*, 486 F.3d 572, 582 (9th Cir. 2007) (holding that plaintiff had sufficiently pled a judicial

/////

deception claim against defendants who allegedly authorized and approved a falsified wiretap affidavit).

Accordingly, based upon the evidence presented on summary judgment, the court concludes that a reasonable jury could find that Sergeant Hale knew that the affidavit submitted by Detective Macias contained misleading information and omitted material facts and, therefore, that he acted with reckless disregard in directing Macias to draft his affidavit and seek the warrant for plaintiff's arrest. Summary judgment must be denied as to plaintiff's Fourth Amendment claim against Sergeant Hale.

### 4. Summary Judgment as to Defendant Detective Sanchez

Plaintiff's Fourth Amendment claim against defendant Detective Sanchez presents a somewhat different legal issue. Detective Sanchez is not alleged to have supervised or assisted Detective Macias in preparing his affidavit or in seeking or the arrest warrant for plaintiff. Rather, at oral argument on the pending motions, plaintiff's counsel represented that plaintiff's theory of liability against Detective Sanchez is premised on his participation in the interview of Robert Tern, who made some statements to detectives inculpating plaintiff and Tellez. In other words, defendant Detective Sanchez's use of various interrogation tactics, discussed in detail above, caused plaintiff to be arrested without probable cause.

"A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978); *see also Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007). The "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013) (quoting Johnson, 588 F.2d at 743–44); *Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012); *see also Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) ("Defendants are liable for the harm proximately caused by their conduct."); *Butler v. Dowd*, 979 F.2d 661, 669–70

(8th Cir. 1992) ("In order to establish a violation of constitutional rights under § 1983, the plaintiff must prove that the defendant's unconstitutional action was the "cause in fact" of the plaintiff's injury.").

Regardless of the efficacy of the techniques employed by Detective Sanchez in his interview of Tern, the evidence on summary judgment cannot establish that the chain of causation extends from that interview to the misrepresentations in or omissions from Detective Macias's arrest warrant affidavit. While a jury could reasonably infer that Detective Sanchez should have known his conduct was likely to result in statements being elicited from Tern that were of questionable reliability, plaintiff presents no evidence on summary judgment that when he interviewed Tern, Detective Sanchez knew or should have known that Macias would later misrepresent the strength of those statements in his affidavit to the reviewing magistrate. Similarly, there is no evidence before the court that Detective Sanchez played a role in drafting or approving the affidavit, or was even aware of its contents. Absent such evidence, plaintiff cannot establish a causal link between Detective Sanchez's alleged wrongdoing and the Fourth Amendment violations plaintiff claims he was subjected to. *See Lacey*, 693 F.3d at 915 (liability only extends to where actor sets in motion acts he "knows or reasonably should know would cause others to inflict the constitutional injury"); *Snow*, 681 F.3d at 989 (noting that absent personal participation, must be "sufficient causal connection" between defendant's acts and plaintiff's constitutional violation); *Hansen v. Black*, 885 at 645–46 (same). Accordingly, defendants' motion for summary judgment will be granted in favor of Detective Sanchez on plaintiff's Fourth Amendment claims.

**B.      Fourteenth Amendment Claims Against the Detective Defendants**

Plaintiff's Fourteenth Amendment claims against Sergeant Hale and Detectives Macias and Sanchez are predicated on the type of claim found to be cognizable in *Tatum v. Moody*, 768

/////

/////

/////

/////

F.3d 806 (9th Cir. 2014).[23]  (*See* Doc. No. 85 at 33.)  In *Tatum*, the Ninth Circuit held that a plaintiff could state a constitutional claim for a prolonged pre-trial detention "when the police, with deliberate indifference to, or in the face of a perceived risk that, their actions will violate the plaintiff's right to be free of unjustified pretrial detention, withhold from the prosecutors information strongly indicative of his innocence."  768 F.3d at 814–15; *see also Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014) ("[N]o one questions the existence of Article III injury when a civil rights plaintiff sues on the theory that the actions of the defendants (say, the police) resulted in wrongful confinement on criminal charges, whether before or after trial."). Such a claim will typically fall into one of two categories: "(1) the circumstances indicated to the defendants that further investigation was warranted, or (2) the defendants denied the plaintiff access to the courts for an extended period of time."  *Id.* at 816 (quoting *Rivera v. County of Los Angeles*, 745 F.3d 384, 390-91 (9th Cir. 2014)).[24]  However, the court in *Tatum* emphasized that this constitutional rule is a narrow one and that a cognizable claim requires detentions of "(1) unusual length, (2) caused by the investigating officers' failure to disclose highly significant exculpatory evidence to prosecutors, and (3) due to conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks."  *Id.* at 819–20.

Here, plaintiff contends that defendants Hale, Macias, and Sanchez withheld from Deputy Attorney General Bowers two interviews: one conducted by the MCSD in June 2014 with an individual by the name of Marcus Whittaker, and another conducted by the Merced Police Department in November 2014 of an individual named Emilio Manzo.   (Doc. No. 85 at 33–34.) Detective Macias interviewed Whittaker in June 2014, prior to the arrest of Tellez or plaintiff,

_____

[23]  To the extent defendants sought dismissal of this claim believing it was based on either *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (holding "there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government") or *Brady v. Maryland*, 373 U.S. 83 (1963) (Doc. No. 65 at 27–34), these arguments are rejected since plaintiff has disclaimed seeking relief under these legal theories.

[24]  Here, it appears plaintiff proceeds under the first of these theories.

about the Atwater shooting at the Merced Police Department.  (Doc. No. 65-8; Doc. No. 71-15.)

Most of that interview focused on a separate unrelated homicide, but during the final portion of

Whittaker's interview, the topic turned to the Atwater shooting.  Whittaker neither exculpated

Tellez or plaintiff nor inculpated himself or others in connection with the Atwater shooting;

indeed, he denied knowing Tellez or having seen Hernandez's body.  (Doc. No. 65-8 at 85, 102–

04.)  While Detective Johnson testified later at his deposition in this case that it was "obvious"

Whittaker was involved in the Atwater killings, it is not apparent that this was known to be the

case at the time of Macias's interview of Whittaker.  (*See* Doc. No. 86-10 at 8.)

Additionally, in November 2014, shortly prior to plaintiff's preliminary hearing, Detective

Johnson of the Merced Police Department met with Emilio Manzo.  (Doc. No. 86-10 at 10)

(Excerpts of Det. Johnson Depo.)  According to Manzo, who identified himself as Whittaker's

best friend, Whittaker was actually the person who shot Hernandez.  (*Id.*)  Detective Johnson told

Manzo the Atwater shooting was not his case, but he would relay the information to the MCSD,

who would be in contact with Manzo.  (*Id.*)  The very next day, Detective Johnson relayed to

Sergeant Hale his conversation with Manzo, in which Manzo told him Larry Morse's son did not

commit the homicide and that his friend Whittaker had committed the homicide.  (*Id.* at 11.)

According to Detective Johnson's deposition testimony, Sergeant Hale responded by saying, "Is

Larry [Morse] buying you fucking lunch?"  (*Id.*)

Neither of these interviews can form the basis for the type of due process claim

recognized by the Ninth Circuit in *Tatum*.  Nothing about the June 2014 interview with Whittaker

was exculpatory to plaintiff or Tellez nor tended to inculpate Whittaker as the actual killer.  While

Whittaker generally admitted to being at the party and seeing a shooting occur, this falls far short

of the type of "highly significant exculpatory evidence" that was present in *Tatum*.  *See* 768 F.3d

at 809 (noting that the detectives in that case failed to disclose that a distinctive robbery crime

spree continued after plaintiff had been arrested for the same crimes, that another individual later

confessed to the robberies, and that the robberies ended as soon as the other individual was

/////

/////

26

incarcerated).[25]  The second interview did produce information exculpating plaintiff, insofar as it implicated Whittaker as Hernandez's killer.  (Doc. No. 37 at ¶ 48.)  However, the detention following this revelation is simply of insufficient length to meet the standard set out by the Ninth Circuit in *Tatum*.  Detective Johnson testified he told Sergeant Hale about his conversation with Manzo on November 5, 2014.  (Doc. No. 86-10 at 11.)[26]  Plaintiff's preliminary hearing commenced on November 10, 2014, and concluded on November 14, 2014, at which time no holding order was issued and plaintiff was released from custody.  Thus, the evidence on summary judgment establishes that plaintiff was detained for, at most, nine days after Manzo's information was relayed to Sergeant Hale.  While there is no firm threshold for what constitutes a detention of "unusual length," the cases recognized by the Ninth Circuit as having "constitutional implications" involved detentions lasting from months to years in length.  *Tatum*, 768 F.3d at 820 (noting detentions that lasted 68 days, 217 days, and 27 months).  A deprivation of one's liberty for an additional nine days falls far short of this mark of what is required to state a cognizable Fourteenth Amendment claim.  *Id.* at 820.[27]

---

[25]  To the extent plaintiff's Fourteenth Amendment claim is premised on the notion that this interview should have been sufficient to warrant "more investigation into the Hernandez murder" (Doc. No. 85 at 34), the evidence establishes that detectives did conduct further investigation prior to arresting plaintiff, including interviewing most of the occupants of his vehicle on that night.  One has no right to dictate the manner in which police conduct any given investigation. *Gini v. Las Vegas Metro. Police Dep't*, 40 F.3d 1041, 1045 (9th Cir. 1994) ("The police have no affirmative obligation to investigate a crime in a particular way."); *Spreadbury v. Hoffman*, No. CV 10-499-M-DWM-JCL, 2010 WL 4607833, at *11 (D. Mont. Oct. 7, 2010) ("There is no cognizable legal cause of action against law enforcement officers for their conduct in inadequately investigating alleged criminal conduct.").

[26]  There is no evidence before the court on summary judgment indicating that Manzo's statement to Detective Johnson were relayed to Deputy Attorney General Bowers of, if so, when.

[27]  In *Tatum*, the Ninth Circuit did note it had "held actionable the one-day detention of a mentally incapacitated man in the absence of probable cause."  768 F.3d at 820.  In the case referred to, *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001), the Los Angeles Police Department ("LAPD") arrested a man named Kerry Sanders who suffered from chronic schizophrenia, believing him to be a fugitive from New York named Robert Sanders.  250 F.3d at 677–78.  After receiving an identification packet on Robert Sanders from law enforcement in New York, the LAPD failed to take any steps to identify the individual in their custody, and did not fingerprint him or notice that his physical characteristics did not match those of the Robert Sanders who was

27

Given the lack of evidence that the June 2014 police interview of Whittaker revealed any "highly significant" information or that there was a detention of "unusual length" following the November 2014 police interview of Manzo, the court concludes plaintiff cannot sustain a claim under the holding in *Tatum*. Accordingly, defendants' motion for summary judgment will be granted as to plaintiff's Fourteenth Amendment claim.

## C. Malicious Prosecution Claims Against Detective Defendants

Defendants Hale, Macias, and Sanchez next argue they should be granted summary judgment on plaintiff's malicious prosecution claim, because plaintiff cannot rebut the presumption that Deputy Attorney General Bowers exercised independent judgment in filing criminal charges against plaintiff. (Doc. No. 65 at 34–39; Doc. No. 66 at 36–39.)

A malicious prosecution claim "requires 'the institution of criminal proceedings against another who is not guilty of the offense charged' and that 'the proceedings have terminated in favor of the accused.'" *Lacey*, 693 F.3d at 919 (quoting Restatement (Second) of Torts § 653 (1977)). A successful claim of malicious prosecution under § 1983 also requires a plaintiff to "show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)); *see also Yagman v. Garcetti*, 852 F.3d 859, 867 (9th Cir. 2017). Malicious prosecution claims are cognizable against police officers in some instances, particularly where the officer maliciously or reckless makes false reports to the prosecuting authority. *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007). That said, a prosecutor's independent judgment "may break the chain of causation between the unconstitutional actions of other officials and the harm suffered by a constitutional tort plaintiff." *Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008). The prosecutor's decision to pursue

---

wanted. *Id.* at 678 (noting the officers paid no attention to Kerry Sanders' "obvious" mental deficiency). The LAPD then transported Kerry Sanders to New York, where authorities likewise failed to notice the mistaken identity, and incarcerated him with no further legal process for more than two years. *Id.* In this respect, *Lee* concerns not so much a one-day detention as a one-day detention that *caused* an individual's two-year incarceration without probable cause.

charges provides an evidentiary presumption that the prosecutor exercised independent judgment. *Id*. That presumption is rebutted by evidence that the prosecutor was given false information, where the officers acted "maliciously or with reckless disregard" for the arrestee's rights, or where the prosecutor relied on the police investigation and arrest rather than coming to an independent judgment. *Id.* at 862–63. In sum, this evidentiary presumption "may be rebutted if the plaintiff shows that the independence of the prosecutor's judgment has been compromised." *Id.* at 862.

Deputy Attorney General Bowers was the lead prosecutor in plaintiff's criminal case. There is some, albeit slight, evidence the MCSD encouraged Bowers to make a charging decision quickly with respect to plaintiff. Sergeant Hale e-mailed Bowers the day before plaintiff's arrest, shortly before 5:00 p.m., to tell him that the MCSD was waiting to hear from him about whether to arrest plaintiff, and attached an arrest warrant for his review. (Doc. No. 65-11 at 56.) Hale received a phone call from Bowers the next day around noon telling him the Attorney General's Office had made the decision to charge plaintiff. (Doc. No. 68-11 at 25.) When asked at his deposition in this action whether anyone from the MCSD had pressured him into filing a complaint against plaintiff, Bowers did not unequivocally state they had not, only replying, "No, I wouldn't put it that way." (Doc. No. 65-11 at 40.)

More importantly, however, there is significant evidence before the court on summary judgment that Bowers's charging decision was not based on his own independent review of the evidence. According to Bowers, he reviewed only "the reports that were provided to me by the sheriff's office and also e-mails or statements that would have been made by the sheriff's office detectives." (Doc. No. 86-1 at 27.) There is also evidence that Bowers merely relied on the descriptions of the evidence provided by the officers. (*See, e.g.*, Doc. No. 68-14 at 7–8 (recalling discussing the substance of the statements made by witnesses with Hale); *id.* at 9 (recalling receiving only investigative reports from the MCSD); Doc. No. 65-11 at 10–13, 15–16, 18–21 (recalling conversations with Hale and others informing Bowers about statements made by witnesses); Doc. Nos. 67-16–20 (e-mails between Bowers and Hale); Doc. No. 86-7 at 42 (e-mail from Hale to Bowers relaying statements made by Delgadillo while his interview was in

progress).)  Even the reports provided to Bowers apparently did not cover all of the detectives' interviews of each of the vehicle's occupants.  (Doc. No. 68-14 at 9–10; Doc. No. 65-11 at 32.)[28] Moreover, at his deposition Bowers did not recall whose statements he had reviewed and when he listened to the audio recordings of the interviews.  (Doc. No. 68-14 at 10; Doc. No. 86-1 at 24–25.)  Tellingly, Bowers recalled little of the evidence developed which exculpated plaintiff. Bowers testified that he knew the victim in this case was shot with a .25-caliber gun prior to plaintiff's arrest, but was not aware that every person interviewed by detectives had said Tellez had a .22-caliber gun that evening.  (Doc. No. 65-11 at 34.)  Bowers was also unaware Tern had been threatened with arrest prior to making any inculpatory statements about Tellez and plaintiff. (Doc. No. 86-1 at 38.)

Perhaps the circumstances played a role in Bowers relying on the officers to present the case to him.  While it is unclear precisely when Bowers first became involved in the case, it was certainly no earlier than July 20, 2014, when plaintiff was first interviewed.  Plaintiff was arrested just a few days later on July 25, 2014 and practically all of the evidence relied upon for his arrest warrant was discovered during the few days between those dates.  Given the rapid manner in which law enforcement pursued the interviews and plaintiff's arrest, there was very little time for Bowers to independently review the raw evidence.  Drawing inferences in plaintiff's favor from the evidence on summary judgment, as the court must, that evidence at least suggests Bowers conducted little independent review of the case prior to plaintiff 's arrest and acted predominantly, if not exclusively, on the information provided to him by the detective defendants. This evidence is sufficient to rebut the presumption that Bowers's involvement in the case "[broke] the chain of causation" between the allegedly unconstitutional acts of the officers and the harm suffered by plaintiff.  *Beck*, 527 F.3d at 862.

/////

---

[28]  An e-mail from Sergeant Hale to Deputy Attorney General Bowers indicates that Bowers received "all reports up to supplement #72" on July 23, 2014.  (Doc. No. 65-11.)  There is no evidence suggesting that anything other than police reports had been sent to Bowers by that date. The detectives' interviews with Tern, Johnson, Ceccoli, Delgadillo, and Gomes appear to have all been documented in higher numbered reports, and therefore presumably not given to Bowers prior to the issuance of the warrant for plaintiff's arrest.  (*See* Doc. No. 65-2.)

Once that presumption has been rebutted, it becomes the defendants' burden to "prove that an independent intervening cause cuts off his tort liability." *Id.* at 863 (quoting *Smiddy v. Varney*, 665 F.2d 261, 267 (9th Cir. 1981)). Since defendants bear the burden of proof for this affirmative defense at trial, summary judgment is only proper here if they would be entitled "to a directed verdict if not controverted at trial." *Celotex*, 477 U.S. at 331; *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). Here, based upon the evidence presented on summary judgment, the court concludes that a reasonable jury could find that Bowers's involvement and charging decision did not break the chain of causation. Thus, the motion for summary judgment must be denied with respect to this claim as to Detective Macias and Sergeant Hale.

Defendant Detective Sanchez, however, is entitled to summary judgment in his favor on plaintiff's malicious prosecution claim. As with plaintiff's Fourth Amendment claim, this claim too is unsupported by any evidence establishing a causal link between Sanchez's alleged actions and the constitutional harms claim to be suffered by plaintiff. Even if the interrogation tactics employed by Detective Sanchez were found to be improper, plaintiff has presented no evidence on summary judgment to show that Sanchez engaged in those tactics "for the purpose of denying [plaintiff] equal protection or another specific constitutional right." *Awabdy*, 368 F.3d at 1066. Nor is there any evidence before the court indicating that Detective Sanchez even presented any information to prosecutor Bowers, and certainly no evidence of him submitting false information. *See Blankenhorn*, 485 F.3d at 482 (indicating that malicious prosecution claims may be cognizable against officers who maliciously or recklessly make false reports to the prosecutor). Due to this lack of evidence, no reasonable jury could conclude Detective Sanchez's actions in investigating this case were taken for the purpose of denying plaintiff his constitutional rights or caused plaintiff to be maliciously prosecuted.

**D.    Intentional Infliction of Emotional Distress Claims Against All Defendants**

In moving for summary judgment, defendants briefly argue that there is no evidence their conduct was sufficiently "outrageous" such that they could be found liable for intentional infliction of emotional distress. (Doc. No. 61 at 43; Doc. No. 65 at 40–41; Doc. No. 66 at 43.)

A claim for intentional infliction of emotional distress requires a plaintiff to establish, among other elements, "extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard [for] the probability of causing, emotional distress." *Ravel v. Hewlett-Packard Enterprise, Inc*., ___ F. Supp.3d___, ___, 2017 WL 118009, *10 (E.D. Cal. Jan. 11, 2017) (quoting *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009); *see also Wilkins v. National Broad. Co., Inc.*, 71 Cal. App. 4th 1066, 1087 (1999). To be sufficiently extreme and outrageous conduct, the actions alleged "must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Cochran v. Cochran*, 65 Cal. App. 4th 488, 494 (1998) (quotations omitted); *see also Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993); *Rangel v. Bridgestone Retail Operations, LLC*, 200 F. Supp. 3d 1024, 1032 (C.D. Cal. 2016). While the court may, in certain instances, conclude the specific conduct alleged is insufficiently outrageous to sustain such a claim as a matter of law, *see Davidson v. City of Westminster*, 32 Cal. 3d 197, 210 (1982), this element of the claim is commonly seen as a factual issue. *See Yun Hee So v. Sook Ja Shin,* 212 Cal. App. 4th 652, 672 (2013) ("Thus, whether conduct is 'outrageous' is usually a question of fact."); *Ragland v. U.S. Bank Nat'l Assoc.*, 209 Cal. App. 4th 182, 204 (2012) ("Whether conduct is outrageous is usually a question of fact."); *Spinks v. Equity Residential Briarwood Apts.*, 171 Cal. App. 4th 1004, 1045 (2009) ("In the usual case, outrageousness is a question of fact."); *Hawkins v. Bank of America N.A.*, No. 2:16-cv-00827-MCE-CKD, 2017 WL 590253, at * (E.D. Cal. Feb. 14, 2017).

Here, the court concludes based upon the evidence presented on summary judgment that a reasonable jury could find that there was an intentional or reckless inclusion of misleading information and omission of exculpatory information from the arrest warrant affidavit leading to plaintiff's prosecution for murder and that such conduct was so outrageous as to "exceed all bounds of that usually tolerated in a civilized community." *Cochran*, 65 Cal. App. 4th at 494.

/////

/////

/////

/////

1    Accordingly, defendants' motion for summary judgment as to this claim will be denied in its

2    entirety as to all defendants.[29]

3    **E.      Bane Act Claims Against All Defendants**

4           The California Bane Act protects against interference "by threat, intimidation, or

5    coercion" or an attempt to do the same "with the exercise or enjoyment by any individual or

6    individuals of rights secured by the Constitution or laws of the United States, or of the rights

7    secured by the Constitution or laws of this state."  Cal. Civ. Code § 52.1(a).  In moving for

8    summary judgment, defendants briefly argue that plaintiff's Bane Act claims must be dismissed

9    because there was no intentional interference with any of plaintiff's rights and there is insufficient

10   evidence that defendants' conduct involved threats, intimidation, or coercion.  (Doc. No. 61 at

11   40–43; Doc. No. 65 at 39–40; Doc. No. 66 at 40–43.)  Defendants have previously raised some of

12   these arguments in moving to dismiss plaintiff's complaint, and the court explained in its prior

13   orders that a Bane Act claim is not precluded where a jury might find plaintiff's arrest violated

14   the Fourth Amendment and defendants' conduct in that connection was more than negligent.

15   (Doc. No. 31 at 21–22; Doc. No. 44 at 4) (finding a Bane Act claim cognizable so long as the

16   coercion is something "beyond the coercive nature inherent in *each and every arrest*.").

17   Defendants have presented no argument on summary judgment which persuades the court to

18   reconsider its prior orders in this regard.

19          To the extent defendants now move for summary judgment arguing a lack of evidence

20   supporting plaintiff's Bane Act claims, the court observes that plaintiff's claims in this regard

21   essentially mirror his Fourth Amendment claims.  (Doc. No. 85 at 39) ("Plaintiff alleges that

22   Defendant[s] made material misstatements to a court in order to secure his arrest, withheld

23   exculpatory evidence from state prosecutors, [and] engaged in intimidating and coercive conduct

24   towards witnesses, including threatening them that they would become suspects in the triple

25   homicide if they did not implicate Plaintiff.").  Therefore, defendants' motion for summary

26

27   _____
     [29]  Vicarious liability is available for intentional infliction of emotional distress. *Blanco v. County
28   of Kings*, 142 F. Supp. 3d 986, 1004 (E.D. Cal. 2015) (citing *Lawson v. Superior Court*, 180 Cal.
     App. 4th 1372, 1388–89 (2010)).

judgment will be granted on plaintiff's Bane Act claim against defendant Detective Sanchez because plaintiff has failed to come forward with sufficient evidence that Sanchez's actions in interviewing Tern were done with any intention to violate plaintiff's constitutional rights. *Dillman v. Tuolumne County*, 1:13-cv-00404 LJO SKO, 2013 WL 1907379, at *20 (E.D. Cal. May 7, 2013) ("[T]he relevant distinction for purposes of the Bane Act is between intentional and unintentional conduct."); *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947, 958 (2012) ("The statutory framework of section 52.1 indicates that the Legislature meant the statute to address interference with constitutional rights involving more egregious conduct than mere negligence.") Just as with plaintiff's Fourth Amendment claim, however, the presence of triable issues of fact with respect to his Bane Act claims against the other defendants precludes summary judgment as to them.

**F.     Punitive Damages**

Each defendant seeks to have any claims for punitive damages brought by plaintiff dismissed.  (Doc. No. 61 at 46; Doc. No. 65 at 40–41; Doc. No. 66 at 46.)  Each of these arguments is summary in nature, essentially stating there are no facts from which a jury could conclude that defendants' conduct was "malicious, oppressive or in reckless disregard of the plaintiff's right."  (Doc. No. 61 at 46; Doc. No. 66 at 46.)  These arguments are unpersuasive.

To the extent a jury could find each of the individual defendants engaged in willful, deceptive, or outrageous conduct, it could also conclude punitive damages were warranted.  *See Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 409 (2009) ("Punitive damages have long been an available remedy at common law for wanton, willful, or outrageous conduct."); *Smith v. Wade*, 461 U.S. 30, 56 (1983) ("[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."); *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) ("[W]e have recognized that '[i]t is well-established that a "jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others."'"); *Sprinks v. Equity Residential Briarwood*

*Apts.*, 171 Cal. App. 4th 1004, 1055 (2009) ("Punitive damages . . . are recoverable . . . for the infliction of emotional distress.").[30]

Accordingly, defendants' motions for summary judgment with respect to plaintiff's punitive damages claims will be denied.

## CONCLUSION

For all of the reasons set forth above:

1. Defendants' motions for summary judgment (Doc. Nos. 61, 65, 66) are granted in part and denied in part:

   a. Summary judgment is granted in favor of defendant Detective Sanchez as to plaintiff's Fourth Amendment and false arrest claims brought against him and denied as to plaintiff's Fourth Amendment and false arrest claims brought against defendants Sergeant Hale and Detective Macias;

   b. Summary judgment is granted in favor of all defendants as to plaintiff's Fourteenth Amendment claim;

   c. Summary judgment is granted in favor of defendant Detective Sanchez as to plaintiff's malicious prosecution claim and is denied as to plaintiff's malicious prosecution claim brought against defendants Sergeant Hale and Detective Macias;

   d. Summary judgment is denied as to plaintiff's intentional infliction of emotional distress claim against each defendant;

   e. Summary judgment is granted in favor of defendant Detective Sanchez as to plaintiff's Bane Act claim brought against him and denied as to plaintiff's Bane Act claim brought against the remaining defendants;

   f. Summary judgment is denied as to plaintiff's punitive damages claims against each defendant.

---

[30] The court has previously dismissed plaintiff's punitive damages claim against defendant Merced County. (Doc. No. 31 at 9.) To the extent defendants have moved for summary judgment on this issue, their motion is denied as having been moot by the court's prior order.

2. This action now proceeds on plaintiff's Fourth Amendment, malicious prosecution, intentional infliction of emotional distress, false arrest, and Bane Act claims against defendants Sergeant Hale and Detective Macias, plaintiff's intentional infliction of emotional distress claim against defendant Detective Sanchez, and plaintiff's false arrest, intentional infliction of emotional distress, and Bane Act claims against the defendant  County of Merced.

IT IS SO ORDERED.

Dated:   **July 11, 2017**

_____
UNITED STATES DISTRICT JUDGE