UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE


ETHAN MORSE,                    )
                                )
            Plaintiff,          )   No. 16-CV-142-DAD
                                )
vs.                             )   TRIAL TESTIMONY OF
                                )     LARRY MORSE
COUNTY OF MERCED, CHARLES       )
HALE, ERICK MACIAS and JOSE     )
SAM SANCHEZ,                    )
                                )
            Defendants.         )
_____)

Fresno, California                    Thursday, April 19, 2018
                                      Friday, April 20, 2018




REPORTER'S TRANSCRIPT OF PROCEEDINGS








KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:                    Gwilliam, Ivary, Chiosso,
                                      Cavalli & Brewer
                                      BY:  **GARY GWILLIAM**
                                      and  **JAYME WALKER**
                                      1999 Harrison Street
                                      Suite 1600
                                      Oakland, California 94612

For the Defendants                    Lewis, Brisbois, Bisgaard & Smith
County of Merced,                     BY:  **DANA FOX**
Hale & Sanchez:                       and  **MATTHEW HARRISON**
                                      221 North Figueroa Street
                                      Suite 1200
                                      Los Angeles, California 90012

For the Defendant                     Carpenter, Rothans & Dumont
Erick Macias:                         BY:  **STEVEN ROTHANS**
                                      and  **DANIELLE FOSTER**
                                      500 South Grand Avenue
                                      19th Floor
                                      Los Angeles, California 90071

3

1                              <u>INDEX</u>

2      <u>PLAINTIFF'S WITNESSES</u>:

3        **LARRY MORSE (4-19-18)**                          4
         DIRECT EXAMINATION BY MR. GWILLIAM                 5
4        **LARRY MORSE (4-20-18)**                          23
         CONTINUED DIRECT EXAMINATION BY MR. GWILLIAM       23
5        CROSS-EXAMINATION BY MR. FOX                       77
         REDIRECT EXAMINATION BY MR. GWILLIAM               117
6        RECROSS-EXAMINATION BY MR. FOX                     123

7                              * * * * *

8

9

10

11

12                             EXHIBITS

13     <u>DEFENDANTS'</u>                                   Marked
         191                                               101
14

15                             * * * * *

16     <u>PLAINTIFF'S</u>                                   Received
         21                                                10
17       22                                                18
         35                                                108
18

19                             * * * * *

20

21

22

23

24

25

4

1    Thursday, April 19, 2018                    Fresno, California

2    4:14 p.m.

3         MR. GWILLIAM:  I'm going to proceed.  My next witness

4    is going to take a while.  Larry Morse.  He's been waiting all

5    afternoon.

6         THE COURT:  Can we get started?  Is that all right?

7         MR. GWILLIAM:  I'd like to get in as much as we can.

8         THE COURT:  I agree.

9         MR. GWILLIAM:  He's been waiting here.  I don't know

10   if we can finish him, but we'll get started.

11        Let the record reflect I'm taking bottled water to

12   the podium.

13        THE COURT:  Has it got a cap?

14        MR. GWILLIAM:  You bet.

15        THE CLERK:  I'm ready this time.

16        THE COURT:  Renee is ready for you.

17        MR. GWILLIAM:  Got to live that down.

18                         **LARRY MORSE**,

19   called as a witness on behalf of the Plaintiff, having been

20   first duly sworn, testified as follows:

21        THE CLERK:  Please have a seat.  State your full name

22   for the record and spell it.

23        THE WITNESS:  My name is Larry Morse, M-O-R-S-E.

24   ///

25   ///

| | |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MR. GWILLIAM: |
| 3 | Q.  Mr. Morse, what's your address? |
| 4 | A.  304 West 23rd Street, Merced, California. |
| 5 | Q.  There's water there if you need it. |
| 6 | A.  I've got a little cold as you know, counsel, I'm -- |
| 7 | Q.  All right.  What is your occupation? |
| 8 | A.  I'm the elected District Attorney of Merced County. |
| 9 | Q.  I'd like to have you tell us a little about your |
| 10 | background.  First, how long have you lived in Merced and tell |
| 11 | me about your family in Merced. |
| 12 | A.  I have been in the District Attorney's Office since 1993. |
| 13 | I was hired as a Deputy District Attorney.  I served for five |
| 14 | years as a Deputy District Attorney.  I was promoted to Chief |
| 15 | Deputy DA in 1998 and was elected District Attorney in 2006 |
| 16 | and have been re-elected two times subsequent to that.  So -- |
| 17 | Q.  Have you lived your whole life in Merced? |
| 18 | A.  No, sir.  I was born in Lancaster, California.  I |
| 19 | graduated high school there.  I went to college at the |
| 20 | University of Arkansas in Fayetteville, Arkansas.  I was a |
| 21 | newspaper reporter actually in my first career.  And worked in |
| 22 | Washington D.C.  And then went to law school in Sacramento and |
| 23 | worked in Sacramento while I went to law school. |
| 24 | Q.  All right.  So what -- briefly describe your duties as the |
| 25 | elected district attorney in Merced. |

1   A.  Yes, sir.  We have an office of about 100 people.  27

2   attorneys, including me.  The district attorney is the chief

3   law enforcement officer in a county.  Law enforcement agencies

4   throughout the county, the police agencies, the sheriff's

5   department, Highway Patrol, they respond to incidents, they

6   investigate cases, they send their reports to the District

7   Attorney's Office.  We review those reports and decide what,

8   if any, charges should be filed.  And then we file the

9   appropriate charges and work the case all the way up to and

10  including sentencing or if a case is pleaded out before then,

11  we monitor it all the way until it's concluded.

12  Q.  And how would you describe your working relationship or

13  your protocol with the Sheriff's Department from the

14  standpoint of being the DA and the Sheriff's Department?

15  A.  Well, the Sheriff's Department is one of the agencies that

16  I work with in Merced County.  It's the largest or the second

17  largest, first or second, with Merced Police Department.  The

18  same basic process.  If an officer makes an arrest, a case

19  report comes over to the District Attorney's Office.  We

20  review it, decide, again, what, if any, charges are

21  appropriate.  If a case involves more investigation, it is

22  generally assigned to the detective division in the Sheriff's

23  Department.  They follow up and, if are able, to make an

24  arrest.  And then send their reports over to our office where

25  we evaluate them too.

1  Q.  All right.  And the standard that you use, what are the

2  standards you use as to whether or not you are going to file

3  criminal charges on cases that are brought to you by the

4  sheriff's office?

5  A.  Contrary to what some people seem to think, prosecutors

6  are not supposed to be concerned about seeking convictions.

7  Our responsibility is to seek justice.  That is our first and

8  most fundamental responsibility.  It is unethical for a

9  prosecutor to file any case unless he or she believes we have

10  a reasonable likelihood of convincing 12 people beyond a

11  reasonable doubt of the charges.

12  Q.  Okay.  Thank you.  Let me turn a little bit to a problem

13  that you've had.  You have a gang problem in Merced County

14  that you have to deal with in the District Attorney's Office?

15  A.  Yes, sir.  Serious gang problem.

16  Q.  And how -- did you have some concerns about whether or not

17  the Sheriff's Department was appropriately handling the gang

18  problem issue in early 2014?

19  A.  I did.

20  Q.  Would you tell us a little bit about the background of

21  what led to the concerns you had about the Sheriff's

22  Department handling the gang problem in Merced.

23  A.  From 2005 to 2015, Merced County was averaging somewhere

24  around 27 homicides a year, which is an incredible number.  It

25  put us in the top five in the State of California for

1    homicides per 100,000 people.  Many of these were gang

2    related.  Most of them were gang related.  And there were

3    becoming more and more gang related homicides.

4         The Sheriff's Department did not have a gang unit, a

5    specialized gang unit within its department.  The Merced

6    Police Department had had a gang unit since 1996.  But the

7    Sheriff's Department had not.  I had --

8    Q.  Just --

9    A.  I'm sorry.

10   Q.  Why was that important to have a gang unit?  And what were

11   your -- more -- be more specific about your concerns about the

12   Sheriff's Department not having a, quote, gang unit?

13   A.  Well, gang prosecution, gang investigation is very

14   specialized.  The gangs, there's Sureño gang members, there's

15   Norteño gang members.  Merced County has both.  The gang

16   members don't recognize city boundaries, they move across from

17   one city to another.

18        Shortly after I had become district attorney, I

19   created the county's first county-wide gang unit so that we

20   could combine our resources and our expertise and have a

21   coordinated strategy against gang violence in the county.  I

22   was having a difficult time getting the Sheriff's Department

23   to actively engage in that process, in the gang intervention

24   aspect of what we were trying to get accomplished.  And had

25   spoken to members of the Board of Supervisors about it on a

1   number of occasions and had tried to speak to the former

2   sheriff about it on a number of occasions.

3   Q.  And so what was your concern and how do you think it was

4   being addressed as of early 2014?

5   A.  It wasn't being addressed.  I had, despite repeated

6   efforts to get the county to lean on the Sheriff's Department

7   to commit more resources to the gang problem in Merced County,

8   nothing was happening.  The District Attorney's Office, which

9   is not primarily a law enforcement agency, we're not out first

10  responders or following up on cases, we prosecute them.  We

11  don't investigate them by and large.  We have an investigation

12  unit.  But we were spending more money, the District

13  Attorney's Office, than the Sheriff's Department was on gang

14  intervention.  And I was -- it was coming out of our budget

15  and I was consistently complaining that that was wrong.  That

16  it shouldn't be that way.

17  Q.  Did that lead you to go to a public presentation to the

18  Board of Supervisors in Merced to set forth your concerns

19  about this gang problem in the Sheriff's Department?

20  A.  Yes, sir.

21  Q.  Did you actually write out a statement that you actually

22  gave to the gang department -- to the Board of Supervisors

23  which was also given to the press?

24  A.  I did.

25  Q.  If you'll be careful of that water, next to you there's a

1  group of exhibits.  May I approach, Your Honor?

2          THE COURT:  You may.

3  BY MR. GWILLIAM:

4  Q.  I would draw your attention, Mr. Morse, to Exhibit 21 and

5  ask you if you recognize that as the statement that you read

6  to the Board of Supervisors and gave to the press -- I don't

7  know the exact date.  It was in January, I believe, of 2014.

8  Do you remember the date exactly?

9  A.  I don't.

10  Q.  Was it in January of '14?

11  A.  That sounds about right.  I couldn't say for sure.

12  Q.  But this is an accurate statement of exactly what you read

13  to the Board of Supervisors about these concerns; is that

14  right?

15  A.  It is.

16          MR. GWILLIAM:  Your Honor, I'd offer Exhibit -- this

17  is Plaintiff's Exhibit 21 into evidence.

18          THE COURT:  Any objection?

19          MR. FOX:  None, Your Honor.

20          MR. RUTTER:  None, Your Honor.

21          THE COURT:  Plaintiff's 21 is admitted.

22      (Plaintiff's Exhibit 21 was received.)

23  BY MR. GWILLIAM:

24  Q.  Would you -- I know it's going to take a couple of

25  minutes, but I think it's important.  Would you read the

1   statement to the jury and read slowly.  We tend to read more

2   quickly than we speak.  And we can also publish it at the same

3   time if that's okay, Your Honor.

4           THE COURT:  It's in evidence.  It can be published.

5           MR. GWILLIAM:  All right.  Please publish it.  We'll

6   kind of go through it.  And I may want to stop you as we go

7   through it.

8           THE WITNESS:  Ready for me?

9           MR. GWILLIAM:  Yes.  Okay.  Let's start at the

10  beginning --

11          THE COURT:  I'm sorry to interrupt.  Can we take off

12  the highlighting?

13          MR. GWILLIAM:  I was going to highlight as I read it.

14  Can you pull it back?

15          THE COURT:  It's not before the jury just yet.  Let's

16  get an unhighlighted version and we'll put it up.

17          MR. GWILLIAM:  Pardon me, Your Honor.

18          THE COURT:  That's all right.  You're going to have

19  it shortly.  You hope.  Let me ask this.  Defense counsel, if

20  Mr. --

21          MR. FOX:  We might have it.  You want us to put it

22  up?

23          THE COURT:  I was just going to ask if you have any

24  objection if Mr. Gwilliam is going to highlight sections, do

25  you care if it's highlighted now?

1    MR. FOX:  We can put up 21.  We've got it clean.  Is

2 that okay?  We have it ready to go.

3    THE COURT:  Can we switch?

4    THE CLERK:  It is switched.

5    THE COURT:  If you get to the point you want to

6 highlight it, we'll move back to your version.  But this is

7 what's in evidence.

8 BY MR. GWILLIAM:

9 Q.  So let's go through this.  I may want to stop you

10 particularly when we get to the third paragraph.  So just read

11 slowly as though you were delivering this to the Board of

12 Supervisors at the meeting there.

13 A.  All right.  "Good morning.  The last few weeks the people

14    of Merced County have been braced by some pretty

15    startling numbers regarding violent crime.  2013

16    represented the most deadly year in Merced County's

17    history with 29 homicides.  By comparison, Fresno

18    County had 35 homicides, but with a population" --

19 Q.  Slow down a little bit for our court report?

20 A.  Sorry.  "But with a population of nearly four times ours

21    at 900,000 and Stanislaus County had 42, but with a

22    population more than double.  That tells us that we

23    had a significantly higher per capita murder rate

24    than either Fresno or Stanislaus Counties.

25    "As if that wasn't grim enough, last week a

1            nation-wide survey pegged Merced as the 88th most

2            dangerous place to live in the United States.  I know

3            none of us believe that to be true, but our crime

4            statistics have given us that ranking.

5            "Of particular concern to this board should be the 19

6            homicides in the unincorporated area of Merced

7            County, far and away the most ever.  Most of these

8            homicides were gang related, including the still

9            unsolved murders of three teenagers on Easter

10           Sunday."

11   Q.   Stop you right there.

12   A.   Yes, sir.

13   Q.   So you were referring to the Easter massacre that we have

14   talked about in this case?

15   A.   Yes, sir.

16   Q.   What were your concerns as of January 14, as to why that

17   crime was still unsolved?

18   A.   I believed that part of the problem with that case not

19   having been solved was, again, the lack of resources available

20   in the Sheriff's Department to identify the gang aspects of

21   the case.  It was clearly a gang homicide.  Many gang members

22   were involved in showing up at that party.  And again, the

23   lack of sufficient resources and expertise on those gangs I

24   believe was contributing to the inability to clear that case.

25   Q.   Thank you.  I don't know that we need to read every bit of

1   this because it is in evidence.  But from your perspective,

2   this statement was given to the press and they were there at

3   the Board of Supervisors?

4   A.   I don't recall whether I specifically gave it to the

5   press.  But it was in the public comments section and I think

6   at the conclusion of my remarks, someone from the press may

7   have asked me for it.  I didn't distribute it to them.  But I

8   think I was asked for it and provided it to them.

9   Q.   Maybe I should draw your attention to the next to last

10  paragraph, where you specifically refer to the Sheriff's

11  Department.  Can you perhaps read that one starting with

12  "because no gang strategy."

13  A.   Yes, sir.  "Because no gang strategy emerged from the

14           Sheriff's Department in response to the increasing

15           violence over the last several years, the DA's Office

16           has become the County's primary gang suppression

17           department, despite that not being our core mission.

18           In 2008, I initiated the creation of the County Gang

19           Task Force and over the last five years, the District

20           Attorney's Office committed more than 1.4 million to

21           gang suppression by supporting the task force.  That

22           is double the amount of money spent during the same

23           period by the Sheriff's Department on gang

24           suppression.  Had the DA's Office not devoted scarce

25           resources to this undertaking Merced County would

1          have had no organized gang strategy or response to

2          gang violence despite the presence of more than 5,000

3          validated gang members in this county.  None."

4  Q.  Let's -- this is in evidence.  We can read it.  But the

5  point is you decided that you were concerned enough with this

6  problem of the Merced County Sheriff's Department not having

7  an active gang force and not being able to solve the gang

8  related problems that you felt you needed to step forward and

9  state this to the Board of Supervisors; is that correct?

10  A.  Yes, sir.

11  Q.  What did you hope would be the solution or the remedy as a

12  result of your stepping forward and giving a public statement

13  like this?

14  A.  I had hoped that the board would recognize the severity of

15  the problem finally.  And that they would direct more

16  resources to the gang problem.  Or direct the Sheriff's

17  Department to begin putting together a gang unit or more gang

18  trained officers.

19  Q.  So your concern was more than just giving -- having money

20  being given to the Sheriff's Department.  You wanted the

21  Sheriff's Department to actively move forward and be more

22  proactive in getting a gang unit; is that correct?

23  A.  That is correct.

24  Q.  All right.  And if the Sheriff's Department wanted to

25  devote more resources to a gang task force, would it be their

1    job to go to the Board of Supervisors and request money from

2    them if they needed it?  For their budget.

3              MR. FOX:  Objection, Your Honor, foundation.

4              THE COURT:  Sustained.

5    BY MR. GWILLIAM:

6    Q.  Do you know the process of how the Sheriff's Department

7    would get a budget for a gang unit if they needed it?

8              MR. FOX:  Objection, Your Honor.  Relevance.  And

9    foundation.

10             THE COURT:  Well, Mr. Gwilliam, don't dwell on this

11   point.  I'll allow the witness to answer, but I don't want a

12   trial on this issue.

13             MR. GWILLIAM:  All right.  I think --

14             THE COURT:  You may answer the question, sir.

15             MR. GWILLIAM:  All right.  Thank you.

16             THE WITNESS:  Thank you.  There would be two options.

17   Either the Board of Supervisors could authorize additional

18   resources to be spent, specifically on a gang program for the

19   Sheriff's Department.  Or the Sheriff's Department could

20   re-allocate existing resources to re-prioritize, which is what

21   I was urging.  Re-prioritize existing resources toward what I

22   considered to be the biggest public safety problem in the

23   County of gang violence.

24   BY MR. GWILLIAM:

25   Q.  All right.  Moving forward.  Following your statement to

1   the Board of Supervisors, was there a newspaper article about

2   your statement in the local Merced sun star newspaper?

3   A.  Yes, sir.

4   Q.  And what, if anything -- did you hear any response back

5   from the Sheriff's Department following the publicity of your

6   statement?

7   A.  I had heard rumblings that some people were not happy with

8   my comments.

9   Q.  And did that prompt you to send an email about those

10  concerns to the Sheriff's Department?

11  A.  It did.

12  Q.  Would you look at Exhibit 22, please.  That appears to be

13  an email of January 29, 2014.  Is that the email that you were

14  referring to?

15  A.  Yes, sir.

16          THE COURT:  Hasn't been published.  Is there an

17  objection, Mr. Fox?

18          MR. FOX:  There is not.  I have no problem with it

19  coming in.

20          THE COURT:  Do you move to admit Exhibit 22?

21          MR. GWILLIAM:  Yes, Your Honor.

22          THE COURT:  Any objection, Mr. Rutter?

23          MR. RUTTER:  No, Your Honor.  It's Plaintiff's

24  Exhibit 22.

25          THE COURT:  Plaintiff's Exhibit 22 is admitted.

1       (Plaintiff's Exhibit 22 was received.)

2           THE CLERK:  Can I ask where we're displaying from?

3           THE COURT:  I think we're going to be back to

4  plaintiff's table.

5  BY MR. GWILLIAM:

6  Q.  Does this refresh your recollection -- this is an email

7  from you on Wednesday, January 29th at 1:16 to Tom Cavallero

8  and Jeff Coburn.  First of all, who are those people?

9  A.  Tom Cavallero was, at that time, I think the acting

10 sheriff.  He had just taken over for the previous sheriff who

11 had resigned, Mark Pazin.  And Jeff Coburn was the detective

12 sergeant of the Merced Sheriff's Department.

13 Q.  Does this refresh your recollection that this would

14 probably have been -- well, let me see.  How long was this

15 after your statement to the Board of Supervisors that you

16 decide to send this email to the Sheriff's Department?

17 A.  The next day.

18 Q.  Okay.  So what was the purpose in sending this email,

19 Larry?

20 A.  The purpose was I was not wanting the Sheriff's

21 Department, the Sheriff Cavallero to believe that I was

22 attacking him.  He had just taken over.  And Detective

23 Sergeant Coburn was still relatively new, I believe, in that

24 role.  Much of my comments had been directed towards the

25 priorities of the previous sheriff.  And I mention that in the

1    second paragraph.

2    Q.  You certainly do.  And I would like to draw your attention

3    to that.  Don't need to go through all of this.  But the first

4    sentence in the second paragraph says, "As I think you know,

5            the absence of a gang commitment from the SO was a

6            root cause of much of the friction that existed

7            between Mark and me, especially while I was having to

8            fill the void from my budget."

9            Would you tell us what that refers to, Larry?

10   A.   Yes.  As I discussed previously, we were spending -- we,

11   the District Attorney's Office, was spending more money on

12   gang violence suppression than the Sheriff's Department.  And

13   I was increasingly resentful.  I had a limited budget as well.

14   But I was doing that in order to keep the gang task force

15   going.  And I had been unsuccessful in getting the previous

16   sheriff to engage in a meaningful way in addressing the out of

17   control gang violence in Merced County.

18   Q.  All right.  Now, I won't -- before I move on this.  You

19   said you'd heard some grumblings from the Sheriff's

20   Department.  Can you be a little more specific of what you

21   heard that led you to write the email in Exhibit 22?

22   A.   I can't -- I think some people in my office mentioned that

23   the Sheriff's Department or they had heard there were some

24   people that weren't happy with my comments to the board.  It

25   was the front page story in the paper.  I can't remember

 1  specifically who said what to me, though, counsel.

 2  Q.  All right.  Well, let's move on to the issues directly at

 3  hand.  First of all, how would you describe your -- generally,

 4  your personal relationship with the police officers and

 5  deputies, detectives, in the Sheriff's Department?  Had you

 6  worked with a lot of them personally?

 7  A.  Yes, I had.

 8  Q.  And how would you describe, in general, your relationship

 9  with them?

10  A.  My relationship was good for the most part.  I continued

11  to try cases, as the elected DA.  A lot of DAs don't try

12  cases.  I have consistently tried homicide cases since being

13  elected.  So I had ongoing interaction with a number of

14  detectives in the Sheriff's Department and other police

15  agencies.

16  Q.  Did you, in 2014, know Chuck or Charles Hale, who was a

17  sergeant I believe at the time?

18  A.  I did.

19  Q.  And how would you describe your knowledge of him in 2014?

20  A.  I had worked a number of cases with Detective Hale over a

21  period of years.  A couple that he worked specifically and

22  then overseeing cases that he was involved in.

23  Q.  So when you work with someone like sergeant -- he was a

24  sergeant at the time; correct?

25  A.  I believe so.  I believe he was detective sergeant.

1   Q.  And you work with somebody, describe a little bit

2   how -- what -- how your -- what your working relationship

3   would be with them if you're working on a case together?

4   A.  Well, mostly they bring us the case after they've done the

5   investigation.  If there is a case that is happening

6   immediately, there's a carjacking and a detective or police

7   officer is making a stop and an arrest, they generally will

8   file the charges and bring them over to our office.

9           In what we would call a cold case, or one that isn't

10  immediately solved or results in an arrest, the general

11  practice has been that the detectives will come and discuss

12  the state of the evidence with us, the District Attorney's

13  Office, prior to making an arrest.

14          Because the difference between probable cause to make

15  an arrest and proof beyond a reasonable doubt is sometimes

16  very, very broad.  And we will review what the evidence that

17  they think they have and we will often times tell them we

18  don't think there's enough, we think you need to go and do X,

19  Y and Z before we're ready to file this case.

20  Q.  All right.  Before we get into the Easter homicide case, I

21  wanted to ask you more about your dealings with Detective

22  Sergeant Hale.  Had you directly worked with cases with him,

23  cases worked up for trial so that you were able to observe his

24  type of detective practice?

25  A.  Yes.

1   Q.  How would you describe Sergeant Hale's practice as a

2   detective, from your personal observations?

3   A.  Detective Sergeant Hale was a very aggressive detective.

4   He worked hard at his cases.  He had a tendency to push us to

5   file cases before we thought they were ready.  And we would

6   periodically have to push back and say, "We're not there yet.

7   We don't believe we're there."

8          Since I've been the elected district attorney, we've

9   convicted 57 of the 60 people who have been charged with

10  homicide in Merced County.  In large measure that is because

11  we carefully review the evidence to make sure that it's

12  sufficient to sustain a conviction.

13         So Detective Hale had, you know, good qualities as a

14  detective.  We just periodically would have to back him up and

15  say, "We're not there yet.  There isn't enough evidence yet."

16  Q.  And you had personal experience with him to make those

17  observations of this type of practice that he engaged in?

18  A.  Yes.

19         MR. GWILLIAM:  Okay.  All right.  Your Honor, I'm

20  ready to move on and go on as long as the Court would like.

21  I --

22         THE COURT:  Good time for a break?

23         MR. GWILLIAM:  Moving to another subject.  But I

24  know --

25         THE COURT:  I was going to stop at 4:45.  Let's break

1  now.

2  (Proceedings concluded at 4:42 p.m.)

3  Friday, April 20, 2018                    Fresno, California

4  8:49 a.m.

5  THE COURT:  Let's bring in the jury.

6  (The jury entered the courtroom.)

7  THE COURT:  You may continue with your direct

8  examination, Mr. Gwilliam.

9  MR. GWILLIAM:  Thank you, Your Honor.

10  Let the record show the lid is on tight on the water.

11  THE COURT:  And let it also reflect we are back in

12  the presence of the jury.  Good morning, ladies and gentlemen.

13  THE JURY:  Good morning.

14  MR. GWILLIAM:  Thank you.

15  **LARRY MORSE**,

16  called as a witness on behalf of the Plaintiff, having been

17  previously sworn, testified as follows:

18  CONTINUED DIRECT EXAMINATION

19  BY MR. GWILLIAM:

20  Q.  Larry, I'd like to turn our attention to something

21  different than what we discussed yesterday.  You said in your

22  statement to the Board of Supervisors in January of '14, you

23  did raise the issue of concerns you had about the Easter

24  massacre or Easter homicide not being solved.  After that

25  presentation in January of '14, when was the next time you

1    heard anything from the Sheriff's Office about the status of

2    that homicide investigation?

3    A.   I don't believe I heard anything else until the day that

4    they came over to announce that they had made arrests.

5    Q.   Tell us a little bit about how that came about, Mr. Morse,

6    and approximately when was that?

7    A.   It was July.

8    Q.   I'll represent to you that Tellez was arrested on July

9    17th.   That's in the record.   Is that about the time that you

10   would have --

11   A.   Yes, sir.

12   Q.   Had Tellez been arrested by the time they came to see you?

13   A.   Yes.

14   Q.   Tell us what happened in terms of your dealing with the

15   Sheriff's Department when they came to you to give you the

16   status of the homicide investigation?

17   A.   I was advised by one of my chief deputies, I think, that

18   they had made an arrest in the Easter shooting.   And that they

19   were going to come over and brief us.

20   Q.   Did they tell you anything else about their plans with

21   regard to the arrest?

22   A.   No.   At that point, no.   We were just told that they were

23   coming by some time soon to give us a briefing on the arrest

24   that they had made.

25   Q.   At some time did you learn that they had a press

1  conference?

2  A.   Yes.   When they arrived, the sheriff's detectives arrived,

3  they told us they only had an hour because -- or they had less

4  than an hour because they had a press conference scheduled in

5  an hour over at the Sheriff's Department to announce the

6  arrest.

7  Q.   All right.   Let's go -- I don't know if you touched on

8  this yesterday, but I want to go over it in more specific

9  detail.   What is the protocol with regard to how the Sheriff's

10  Department should approach an arrest on a case such as this

11  Easter homicide case as it relates to presenting this to the

12  District Attorney's Office?

13  A.   What would usually happen is on a case, certainly a case

14  of this magnitude and a case that was that old.   At that point

15  this case was 16 months old.   We would have had a

16  consultation, discussion with the detectives before they would

17  have been making arrests.   Just to make sure that we were

18  comfortable that there was sufficient evidence for us to take

19  the case and proceed and file the charges.   That didn't happen

20  in this case.

21  Q.   Tell us what happened then.

22  A.   Well, when they came to our office -- we have a conference

23  room on the second floor.   My two chief deputies and my chief

24  investigator and I met with -- I know Detective Sergeant Hale

25  was there and I can't remember whether -- who else was there

1   to tell you the truth.

2   Q.  Was Cavallero, the sheriff there?

3   A.  No, he was not there.  And as you know, there were three

4   homicides that night.  There were two that took place in the

5   back yard of the residence where the party had been.  They

6   were largely unrelated to the one that took place out in the

7   front yard.

8   Q.  Hernandez killing.

9   A.  Yes, sir.  So they spent most of their time talking to us

10  about the shooting in the -- the two people who were killed in

11  the back yard.  And had a number of witnesses that they had

12  spoken to, a considerable amount of information regarding the

13  shooting in the back yard.

14          With respect to the shooting of Hernandez in the

15  front yard, it was not quite an afterthought, but almost.

16  They didn't spend any real time talking about that except to

17  say essentially that they had a butt dial, which was this 911

18  tape, and that he had confessed essentially, or implicated

19  himself, Jacob Tellez, in that shooting.

20  Q.  Did they indicate to you that they felt that they had a,

21  quote, confession as a result of this tape?

22          MR. FOX:  Objection, Your Honor.  It's hearsay.

23          THE COURT:  Overruled.

24          THE WITNESS:  Yes.

25  BY MR. GWILLIAM:

1  Q.  Now, did they -- did they give you any other information

2  on Tellez?  For example, did they play the 911 tape?

3  A.  They did not.  Not that I recall.  I don't recall that we

4  were -- that we had the tape played for us.

5  Q.  Let me put this in context.  When they came in, Hale and

6  whoever came in with him to brief you on this, they had

7  already arrested these people; right?

8  A.  Yes.

9  Q.  Including Tellez.  And they had a press conference set.

10 What is the protocol with regard to them proceeding with a

11 press conference before they've briefed the District

12 Attorney's Office on a case such as this?

13 A.  Well, I don't know that there's a protocol as such.  It

14 was -- it was unusual, in my opinion, my experience, to have

15 scheduled a press conference after having made the arrest

16 without having provided us with a detailed briefing of the

17 state of the evidence in that case.  And we absolutely did not

18 get a detailed briefing on the evidence in the case.

19 Q.  Let me ask you an important fact.  Were you informed, by

20 Hale or anyone else from the Sheriff's Department in this

21 briefing, that Mr. Tellez had been previously arrested and

22 released earlier with regard to this investigation?

23 A.  No, I was not.

24 Q.  Now, since then you've obviously learned a lot about this

25 investigation from many sources; would that be generally true?

1   A.  Yes, sir.

2   Q.  Tell me, given your understanding of what's happened and

3   the facts, what would you expect would be the proper procedure

4   and protocol in terms of what information you feel they should

5   have given you with regard to the Hernandez murder in order

6   for you to evaluate whether or not you felt you were ready to

7   proceed with charges?

8            MR. FOX:  Objection, Your Honor.  Relevance.

9            THE COURT:  What is the relevance?

10           MR. GWILLIAM:  The relevance is it's a violation of

11  protocol and practices by the Sheriff's Department with regard

12  to this investigation.  We contend that it was a rush to

13  judgment and this was a part of what they should have done had

14  they done it right.

15           MR. FOX:  Your Honor, that's --

16           MR. GWILLIAM:  We will have expert testimony on this

17  too.

18           MR. FOX:  Then that should be for the expert.  This

19  is counsel's argument.  It's not relevant as to this witness.

20           THE COURT:  Counsel approach.

21      (The following proceedings were held at sidebar between

22       the Court and counsel:)

23           THE COURT:  Your co-counsel is always welcome to join

24  at any sidebar.

25           MR. RUTTER:  She's smarter too.  She probably should.

1          THE COURT:  You know, this is another one of those

2     areas where this case is unusual.  To what extent is the jury

3     being asked to accept the district attorney's testimony

4     regarding typical practices in that county versus --

5          (Fire drill.)

6          (Recess.)

7          THE COURT:  We're outside the presence of the jury.

8     And I thought before we -- they, some of them had to use the

9     facilities when they got back from the fire drill.  So I

10    thought while they were busy, that maybe we could talk about

11    this outside their presence.

12         Here's what I think the distinction is:  It would

13    seem to me reasonable for Mr. Morse to testify based upon his

14    experience as the District Attorney of Merced County, what the

15    typical usual procedures that were followed in filing of

16    criminal cases and everything that leads up to it was.  It

17    does not seem appropriate to me that he testify as to his

18    opinions about what should or should not have happened.

19    Because there, I think he's testifying as an expert.  Hasn't

20    been qualified as an expert.  It's an unusual situation given

21    the fact that he's not testifying in his capacity as District

22    Attorney.  Though obviously he has knowledge about the way

23    things normally worked in his experience as the lead

24    prosecutor elected DA of that county.  Does it make sense --

25         MR. GWILLIAM:  Well, I hear what you're saying, Your

Honor, and I tried hard not to frame that and do not want to

frame that as an expert opinion.  And I think perhaps if I

rephrase the question, it might make it a little better, to

say, you know, given generally what you knew about it, what

would you expect from the protocol, the type of evidence that

you would receive as opposed to tying it in necessarily to all

this evidence that he learned later.

          I think when I got into the question about what he

learned later, that may have alerted the Court and,

appropriately, counsel to the fact that it sounded like expert

testimony.  But I really do want to keep it within the

protocol, practices of what he expected in this type of a

case.  So maybe if I can just frame it differently, we'll

avoid that problem.

          THE COURT:  The question was:  Given your

understanding of what's happened and the facts, what would you

expect would be the proper procedure and protocol in terms of

what information you feel they should have given you with

regard to the Hernandez murder in order for you to evaluate

whether or not you felt you were ready to proceed with

charges?

          MR. GWILLIAM:  Okay.

          THE COURT:  That was the question that drew a

relevance objection.  I take it the basis was that they called

for an expert opinion.

1          MR. FOX:  It's both, Your Honor, having heard it

2     again.  It does call for an expert.  And what his feeling is

3     is irrelevant.  What he thinks.  I also think counsel is still

4     asking an inappropriate question.  It doesn't matter what this

5     person says custom and practice is.  That would turn him into

6     an expert.  Because what they're going to then say is so you

7     heard what the custom and practice is and that was breached.

8     He shouldn't be testifying to what the custom and practice or

9     the standard for what should be submitted for an arrest would

10    be.

11         The other reason it's irrelevant, Your Honor, is this

12    wasn't a warrant.  This wasn't an arrest submitted to the DA

13    for filing and arrest.  They didn't arrest him and take him to

14    the DA.  They went to the judge first for a Ramey warrant.  So

15    it's a different standard now that he's asking about.

16         THE COURT:  You know, we've had this debate before.

17    And I continue to stick by my position.  There is only one

18    definition of probable cause.  There is not a different one

19    for a, quote, Ramey warrant.  One for a search warrant.  One

20    for -- no.  Probable cause means something.

21         MR. FOX:  I didn't -- I understand that, Your Honor.

22    My argument wasn't clear then.

23         THE COURT:  Okay.

24         MR. FOX:  What the normal procedure is to bring the

25    District Attorney evidence so that the District Attorney can

1    say what should be done is not relevant in this case because

2    that's not what happened here.  That's -- so I think it

3    doesn't matter what he thinks for those two reasons and it

4    does go into expert testimony, even the way counsel -- it

5    sounds like he's withdrawing the question or the Court's

6    sustaining the objection, I don't know which.  And then he

7    wants to rephrase it.  I don't think he's cured the problem.

8            THE COURT:  Well, see, I disagree with part of your

9    argument.  Because I think this witness can testify as in his

10   experience.  He can give lay testimony regarding in his

11   experience what he would have expected to receive prior to the

12   arrest being made, the press conference being held.  And

13   although it's a little unclear to me -- I don't think I

14   understand the situation because I'm not sure why the

15   Sheriff's -- I don't understand why the Sheriff's Department

16   was briefing the DA prior to the second arrest of Tellez when

17   the DA -- it was my understanding that the sequence of events,

18   based upon what you all have been telling me for a while, that

19   by that time the DA's Office was -- they weren't out at the

20   time of the Tellez second arrest?

21           MR. FOX:  No.

22           THE COURT:  It was shortly thereafter.

23           MR. FOX:  Yes.

24           MR. GWILLIAM:  Right.

25           THE COURT:  Within days thereafter.

1           MR. FOX:  Right.

2           THE COURT:  So Bowers wasn't involved at this point.

3           MR. GWILLIAM:  No, no.  May I make my position --

4           THE COURT:  Well then I think it is relevant.

5           MR. GWILLIAM:  Okay.

6           THE COURT:  It goes to -- with respect to malicious

7    prosecution, it goes to the state of mind of the officers.  If

8    this DA, who was involved in the case, says, "Look, in my

9    experience this is what normally would have happened, that's

10   not what they did."

11          MR. GWILLIAM:  And if I can just add to that point

12   briefly.

13          THE COURT:  I'll get back to Mr. Fox.  Mr. Gwilliam.

14   Briefly.  And then I'm going to rule.

15          MR. GWILLIAM:  And it's not -- we're asking for a

16   breach of protocol by Hale because we contend that Hale was

17   rushing to judgment.

18          THE COURT:  I get it.

19          MR. GWILLIAM:  I think you get that.  So --

20          THE COURT:  Mr. Fox.

21          MR. FOX:  This would be an interesting argument and

22   questions if it dealt with the plaintiff.

23          THE COURT:  I understand.

24          MR. FOX:  This is Tellez.  The claim is malicious

25   prosecution of Mr. Morse.  Not Mr. Tellez.

1          THE COURT:  I get it.

2          MR. FOX:  So now we're talking about what was the

3     rush to judgment and all this.  At this point, Your Honor, it

4     is clear the Sheriff's Department has no idea Ethan Morse is

5     involved.

6          THE COURT:  I understand.

7          MR. FOX:  So why are we going down this rabbit hole

8     of the process and the protocols for arresting Tellez when

9     that's not part of the malicious prosecution claim?

10          THE COURT:  I think it has some relevance.  You know

11     what I really think is a little bit of a red herring, just for

12     what it's worth, is the whole retaliation aspect.  Because I

13     think really what this is really all about was -- I think this

14     testimony about a rush to judgment in pursuing Tellez and how

15     that was handled has some relevance with respect to the

16     overall prosecution.  I'm going to allow it.

17          But I'm -- and I'm overruling -- well, I'm sustaining

18     the objection to the way the question was phrased, I'm

19     overruling the more general objection though you can certainly

20     make it on the record when the question is asked to preserve

21     your record.

22          I'm instructing you, Mr. Gwilliam, not to ask for

23     expert opinion but to ask only questions relating to this

24     witness' knowledge based upon his experience -- his particular

25     experiences.

1          MR. GWILLIAM:  Right.

2          THE COURT:  Let's bring the jury back in.  Off the

3    record.

4     (Off the record.)

5     (The jury entered the courtroom.)

6          THE COURT:  All right.  Let the record reflect that

7    we are back in the presence of the jury.  And ladies and

8    gentlemen, as I said to counsel, we need to look on the bright

9    side.  The weather was nice, it wasn't raining.  If you're

10   going to have a fire drill, it wasn't the worst day to have

11   one.  So thank you for your cooperation in that drill.

12          And Mr. Gwilliam, you may continue.

13          MR. GWILLIAM:  Yes.  After our little mandatory

14   exercise, hope we all feel better.

15   Q.  Larry, I want to rephrase the question and ask you.  I

16   want to focus our attention on the general protocol and

17   practices of the District Attorney and it's related to the

18   Sheriff's Department when they bring a case to you under

19   circumstances as they brought the Hernandez case.

20          In that sense, can you tell me, you've told us a

21   little bit about what type of evidence you didn't get.  Can

22   you tell us what type of evidence you would expect to get if

23   you had been properly briefed under the practices and protocol

24   of the District Attorney's Office?

25          MR. FOX:  Objection, Your Honor.  It's argumentative.

1          THE COURT:  Overruled.

2          MR. FOX:  And relevance and 403, Your Honor, as we

3   discussed.

4          THE COURT:  Overruled.

5          MR. FOX:  Thank you, Your Honor.

6          THE WITNESS:  May I?

7          THE COURT:  You may answer.

8          THE WITNESS:  Thank you.  Well, it's -- obviously

9   when the detectives are coming over to talk to us about the

10  evidence in a case, they're going to tell us all the facts

11  that point to a person's guilt, what they believe points to a

12  person's guilt.  We obviously expect that.  What is even more

13  important, from our standpoint, is whatever information there

14  is that is exculpatory, that doesn't suggest that this person

15  may have been responsible.

16         Basically, I want to know the bad news as well.  If

17  there are facts that are inconsistent with a person's guilt,

18  it's as important, if not more so, for me to know that.  We

19  have to take this case into a courtroom and prove it to a

20  jury.  And so I need to know the bad news.  And so if you're

21  not giving us the bad news, then it's not an accurate and not

22  a competent briefing.

23  BY MR. GWILLIAM:

24  Q.  Let me just make sure that we all understand exactly what

25  happened.  As it relates to Hale coming in for the Sheriff's

1    Department to tell you about the Tellez arrest for the

2    Hernandez murder, what information, if any, did you receive

3    other than the fact that they told you that Tellez had, quote,

4    "confessed to the murder on a 911 tape." Did you get any

5    other information?

6    A.   No, sir. And it -- actually, it wasn't necessarily

7    confess, it was admitted. He hadn't confessed. They

8    characterized it as an admission because they had this tape

9    that they thought he was saying something that suggested he

10   was involved.

11   Q.   Okay. All right. I think we've covered that. Let's turn

12   to what happened next there. So the press conference went on.

13   Did you attend the press conference?

14   A.   No, I did not.

15   Q.   But you -- did you hear about the press conference in the

16   news? Was it newsworthy?

17   A.   Yes. Very much so.

18   Q.   Okay. And after the press conference happened, did you

19   hear from your son? And if so, please tell us how that came

20   about.

21   A.   Yes. That evening we were at home. And we had a couple

22   of discussions over the previous 16 months about that case.

23   You know, it was a very high profile case. And we were

24   sitting at home and maybe the TV had come on. But I told him,

25   "I think we might have cleared that Easter shooting." And

1   Ethan looked at me and said, "Dad, they have the wrong guy."

2   And I said, "What do you mean they have the wrong guy?"   He

3   goes, "He didn't do it."  And I said, "How do you know he

4   didn't do it?"  And he said, "I was there."

5   Q.   What was your reaction to that?

6   A.   Well, my heart fell out of my chest and I said, "What do

7   you mean you were there?"   He said, "You know, we were at

8   that party.  I went to that party." And it was -- he had said

9   previously when we asked him about it -- because there were

10   kids from all the high schools had gone to that party.  I

11   asked him if he had gone to that party and he said no.  And so

12   I said, "Well, this is really serious, Ethan.  What's -- what

13   do you know?  What's going on?"

14   Q.   So did he tell you what he knew in a general sense at that

15   time?

16   A.   He did.

17   Q.   Just generally tell us what he told you.

18   A.   He said that he and several people had gone to the party

19   in our car.  We own an old Land Cruiser, '98 Land Cruiser that

20   he had use of.  And we had been out of town, Cindy and I, for

21   that weekend.  And of course, you always hold your breath when

22   you leave town with teenagers.

23        But they had gone to this party, he and a number of

24   his friends had gone to this party.  And that they had pulled

25   up and it was out in the country.  And that when they walked

1    in, started walking in, there were a lot of people walking

2    into the party, that they had walked by some guys who looked

3    sort of sketchy.

4           MR. FOX:  Excuse me for a second.  Your Honor, this

5    is all hearsay now.  Objection, hearsay.

6           THE COURT:  What is --

7           MR. GWILLIAM:  Well, Your Honor, we're offering it to

8    show what information he received and what actions he took

9    from it.  And I think it's a consistent statement.  So I'm not

10   necessarily offering it for the truth of what happened out

11   there, but I think that this conversation with his son and

12   what happened thereafter is relevant to the facts here.  And I

13   think it's appropriate.

14          MR. FOX:  Your Honor, he can say you had a

15   conversation, what did you do as a result of that?  Mr. Morse

16   is going to testify and he can get it directly from him.

17          THE COURT:  I'm going to sustain the objection, both

18   with respect to hearsay and in particular with respect to the

19   narrative nature of the testimony.  Tell us everything that he

20   told you at that time.

21          MR. GWILLIAM:  Okay.

22          THE COURT:  Ask specific questions and --

23          MR. GWILLIAM:  I was trying to avoid leading

24   questions.

25          THE COURT:  -- nonhearsay.

```
 1              MR. GWILLIAM:  So let me see.
 2    Q.  He told you in some detail, did he, about what had
 3    happened that evening?
 4    A.  He did.
 5    Q.  And can you just briefly say, in essence, he told you he
 6    was there.
 7    A.  Yes.
 8    Q.  And after he had given you this discussion of what had
 9    happened, what was your reaction in terms of what should
10    happen next?
11    A.  Well, I satisfied myself, my wife and I, that Ethan had
12    told us everything he knew.  And at that point, I realized
13    that a person was in jail for something that he didn't do.
14    And that is obviously the worst thing that can happen in the
15    system.  And so we -- I told Ethan, "Well, we obviously got to
16    call the detectives and tell them there's a mistake."
17    Q.  Okay.  So what did you do?
18    A.  So we called -- I think I called Detective Hale that night
19    and I told him, "There's a problem with the Tellez arrest.  My
20    son just advised me that he was there and that Tellez didn't
21    have anything to do with the shooting."
22    Q.  And so what was Hale's response?
23    A.  I can't specifically recall what his response was.  I said
24    he -- "my son wants to come in and talk to you about this."
25    And I think we made arrangements to talk the next day.
```

1  Q.  Okay.  And so what happened then next in terms of Ethan

2  going in and talking to the Sheriff's Department about his

3  being a witness?

4  A.  The next day was a Friday, as I recall.  And I called

5  Detective Hale again and was hoping that Ethan would be able

6  to come in and testify -- or to be interviewed that day.  I

7  was wanting this guy out of custody if he's in jail for

8  something he didn't do.  But they wanted to interview Ethan on

9  Sunday.  And so I said, "Okay.  We'll make him available on

10  Sunday."  And so on Sunday, Ethan -- I drove Ethan over to the

11  detective division Sunday evening, early evening for the

12  interview.

13  Q.  So you drove Ethan to the Sheriff's Office?

14  A.  Yes.

15  Q.  And did you ask to be present at the interview?

16  A.  No.  They asked me if I wanted to sit in on the interview

17  and I said, "No, he knows to tell the truth."

18  Q.  And so you left him with Hale and Macias; is that correct?

19  A.  I did.

20  Q.  And about -- I presume that Ethan came home later that

21  evening?

22  A.  He did.

23  Q.  And reported to you that he had a conversation with him?

24  A.  He did.

25  Q.  Did he report to you that he had any concerns about what

1   had happened in the interview?

2   A.  He did.  He wasn't comfortable express --

3          MR. FOX:  Objection, Your Honor, this is hearsay.

4          MR. GWILLIAM:  I think it goes to the state of mind.

5          THE COURT:  Overruled.  I'll allow the witness to

6   answer.  It's not admitted for the truth.  It's as to

7   explaining this witness' actions thereafter, I believe.  You

8   may answer.

9          THE WITNESS:  Thank you, Your Honor.  He expressed

10  some concern about the way that they had questioned him.  I

11  just recall him saying, "I really didn't like where they were

12  going or what they were asking about."  He didn't like the way

13  that it had happened.

14  BY MR. GWILLIAM:

15  Q.  And Ethan had told you that there were a number of other

16  kids in the car with him on the evening of the party; right?

17  A.  Yes.

18  Q.  And what, if anything, did he tell you about whether or

19  not he was going to assist the Sheriff's Office in bringing in

20  those other witnesses?

21  A.  Well, he wanted -- he was definitely going to assist.

22  Everything was going to come out.  He wanted to contact

23  the -- these people himself because, like him, I think some of

24  kids had not told their parents that they had been at this

25  party.  And he was hoping that -- not to have to drag anybody

43

1   else into this if he didn't need to.  And he was hoping that

2   once he told them the story, that Tellez would be released and

3   that would be the end of it.

4   Q.   Okay.  But it turned out that instead the Sheriff's

5   Department began interviewing at least some of the other kids

6   in the car; is that correct?

7   A.   That's what I was -- came to understand.

8   Q.   So --

9          THE COURT:  Please let the witness finish his answer.

10   That was?

11          THE WITNESS:  I'm sorry, Your Honor?

12          THE COURT:  The question was they started to begin

13   interviewing at least some of the kids in the car; is that

14   correct?  And your answer was?

15          THE WITNESS:  Yes, sir.  That's what I came to

16   understand.

17          THE COURT:  Thank you.

18   BY MR. GWILLIAM:

19   Q.   At some time, as far as you're concerned, did the subject

20   come up of whether or not Ethan should take a polygraph?

21   A.   Well, I know that he volunteered to take a polygraph.

22   Q.   As far as you're concerned, is polygraph sometimes

23   appropriately used in investigations even though they're

24   inadmissible?

25   A.   It's a tool that detectives will sometimes use.  Sometimes

1    just presenting the option to someone will either convince

2    someone to cooperate or could be an indication of whether

3    somebody is being truthful or not.

4    Q.   Did you ever talk to Hale or anybody in the Sheriff's

5    Office about his willingness to take a polygraph?

6    A.   No, sir.

7    Q.   Let's turn to what happened to you.  What was your

8    reaction, in terms of your being able to prosecute the case

9    once your son had come forward as a witness?

10   A.   Well, initially when Ethan told me that he had been there

11   and that Tellez hadn't done it, I still thought, well, okay,

12   once this is explained to the detectives that Tellez -- excuse

13   me, Tellez will be released.  And I will still be able -- our

14   office will still be able to prosecute the two folks in the

15   back yard.

16          After Ethan was interviewed on Sunday, the following

17   day, Monday, one of my chief deputies, Rob Carroll, told me

18   that, "I don't know, the detectives seem to have some issues

19   with Ethan's statements."  And I said, "Really?"  And he said,

20   "Yeah."  I said, "Well, then we'll probably have a conflict.

21   Let's talk about this later."

22          And so I think on Tuesday, the next day, I had

23   learned that they had some issues with Ethan's statements or

24   his involvement.  And so I said, "Well, then we clearly -- we

25   have a conflict, we're going to have to get out of this."

Larry Moose

45

1   Q.   Okay.  And is that what you did?  You turned it over to

2   the Attorney General's Office?

3   A.   Yes, sir.  I instructed one of our chief deputies to

4   contact the Attorney General's Office, which is what happens

5   often times when you have conflicts.

6   Q.   And during that week, after you had turned it over to the

7   AG's office, were you aware that Ethan was continuing to try

8   and get other kids to come in and be witnesses for the

9   Sheriff's Department about what had happened?

10  A.   Yes.  It was -- a couple of those kids, Ethan was still

11  friends with -- Andrew Masengale -- were easier.  Some of

12  those other kids that were with I had not met and they weren't

13  close friends of Ethan's, they were just acquaintances that

14  went to that party that night.  So he was trying to track down

15  some of those folks as well.  I'd asked him about it.  But it

16  was 16 months later.

17  Q.   Right.

18  A.   So, you know, everybody had moved on.  Ethan was about to

19  go to college.  So it was quite some time after the fact.

20  Q.   Did you know that he tried to and eventually took Robert

21  Tern into the Sheriff's Department to be interviewed?

22  A.   Yes.

23  Q.   Did you know Robert Tern, Larry?

24  A.   Yes.

25  Q.   Tell us a little bit about him.  How you knew Robert.

1   A.  Robert was a friend of Ethan's from high school.  Robert,

2   very shy.  Southeast Asian kid.  Hmong family.  Family worked

3   the fields.  Very, very shy.  Very nice kid.  He'd come with

4   us on family vacation one time.

5           MR. FOX:  Your Honor, relevance of all this.  It's a

6   narrative.

7           THE COURT:  Sustained as to the narrative.  Please

8   ask questions.

9           MR. GWILLIAM:  Okay.

10  Q.  So Larry, you knew him, you'd actually been on vacations

11  with him, he's been to your home?

12  A.  Yes.

13  Q.  And when Ethan began to try to talk to Robert, did he

14  indicate that he was -- that Robert was having any concerns

15  about going into the Sheriff's Department?

16  A.  Oh, Robert was very afraid of law enforcement just in

17  general, I think, as I understood it, from the family's

18  experiences in southeast Asia.

19  Q.  And did you feel -- did you have any contact yourself with

20  Robert in order to encourage him to come in?

21  A.  Not at that time, no, I did not.

22  Q.  At some time later did you talk to Robert about this?

23  A.  Yes, after Ethan was arrested, I talked to Robert about

24  it.

25  Q.  Are you sure you didn't talk to him beforehand?

1   A.   I don't remember talking to -- I could have.  I don't

2   really recall talking to Robert.  The kids were in and out.  I

3   don't recall that I talked to him until after Ethan was

4   arrested.

5   Q.   He seemed to recall that you did.  But let's --

6   A.   I -- I may have.  But I don't really recall anything

7   specific about talking to Robert.

8   Q.   Let's assume that you had a conversation with him in order

9   to encourage him to go in to speak to the Sheriff's

10  Department.  Do you think that would have been appropriate

11  once you'd stepped out of the case?

12  A.   Absolutely.

13  Q.   Do you think that there's any problem with your having a

14  conflict of interest in terms of encouraging witnesses to come

15  in there?

16          MR. FOX:  Calls for an expert opinion, Your Honor.

17          MR. GWILLIAM:  No.

18          THE COURT:  No.  Overruled.

19          THE WITNESS:  My conflict of interest was in

20  prosecuting this case, not cooperating or encouraging

21  witnesses to come forward with information that they had.  I

22  didn't have any conflict in encouraging witnesses to

23  participate or cooperate in an ongoing investigation.

24  BY MR. GWILLIAM:

25  Q.   You did talk to one of the witnesses and encouraged him to

Larry Moose - D

48

1   come in, did you not?

2   A.   Yes.

3   Q.   Tony Gomes.

4   A.   Yes, sir.

5   Q.   Now, Larry, you have been accused in this courtroom

6   publicly by Mr. Fox of a conflict of interest and ethical

7   violations.  Do you think you did anything wrong whatsoever in

8   trying to assist the Sheriff's Department with these

9   witnesses?

10  A.   No.

11          MR. FOX:  First of all, Your Honor, it's

12  argumentative.  The preface is not a question and I'd ask the

13  Court to strike that.

14          THE COURT:  I will.  And?

15          MR. FOX:  Sorry?

16          THE COURT:  Was there any other objection?

17          MR. FOX:  No.  And I move to strike counsel's

18  comments and the jury be instructed, Your Honor.

19          THE COURT:  Well, I'm not going to instruct because

20  the jury has been instructed that counsel's questions are not

21  evidence.  But I am going to ask you to rephrase because the

22  preface to the question was argumentative.

23          MR. GWILLIAM:  Okay, Your Honor.

24  Q.   Larry, I want you to tell us, please, whether you feel

25  that you violated any ethical duties whatsoever in talking to

1    these kids and encouraging them to come into the Sheriff's

2    Department to -- before Ethan was arrested?

3    A.   No.  None whatsoever.

4    Q.   Tell us why you feel that way.

5    A.   I had no idea that they were looking at Ethan as anything

6    other than a witness.  I never thought that Ethan was a

7    suspect until he was arrested in our front yard.  I was trying

8    to get these kids to come forward and tell what they knew

9    because a young man was sitting in jail charged with murder

10   that I believed he wasn't responsible for.

11        These kids were all terrified because this had been a

12   gang related shooting.  There were many kids from good schools

13   who were at that party, good kids, good families at that

14   school -- or at that party.  They were all terrified because

15   of fear of retaliation.  And so nobody was coming forward.

16   Why the case was so cold.  Ethan had the courage, in my

17   opinion, to come forward and say, "This is wrong.  He didn't

18   do it."

19   Q.   Let's stick with your -- as far as you're concerned.  You

20   talked to Tony Gomes, did you not?

21   A.   I did.

22   Q.   Now, I want to ask you this question.  Let's talk about

23   Tony Gomes.  And if you would like -- have you reviewed the

24   police report as it relates to the Tony Gomes interview, and

25   particularly a phone call that occurred between your household

1  and Tony Gomes while he was being interviewed?

2  A.  Yes, I have.

3  Q.  If you need to refer to it, the exhibit number in front of

4  you is Exhibit 37.  Just want to make sure.  I'm not going to

5  offer that, Your Honor, I just want to make sure that he has

6  read that and refreshed his recollection.

7          MR. RUTTER:  Plaintiff's Exhibit 37.

8          MR. GWILLIAM:  Plaintiff's Exhibit 37, correct?

9  Q.  Does that appear to be it?

10  A.  Yes.

11  Q.  Now, I want to ask you this question.  How was it that it

12  came about that you had a conversation with Tony Gomes which

13  apparently occurred on July 24th, the Thursday before your son

14  was arrested?

15  A.  I think it was Tuesday.  I don't think it was -- I think

16  it was earlier than that.  But Ethan had been trying to find

17  Tony Gomes.  You know, he -- and apparently at some point we

18  were in the kitchen, I heard Ethan on the phone and apparently

19  he was talking to Tony Gomes.

20  Q.  Okay.  I want to ask you this question.  Did you yourself

21  call Tony Gomes?

22  A.  No.

23  Q.  Who called Tony Gomes from your house?

24  A.  Ethan.

25  Q.  You did not call him yourself; correct?

1   A.   No.  And I didn't know that Ethan was calling him either.

2   Q.   And while Ethan was talking to him, did you come to the

3   understanding that he was talking to Tony?

4   A.   I heard Ethan say, "Just tell the truth."  And at that

5   point, I said, "Who are you talking to?"  And he said,

6   "Tony."  And I said, "Let me talk to Tony."

7   Q.   All right.  Tell me about your relationship with Tony

8   Gomes.  How well did you know this young man?

9   A.   He was another casual friend of Ethan's.  I think he was a

10  little older, a year or so older.  He had been on a vacation

11  with us as well.  I knew him not well, but he was an

12  acquaintance of Ethan's.

13  Q.   And why did you feel that you wanted to talk to Tony while

14  your son was chatting with him?

15  A.   Because I was wanting these kids to come forward and

16  cooperate and tell the sheriff.  They were all still afraid to

17  speak to the police, to the Sheriff's Department.  And I heard

18  Ethan say, "Just tell the truth."  And then I asked him, "Who

19  are you talking to?"  And he said "Tony."  And I said, "Let me

20  talk to him" because I wanted to encourage Tony to get in

21  there and talk to the sheriff.

22  Q.   At some time did you learn that apparently someone from

23  the Sheriff's Department surreptitiously recorded the phone

24  call that you had with Tony Gomes there at your house?

25          MR. FOX:  Objection, Your Honor, it's argumentative.

52

1    And lacks foundation.

2              THE COURT:  Rephrase the question without

3    "surreptitiously" because I assume you'll ask him whether he

4    knew he was being recorded after you establish that.

5              MR. GWILLIAM:  All right.  Thank you, Your Honor.

6    Q.  While you were having this conversation with Tony Gomes,

7    were you aware that the Sheriff's Department was recording it?

8    A.  No, I wasn't.

9    Q.  When did you learn later that the Sheriff's Department had

10   recorded your conversation with Tony Gomes?

11   A.  Tony Gomes.  I don't recall specifically, counsel.  The

12   following week.  Sometime afterwards.

13   Q.  But you recall your conversation with Tony Gomes.

14   A.  Yes.

15   Q.  And you've refreshed your memory from the tape that you

16   got in Exhibit 37; right?

17   A.  Yes, sir.

18   Q.  As far as you're concerned, did you say anything

19   inappropriate to Tony Gomes?

20   A.  Absolutely not.

21   Q.  Give us the essence of what you said in your conversation

22   with him in terms of encouraging him to come forward.

23   A.  I told Tony that he needed to grow some stones and come

24   forward and tell what he knew.

25   Q.  What did you mean by that?  Pardon me.

1    A.  Well, these kids were all still afraid.  And you know, at

2    this point, my biggest concern was that we had somebody in

3    jail charged with murder that wasn't guilty.  And these kids

4    were letting him sit there.  And I was getting frustrated with

5    these kids.  And I'm like, "Come forward and talk to the

6    detectives and tell the truth."  I think I told him at least

7    six or seven times during the conversation, "Tell the truth.

8    Tell the truth.  That's all you need to do is tell the truth.

9    This is what I understand happened," you know, and I walked

10   back through what Ethan had told me.  And said, "Just go tell

11   the truth."  I never --

12   Q.  And in looking at that, and reading it back, you've been

13   questioned about this before.  Do you feel now that you did

14   anything at all inappropriate in encouraging Tony Gomes to

15   come forward?

16   A.  Absolutely not.

17   Q.  And he, in fact, did ultimately give a statement to the

18   Sheriff's Department?

19   A.  Yes.

20   Q.  Okay.  Thank you.  All right.  Let me turn to an entirely

21   separate subject.  How was it, Larry, that you first became

22   aware that your son had been arrested for murder in regard to

23   this investigation?

24   A.  We were -- it was Friday afternoon.  And we were sitting

25   in -- I had come home a little early, it was late Friday

1    afternoon.  And Ethan was there with a couple of friends.  And

2    they were getting ready to go and float the Merced River.  And

3    he and I had a nice moment where we were talking about him

4    getting excited about going off to college.  He was about

5    three weeks from leaving.  And, you know, you get sort of

6    misty eyed thinking about your son, your children leaving home

7    anyway.  So we were having just a nice father/son moment and

8    talking about that.  And they were -- he was in shorts.  And

9    he left.  And as usual, "Be careful."  And I was sitting back

10   down in the den.

11          And a couple minutes later, somebody -- one of his

12   friends came running back into the house and said, "Mr. Morse,

13   they're arresting Ethan." And I said, "What?"   And he said,

14   "They're arresting Ethan."  And so I ran outside and I could

15   see that there was a sheriff's detective who I knew, who was

16   in an unmarked car.  And he had Ethan in handcuffs.  And this

17   is right in the middle of the street in my front yard at three

18   or four o'clock in the afternoon on Friday.  And I ran out and

19   I said --

20          MR. FOX:  Your Honor, this is now -- it's

21   nonresponsive.  It's been covered.

22          THE COURT:  Overruled.

23          MR. FOX:  It's a narrative.

24          MR. GWILLIAM:  All right.

25          THE COURT:  It is.  Ask a question.

 1   BY MR. GWILLIAM:

 2   Q.  Okay.  So when you all of a sudden saw your son there in

 3   handcuffs being put in a sheriffs car, what did you do next?

 4   A.  I said, "Roy, what's going on?"  And he said, "We're

 5   detaining Ethan."  I said, "It looks to me like you're

 6   arresting Ethan."  He said, "Well then we're arresting him."

 7   I said, "On what charge?"  He said, "You're going to have to

 8   call the sheriff."

 9           MR. FOX:  This is all back -- everything he isn't

10   saying is hearsay.  So we just keep going back with hearsay.

11   Non-party.

12           THE COURT:  I'm going to overrule the objection.  You

13   may continue.

14   BY MR. GWILLIAM:

15   Q.  So go ahead with your conversation with the Sheriff's

16   Department.

17   A.  And at that point, he had said, "Well, you're going to

18   have to call the Sheriff."  And I think Ethan was in shorts

19   and I said, "Can I get him a shirt?"  I think.  And ran in and

20   got him a shirt.  And then I told Ethan, "Don't say anything"

21   at that point and that was --

22   Q.  All right.  Now --

23   A.  They took him away.

24   Q.  Let me ask you, Larry.  Is there a protocol, as far as you

25   know in the Sheriff's Department, perhaps in law enforcement

1    in Merced County, about whether or not someone who is not a

2    flight risk, who is perhaps well known in the community, a

3    doctor, a lawyer, something like this, can be brought in for

4    an arrest without having to be handcuffed in this manner?

5           MR. FOX:  Objection, Your Honor.  Relevance.  Asking

6    for expert opinion.

7           THE COURT:  Overruled.

8           THE WITNESS:  I don't know.  Every -- you know, the

9    agencies do it differently on different cases.  I completely

10   thought it was unnecessary to arrest my son in the front yard.

11   If they wanted to see him, if they wanted him to turn himself

12   in, he absolutely would have done so.

13   BY MR. GWILLIAM:

14   Q.  Okay.  That's --

15   A.  I didn't understand why they --

16   Q.  There is a process where they can call and ask somebody to

17   turn themselves in if they've got a lawyer and that sort of

18   thing; right?

19   A.  Yes.

20          MR. FOX:  Objection.  Leading, Your Honor.

21          THE COURT:  Sustained.  Strike the answer.

22   BY MR. GWILLIAM:

23   Q.  Do you know whether or not there is a protocol where

24   people can be -- turn themselves in and not be arrested in

25   Merced County?

 1   A.  I don't --

 2   Q.  Just the --

 3   A.  I don't know if there's a protocol per se.

 4   Q.  Do you know if that happens?

 5   A.  It does happen.

 6   Q.  All right.  And you were never notified in any way, shape

 7   or form about your son's arrest or even that he was a suspect

 8   until they showed up in your front yard.  Right?

 9            MR. FOX:  Objection.  Relevance.

10            THE COURT:  Overruled.

11            THE WITNESS:  No, I was not.

12   BY MR. GWILLIAM:

13   Q.  Okay.  Larry, let me ask you a question about Ethan in

14   July of '14.  Tell us a little bit, if you would, what was

15   going on with Ethan?  What kind of a kid was he just before

16   the arrest happened?  What was happening in his life then?

17            MR. RUTTER:  Objection.  Vague.

18            THE COURT:  Overruled.

19            THE WITNESS:  He was in a great spot.  Ethan was a

20   wrestler.  That was his identity.  He was a very good

21   wrestler.  He was all league twice and he made it all the way

22   to the state championships, which is an incredible

23   accomplishment.  And wrestling is a pretty consuming sport.

24   You have to -- you're always losing weight, making weight,

25   working out.  It's a very demanding sport.  But he loved it.

 1    And that he had gotten a scholarship, partial scholarship to

 2    wrestle just validated everything that he had been working

 3    for.

 4            And ironically, I had just been getting ready to do a

 5    little release to the newspaper about him having gotten a

 6    scholarship to Ouachita Baptist for wrestling.  But before I

 7    got that press release to the paper, he was arrested and

 8    charged with murder.

 9    BY MR. GWILLIAM:

10    Q.   Now, what is Ouachita Baptist?  Can you tell us a little

11    bit about that university and why he got this scholarship,

12    wrestling scholarship to go there?

13    A.   Ouachita Baptist is a school in -- smaller school in

14    Arkansas.  It was a Division 2 program.  There's Division 1

15    wrestling and Division 2.  It was a very good program.  Coach

16    was nationally known.  They were very interested in Ethan.  My

17    wife is from -- originally from Little Rock.  And so there was

18    family nearby.  So it was just a perfect situation for him and

19    for us.

20    Q.   A little more about Ethan.  What kind of a kid was he, had

21    he ever had any serious trouble as far as you were concerned,

22    up until -- well, at any time up until the time he was

23    arrested?

24    A.   No.  Far from perfect.  I have three boys and all of them

25    far from perfect.  But a good kid.  Good heart.  Loyal.  Hard

1    working kid.  He was our optimist, you know, our cup half

2    full.  Ethan was always the one that the cup was all the way

3    full.  Everything was, you know, positive and good and it was

4    going to be great.

5    Q.  Where does he fit within your three sons in terms of -- if

6    you can tell us.

7    A.  He's our middle son.

8    Q.  Middle son.  Okay.  All right.  So let's turn to what

9    happened afterwards.  So what happened to Ethan, as far as you

10   know, Larry, after he was arrested on the afternoon of Friday,

11   July 24th, 2014?

12   A.  He was taken to jail in Merced County.  And I called the

13   sheriff, who at that time I think was the acting sheriff, Tom

14   Cavallero, and I asked Tom what's going on.  And he said,

15   "We've arrested your son."  And I said, "For what?"  And he

16   said, "For murder."  And I said, "Are you saying that Ethan

17   was a shooter in this thing?"   And he said, "No, as an aider

18   and abetter."  And I don't recall whether I told him or

19   something about "please don't keep him in custody in Merced."

20   But at some point I think that was communicated.

21   Q.  Why did you not want him in custody in Merced, Larry?

22   A.  Because I didn't think his safety could be protected

23   there.  I'm the District Attorney, the news -- there's no

24   secrets in a jail.  The news would go like wildfire and people

25   who have a beef with me or the District Attorney's Office

1    would possibly, you know, want to hurt Ethan.  It's always a

2    concern.

3    Q.  Was he, in fact, subsequently sent then to another county

4    in the jail?

5    A.  Yes, they moved him to Mariposa County.

6    Q.  How long after he was arrested they moved him up there?

7    A.  Either later that night, I think.  Later that evening.

8    Q.  Now, was it your understanding that Ethan was charged with

9    what they call a gang enhancement so that there could be no

10   bail for his charges?

11   A.  Well, he was charged with first degree murder and gang

12   enhancements, which obviously was ridiculous.  They charged

13   him as being involved in a criminal street gang, which is what

14   the charge meant.  And --

15   Q.  And who -- from your understanding -- you've looked at the

16   records, from your understanding, who was it that initiated

17   this gang enhancement charge against Ethan?

18   A.  The detectives.

19   Q.  Okay.  Let's talk just a little bit about what happened to

20   Ethan during the period of time up until the time of his

21   preliminary hearing.  Did you make efforts to try and get him

22   a lawyer?

23   A.  Yes, sir.

24   Q.  And did you find a good lawyer for him?

25   A.  Yes, we did.

1  Q.  And did you communicate with him and visit him in the jail
2  in Mariposa?
3  A.  Yes.  We went up -- we had one day that you could see him
4  behind glass on a Friday I think was visiting day.  And then
5  he was able to make a phone call each day, I think.  So we
6  spoke to him every day and saw him every Friday.
7  Q.  How would you describe for the jury how -- what kind of
8  problems, if any, Ethan was having?  Particularly from an
9  emotional standpoint while he was in jail.
10  A.  He couldn't believe he was in jail is, I think, the
11  biggest thing.  He kept -- when we would see him, he would
12  ask, "What's going on?"   And, you know, I couldn't really
13  tell him anything.  And since the phones in the jail are
14  recorded, I told him, "Don't say anything and we can't talk
15  about your case at all.  But we know this is wrong and we will
16  do everything we can to make this right."
17         Initially, he was a couple weeks from going away to
18  college.  So he kept saying, asking us, "Do you think they're
19  going to let me out?  Do you think I'll be able to go out in
20  time to go to college?"  And my wife and I both knew that that
21  wasn't likely, but we didn't tell him that initially because
22  we were -- we just couldn't do it.
23  Q.  Go ahead about -- I want you to kind of focus, if you
24  would, on your observation of Ethan's reactions and concerns
25  and emotions that he had while he was there in the Mariposa

1   County Jail.

2   A.  Well, he kept thinking that he'd be released the next day.

3   That once everybody had talked to the detectives, that this

4   would all be cleared up.  And we had, his mother and I had

5   already started to figure out that this is not going to, you

6   know, come and go quickly.  And -- but we didn't really want

7   to tell him that.  So once it became clear that he wasn't

8   going to get out in time to go to college, we noticed a

9   significant change, you know, in his attitude and --

10  Q.  Tell us what you observed then.

11  A.  He just became depressed and down.  He was just -- he kept

12  asking why, you know.  And I didn't really have a good answer

13  for him.  All we could tell him was that we were going to

14  continue to do everything we could to make this, you know,

15  right.

16  Q.  Did he express any fears about being in jail?  And if so,

17  tell us what those were.

18  A.  Well --

19          MR. FOX:  Objection, Your Honor.  It's hearsay.

20          THE COURT:  Overruled.

21          THE WITNESS:  I talked to him about it.  You know,

22  he's a wrestler.  He's capable of handling himself.  But jail

23  is a whole different kettle of fish in terms of who's in

24  there.  And I just told him to be very careful, don't turn

25  your back, don't -- you know, don't tell anyone anything.

1    Just --

2    BY MR. GWILLIAM:

3    Q.  I'm interested in his reactions, Larry.  I know you're

4    concerned as his father.  But let's talk a little bit about

5    how Ethan was feeling about these fears.

6              THE COURT:  Not about what he said.

7              MR. GWILLIAM:  About what?

8              THE COURT:  If the question is what did Ethan say,

9    I'm going to sustain the objection.

10             MR. GWILLIAM:  Oh, okay.  I thought that would be

11   appropriate.  I didn't think that was hearsay because it's an

12   expression of his emotional distress.  It's not offered for

13   the truth of the matter, it's offered to show his emotional

14   distress and damages.  I thought that was an exception to the

15   hearsay rule.

16             MR. FOX:  That's how it affects him, his thought

17   process.  The Court is right that the hearsay objection is

18   about what the plaintiff himself says.

19             MR. GWILLIAM:  I'm talking about the plaintiff.

20             MR. FOX:  That's hearsay.  Objection hearsay.

21             MR. GWILLIAM:  Let me --

22             THE COURT:  Rephrase.

23             MR. GWILLIAM:  -- start again.

24             THE COURT:  Please.

25   BY MR. GWILLIAM:

1   Q.   Larry, I want you to focus, if you can, on your

2   observations and what Ethan said and what you observed him

3   about any concerns and fears he had in the jail.  So tell us,

4   please, just focused on that subject.

5   A.   He was depressed is the biggest thing that we could see.

6   And trying to, you know, continue to do pushups or do whatever

7   because he was hoping that he was going to be out in time to

8   pick up his wrestling.  He didn't talk to me while he was in

9   custody about -- well, on the phone.  Personally when we had

10  the face to face meeting, it would be behind glass.  He would

11  say, "I'm keeping my eyes open all the time.  I'm looking

12  out."  And just -- you know, I was just trying to encourage

13  him to be vigilant.  So I knew that he was concerned about his

14  safety.

15  Q.   All right.  I'm going to change the subject a little bit.

16  During the time that he was in jail, did you have a death in

17  your family?  And if so, would you tell the jury about that,

18  please.

19  A.   My father died while Ethan was in custody.

20  Q.   And tell us how well did Ethan know or care for his

21  grandfather?

22  A.   Well, I'm one of six kids.  My father was 87.  He was in

23  good shape.  And he died very suddenly.  He knew Ethan was in

24  jail.  I'd had to go over and tell my mom and dad what had

25  happened.  My dad wrote Ethan a couple of times while he was

1   in jail.  He was a great letter writer.

2           And so for the funeral, my dad was a well known, well

3   loved man in Merced.  And for his funeral, which was before

4   the preliminary hearing obviously, all of the grandsons were

5   the pallbearers.  And Ethan was the only one who was not

6   there.  And it was very obvious to everyone in the church

7   that -- because the story had been so public, that Ethan was

8   missing.

9   Q.  All right.  Let me move forward here.  At some stage there

10  was a preliminary hearing, I understand, in November, mid

11  November of 2014.

12  A.  Yes.

13  Q.  And did you -- were you able to be involved in that at all

14  or --

15  A.  This is all -- this was all so public and so complicated.

16  And I just made a decision that I did not want to add to the

17  circus of it by being anywhere near the court.  My wife

18  attended every day, but I just stayed away.

19  Q.  Tell us a little more about what you mean about this being

20  a widely publicized circus, if you would, Larry.

21  A.  Well, the DA's son has been arrested for murder.  It's a

22  front page story every time he shows up in court.  And there

23  are blogs, as we know these days, and there would be hundreds

24  and hundreds of blogs saying the most awful things about

25  Ethan, about me, about his mother.  Just the most awful things

1  that people put out on blogs.  And there was one individual in
2  particular that had a website news service --
3          MR. FOX:  Objection.  Relevance.  Going to be
4  hearsay.
5          THE COURT:  Overruled.
6          MR. GWILLIAM:  Thank you.
7          THE COURT:  Ask a question though.  It's --
8  BY MR. GWILLIAM:
9  Q.  Okay.  So I'm just -- you've given us examples of front
10 page news.  It was on the social media.  There was a blog
11 site.  You started to tell us a little more about this one
12 blog site.  Would you tell us a little more about this blog
13 site as it related to comments they were making about Ethan?
14 A.  This horrible human being had a blog called Merced County
15 News Television.  And it was -- he wasn't a journalist, he
16 just threw anything that anyone told him or anything that he
17 wanted to write, put out there as news.  And he just wrote
18 that Ethan was guilty of murder --
19         MR. FOX:  Objection.  Now we're into hearsay.
20 Hearsay.  Publishing hearsay.
21         THE COURT:  Sustained.
22         MR. GWILLIAM:  Let me move on.
23 Q.  We now know, of course, that following a preliminary
24 hearing of four days, a judge ruled that there was
25 insufficient evidence to move forward on it and released

1  Ethan; right?

2  A.   Found him factually innocent.

3  Q.   Well, well, that's -- let's leave that out of the story,

4  please.  So did -- when Ethan came home, tell us a little bit

5  about how he was doing.  Was he much changed from when he was

6  in jail?

7  A.   Yes.

8  Q.   Tell us, please, about how Ethan was doing after he came

9  home from being released from jail.

10 A.   Well, he was very bitter, very depressed.  He was -- he

11 didn't -- it got worse as he got home because while he had

12 been in custody, he did not know how much publicity, all these

13 horrible blogs that were out that kept saying things about

14 him.

15       And even after he was not held to trial, they kept

16 coming and suggesting that he'd gotten away with murder and

17 that I had pulled strings and all these other things that kept

18 coming.

19       And I think it made him feel even more depressed

20 instead of him coming out and saying, see, everybody got it

21 wrong and, you know, I didn't do anything.  They kept sort of

22 doubling down on this and saying that he'd gotten away with

23 something.  And I think that -- and he was fearful because a

24 lot of the comments talked about street justice.

25       MR. FOX:  Excuse me.  This is no longer responsive to

68

1    the question.

2              THE COURT:  Is there an objection?

3              MR. FOX:  Objection, Your Honor.  No longer

4    responsive.

5              MR. GWILLIAM:  I'll --

6              THE COURT:  Sustained.

7              MR. FOX:  And Your Honor, may we approach briefly?

8              THE COURT:  No.

9              MR. GWILLIAM:  Thank you.

10   Q.  I want to move on.  I won't be too much longer.  In the

11   weeks and maybe even months following him coming home, did he

12   ultimately get a chance to go on to college at some later

13   time?

14   A.  We made the decision, his mother and I, to try to get him

15   back into Ouachita Baptist.  Largely because we were concerned

16   about his safety.  We did not feel it was safe for him to be

17   there.  We thought he was going to be a victim of retaliation

18   from people that thought he had gotten away with the shooting.

19   And our paramount concern at that point was Ethan's safety.

20   We literally were fearful that he could be killed.  So we

21   contacted the college and they agreed to allow him to start

22   the second semester.  Not on scholarship.  And he would have

23   to then start all over to try and get his wrestling

24   reestablished.

25   Q.  So this would have been after the first of the year in

1  2015?

2  A.   Yes, sir.

3  Q.   And what happened briefly with regard to his college?  Did

4  that work out for him?

5  A.   Not very well.  I took him back to school.  He was

6  starting in the middle of the year.  It's a smaller school.

7  People know each other.  And almost immediately, because of

8  social media and he was a kid from California, of course

9  people are going to start Googling you.  And he told us that

10 it was out that he had been arrested for this, you know, gang

11 murder.  And he began to feel very ostracized or people

12 weren't as friendly with him.  And it just -- it just wasn't a

13 good thing for him.  It just had fallen apart.

14 Q.   So how long was he in Ouachita before he came back home?

15 A.   He finished the semester.  Finished a whole semester and

16 he just said "I don't want to go back there."

17 Q.   We spent a lot of time on this.  Let me just kind of cut

18 to the chase here if I could a little bit.  As far as you're

19 concerned, is Ethan even now continually having any problems,

20 emotional problems as a result of his arrest in 2014?  And if

21 so, please tell us, from your observations, what problems, if

22 any, you think he's having now?

23 A.   Absolutely.

24 Q.   Tell us, please.

25 A.   Any time there is any story about me.  And as the District

1    Attorney, there are all kinds of stories about cases we're

2    doing.  There, any time anything is ever mentioned about me or

3    Ethan, he will be inundated with blogs about my son that got

4    away with murder.

5         He -- I have noted that he doesn't move around in

6    Merced like he used to.  He tends to keep much more to

7    himself.  I think he feels like he's under -- always under a

8    cloud and that there's always suspicion attached to him.  He's

9    much more suspicious himself.  He used to have really good

10   attitudes about law enforcement, I think he has unfortunately

11   much more negative attitudes about it.

12   Q.   Okay.  I want to ask you.  As far as you're concerned, up

13   until the time he's arrested, was this a kid that seemed to be

14   positive about law enforcement?

15   A.   Absolutely.

16   Q.   All right.  Let me just kind of end my questioning on the

17   subject with this question:  Can you please tell us, from your

18   observation, as his father, Larry, how you feel your son has

19   changed as a result of his arrest in 2014?

20   A.   It completely derailed the future that he had worked for.

21   Breaks our heart.  He had worked really hard to get a

22   wrestling scholarship.  I can't tell you how much work was

23   involved in that.  He was all academic one year.  And so he'd

24   worked really hard on that.  And right on the cusp of being

25   able to go and do what he had fought and strove to achieve, it

1   was all just pulled out from under him in the cruelest way

2   imaginable and so publicly.  It would have been bad enough for

3   anyone, but all of this is front page news and grist for

4   people's opinions about what a terrible person he is.

5   Q.  Do you think he's a changed person?

6   A.  Yes.  In many ways.

7   Q.  How?

8   A.  He's not -- he's a great kid.  He is a great kid.  But

9   he's not the optimistic buoyant, you know, kid that he once

10  was.  He's much more cynical and suspicious about people and

11  things.  And much more cautious and tentative about what he

12  does.  You don't want to be thinking about where you go at 21,

13  but he has to think about those things.  I see that he thinks

14  about that, where he doesn't want to put himself somewhere

15  where he could be susceptible to being attacked by a gang

16  member or something that thinks he was involved in that case.

17          MR. GWILLIAM:  Larry, I know this hasn't been easy

18  for you.  I appreciate your honesty with us.  That's all I

19  have at this time.

20          THE WITNESS:  Thank you.

21          THE COURT:  Cross-examination.

22          MR. FOX:  May we approach for a moment, Your Honor?

23          THE COURT:  Yes.

24      (The following proceedings were held at sidebar between

25       the Court and counsel:)

1          MR. FOX:  I'm sure the Court heard the answer that

2    has caused me to come up here and approach.  And I tried not

3    to jump up and object and highlight the issue.  I waited for

4    it to go by and then I asked the Court to approach.

5          THE COURT:  And I denied the request.

6          MR. FOX:  And Mr. Gwilliam asked the witness, "At the

7    preliminary hearing, the judge found there was insufficient

8    evidence to move forward and released Ethan?"  He didn't say

9    "yes," he didn't say "no," he then violated the Court's order

10   and said, the answer was:  "Found him factually innocent."

11         Your Honor, I looked.  The jurors wrote it down.  I

12   was in a difficult position.  If I jumped up and objected, I

13   would have highlighted it.  So I waited about three more

14   questions and answers and that's when I asked to approach

15   because I didn't want to make a scene in front of this jury

16   and highlight that this -- what this witness had done.

17         THE COURT:  Oh, I felt that's exactly what you were

18   doing.  But go ahead.  That's why I denied the sidebar.  Go

19   ahead.

20         MR. FOX:  Okay.  Well, I waited a few minutes so it

21   wouldn't be in direct response to the question and answer.

22         THE COURT:  So what do you want?

23         MR. FOX:  So in light of this, this is a violation of

24   the order.  And it so goes to the heart of the case when he

25   said "he found him factually innocent," which the Court has

1   ruled out.  I'm compelled at this time -- and Your Honor, I've

2   thought about it.  If I ask for a limiting instruction, the

3   problem is then I'm just highlighting it again.  I'm ringing

4   the bell again for you to unring it.  So I thought about this.

5   I think the only thing I can do is move for a mistrial.

6           THE COURT:  You join, Mr. Rutter?

7           MR. RUTTER:  I am joining.

8           THE COURT:  The --

9           MR. RUTTER:  May I --

10          THE COURT:  Go ahead.

11          MR. RUTTER:  This is an egregious violation.  I mean,

12  we fought and fought and fought regarding this very issue.

13  And the witness either purposefully violated it or counsel for

14  plaintiff neglected to do what we all know he should have

15  done.  This has been -- we fought and fought about it.  And I

16  join in the motion for mistrial.

17          THE COURT:  Okay.  The motion for mistrial is denied.

18  The response is, for the most part, actually correct.  It's

19  not as if there was testimony from this witness that the judge

20  presiding at the preliminary examination or preliminary

21  hearing made a factual finding that no shots were fired from

22  the car.

23          If you -- we talked about this.  I actually came very

24  close to saying, "Look, I can let this in and then give an

25  instruction to the jury later that they're not bound by any

1    determination made by the judge at the preliminary hearing as

2    to whether the witness was found factually innocent."

3         I ultimately ruled, look, I'm -- I think it's

4    improper to take judicial notice of specific factual findings.

5    That very brief testimony about, "oh, he was found factually

6    innocent" is in many ways correct.  And it's been an issue

7    that has -- but you're right, you did argue a lot about.  I'm

8    not sure always very well focused argument, but in large part

9    you put it on me right before the trial started and I tried my

10   best to say how we were going to litigate the case.

11        I don't find it egregious.  If you -- I'm denying the

12   motion for mistrial.  I don't think it was intentional.  Mr.

13   Gwilliam didn't try to elicit it.

14        MR. GWILLIAM:  No, I didn't, Your Honor.

15        THE COURT:  And the witness was excluded and was not

16   present during those discussions.  And may have misunderstood

17   where the ground rule was or wasn't.  May have been focused on

18   the fact that what I was the most concerned about was that the

19   factual finding that no shots were fired from the car was not

20   going to be binding -- was not going to be allowed in the case

21   because it was going to be difficult to instruct the jury in a

22   way that would make sense to them if I let that testimony in.

23        I don't feel the same way about that very brief

24   testimony.  But if, upon reflection, I mean it's up to you.

25   You can probe it.  You can leave it alone, which is what I

1   suspect you want to do.  If you want me to give a limiting

2   instruction during the trial, at the end of trial, a specific

3   jury instruction at the end of trial, I'll do anything within

4   reason to try to make it clear to this jury what it is they're

5   called upon to decide and that any finding by the state court

6   at the preliminary examination is not binding upon them and

7   that they're not -- they're not to give it any preclusive

8   effect.

9        I'll do anything within reason.  But I don't think

10  that that was intentional.  And I don't think it's very

11  damaging.  And I'm denying the motion for mistrial.

12       MR. FOX:  Your Honor, would you allow me just to make

13  a record on a comment?  Briefly.

14       MR. GWILLIAM:  Just made the record.

15       MR. FOX:  I need to make my record.  The Court found

16  pretrial in its order, which is docket number 219, that --

17       THE COURT:  Is that the minute order?

18       MR. FOX:  It is, Your Honor.  "Evidence of any

19  finding of factual innocence would appear to be irrelevant to

20  the issues remaining to be resolved by the jury in this case."

21  The question asked, "Did the Court, at the preliminary, find

22  there was insufficient evidence?"  And the answer was "Found

23  him factually innocent."  It clearly is implied that Court at

24  the preliminary made a factual finding of innocence.

25       THE COURT:  Well, they --

1          MR. FOX:  The last thing.

2          THE COURT:  Go ahead.

3          MR. FOX:  The last thing I'd like to say, Your Honor,

4   is the Court is cognizant of who this witness is.  This is a

5   29 year attorney, a trial lawyer, who's very savvy and very

6   experienced.  The Court says he wasn't here at the in limine.

7   He shouldn't have been here at the in limine arguments or on

8   the phone because he's a witness.  So I -- Mr. Gwilliam --

9          THE COURT:  I disagree, but go ahead.

10         MR. FOX:  He could have sat in on the hearing, on the

11  motions in limine?

12         THE COURT:  Sure he could have.  Go ahead.

13         MR. FOX:  Mr. Gwilliam is an experienced lawyer.  I

14  fully presume that he advised the witnesses of the rulings of

15  this Court as I have done with my witnesses so that nobody

16  violates those orders.  If that assumption was an unfair

17  assumption, then this witness would have had to have known you

18  ruled that out and a savvy 29-year attorney who's a District

19  Attorney and tries cases would know better than to throw that

20  in the middle of this and taint the case.

21         MR. GWILLIAM:  I'm not --

22         THE COURT:  You done with your filibuster or was that

23  an objection?  We're taking a long time.

24         MR. FOX:  I was trying to make my record, Your Honor.

25         THE COURT:  Well, we're at sidebar.  All right.  The

77

1    motion is denied for the reasons I've indicated.  And I'll

2    also add in response to that argument that my ruling was

3    pretty specific and the admission of irrelevant evidence is

4    not prejudicial nor is it grounds for a mistrial.  Motion

5    denied.

6         MR. FOX:  Thank you, Your Honor.

7         (The following proceedings were held in open court:)

8         THE COURT:  Cross-examination.

9         MR. FOX:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11   BY MR. FOX:

12   Q.  Good morning, Mr. Morse.

13   A.  Good morning.

14   Q.  We haven't met.  I'm Dana Fox.  It's nice to meet you.

15        Now, I'd like to put up and start with Exhibit 21,

16   which is in evidence.  This is your press -- your statement

17   that you read to the County Board of Supervisors.  Let's put

18   that up, please, the first page.

19        Okay.  You see it on the screen, Mr. Morse?

20   A.  I do.

21   Q.  Okay.  Now, this was -- there's some water there if you

22   want it.

23   A.  Thank you.

24   Q.  This was read by you in what's called public comments.  So

25   if you go to a Board of Supervisors meeting, you or anyone

1    else in the public, can stand up, like I am now in front of a

2    microphone and just address the Board of Supervisors; correct?

3    A.   Yes.

4    Q.   And that's what you did.  And you read this statement.

5    Correct?

6    A.   Yes.

7    Q.   All right.  I want to go through a couple of things that

8    you said in this statement to the Board of Supervisors.  So,

9    again, so we set the stage.  You're standing there.  The Board

10    of Supervisors are there and you're reading this off to them.

11    Let's look at the first paragraph, please, and bring that up.

12    All right.  The first thing is, as you're saying there, "I am

13    here today to tell this board," so you're addressing the

14    board, you're not addressing the Sheriff's Department;

15    correct?

16    A.   Correct.

17    Q.   All right.  Let's go to the next part.

18         All right.  And you indicate in here --

19         MR. GWILLIAM:  The highlights, just for the record,

20    are counsel's, not on the document.

21         MR. FOX:  Absolutely.  I've highlighted that for ease

22    of reference, Your Honor.  I added this.

23         MR. GWILLIAM:  Well, I didn't get my highlights in.

24    I just wanted, you know, what's good for the goose is good for

25    the gander.

1          MR. FOX:  I think that was before it was admitted.

2          MR. GWILLIAM:  If we both get to highlight, then

3     fine.

4          THE COURT:  This document is in evidence.  And the

5     record should reflect the highlighting there has been placed

6     by counsel for purposes of questioning.  And I'll try to make

7     sure that we maintain consistency in my rulings in that

8     regard.  You may continue.

9          MR. GWILLIAM:  I'm not implying you don't.  Don't get

10    me wrong.

11    BY MR. FOX:

12    Q.   "Each year I have spoken with members of this board and

13              told them that the amount of money and resources we

14              are devoting to the gang problem is not enough.  And

15              each year nothing has changed."

16              Let's go to the next portion.  All right.  No, hold

17    on.

18              All right.  You also told the Board of Supervisors,

19              "There are incredibly talented detectives and

20              deputies at the Sheriff's Department.  They know that

21              the gang problem is our number one challenge.  They

22              need this board to give them the directive and the

23              resources to confront the gang menace, today and

24              tomorrow."

25              Correct?

1    A.  Yes.

2    Q.  And you, in fact, did feel -- you felt this, that the men

3    and women in the detectives unit at the Sheriff's Department

4    were incredibly talented; true?

5    A.  Yes.  Many of them.

6    Q.  And let's look at the next thing you told the Sheriff's

7    Department on -- I think we now have a date.  Don't we?  I

8    think this would be January 28, 2014.  Right?

9    A.  I have no idea, counsel.

10   Q.  Your email that you sent which talks about being there,

11   the statement the day before is January 29th, 2014.  Right?

12   Exhibit 22?

13   A.  Yes.

14   Q.  So that would now give us a date when you're addressing

15   the Board of Supervisors.

16   A.  Yes.

17   Q.  Okay.  Terrific.  You wrote here, "I was very encouraged

18   that my friend, new Sheriff Tom Cavallero, in one of his first

19   actions as sheriff, announced that he was redirecting

20   resources from the STAR team to -- let me stop there.  What is

21   STAR?

22   A.  I don't know.  It's -- it's an acronym for some unit in

23   the Sheriff's Department.  I'm not sure exactly what it stands

24   for.

25   Q.  Fair enough.  Okay.  From the STAR team to gangs and

1    narcotics, adding personnel to both task forces.  This is an

2    important step in the right direction and we applaud him for

3    it."

4          Correct?

5    A.  Yes.

6    Q.  All right.  Now, after reading that statement in front of

7    the board and to the board, you then write your email the next

8    day, January 29, Exhibit 22, to Sheriff Cavallero and the head

9    of the detective division, Sergeant Detective Coburn.

10   Correct?

11   A.  Yes.

12   Q.  All right.  So let's put that up a little bit.  Exhibit

13   22.  And cover what you advised them.  Now, the whole document

14   is in evidence for the jury to get, but I want to go through

15   some of it.

16        Okay.  There's the whole email you write on January

17   29th to Cavallero and Coburn; correct?

18   A.  Yes.

19   Q.  All right.  Let's go through a little bit with my

20   highlighting added to bring it out.  Go through the first one.

21        All right.  "Please know that I would never criticize

22        your work in investigating homicides or encourage

23        others to do so.  I have profound respect for the

24        skills of the Merced Sheriff's Office Detective

25        Bureau and am acutely aware of the daunting

1          challenges you face in doing your job."

2          That's what you wrote to them; correct?

3   A.   Yes.

4   Q.   And next, let's bring up the next part of it.  "My point

5   to the board" -- you're talking about the day before when you

6   were addressing the Board of Supervisors; correct?

7   A.   Yes.

8   Q.   "Was that the records show that they have failed to

9          provide adequate resources to wage a successful gang

10         suppression strategy.  And they failed to insist that

11         Mark make gang suppression a priority.  I think both

12         of you know that I have been whistling this tune for

13         years without much success."

14         Now, in this part that I've got up, the "they" is the

15   Board of Supervisors; correct?

16   A.   Yes.

17   Q.   And the "Mark" was the prior sheriff before Cavallero?

18   A.   Yes.

19   Q.   Next part.  You talk about despite your hectoring --

20   despite your constant request to the board, "the board

21   preferred to avoid the issue rather than confront Mark," the

22   sheriff, "with the absence of any gang strategy even in the

23   face of increasing gang violence in the county."  Correct?

24   A.   Yes.

25   Q.   Next you wrote --

Larry Morse - X

83

1           MR. GWILLIAM:  Your Honor, I do think that the

2    sentence should be put back in the context of the document.

3    By pulling it out, I think it's out of context with the

4    document.  That may not be terribly important, but --

5           THE COURT:  Overruled.  The document in its entirety

6    is in evidence.  It will be available to the jury --

7           MR. GWILLIAM:  All right.

8           THE COURT:  -- during their deliberations.  You may

9    continue.

10          MR. FOX:  Thank you, Your Honor.

11   Q.  You then say, "I am hoping that going out on this limb

12   will compel the board to get serious about making gang

13   interdiction their top public safety priority."

14          It goes on, "It may already have borne some fruit as

15   I met this morning with Supervisor Pedrozo" -- and you go on

16   to say, he came to you and kind of said "We heard you, we're

17   going to try to do better."  Correct?

18   A.  Yes.

19   Q.  When you say "he" -- I should be more clear.  One of the

20   members of the County Board of Supervisors said, "We're going

21   to try to do better in trying to get the Sheriff's Department

22   the funds and the tools they need to fight this gang problem."

23   A.  That's what they said.

24   Q.  All right.  Let me go back.  Just the reference to "going

25   out on a limb."  What you meant by that was you, as the

1    District Attorney, standing up and making these public

2    comments?

3    A.   Yes.

4    Q.   Next.  You say as part of this, "I have the highest regard

5             for both of you and do not want any of my comments to

6             be construed as criticism of your work.  To the

7             contrary, I am optimistic that we have turned a

8             corner and, with your leadership, things will improve

9             dramatically in the months ahead."

10            True?

11   A.   True.

12   Q.   Now, you gave your deposition in this case, Mr. Morse, on

13   January 31, 2017.  You recall?

14   A.   I do.

15   Q.   And were you -- did counsel give you a copy of your

16   deposition so you could review it before testifying here

17   today?

18   A.   Yes.

19   Q.   All right.  Do you agree that your son, Ethan Morse, was

20   not targeted to try to get back at you for the public comments

21   you made on January 28th, 2014?

22   A.   I don't think he was targeted.  I think he was collateral

23   damage.

24   Q.   My question was:  Do you think he was targeted?  And your

25   answer was he is not; correct?

1   A.  Yes.

2   Q.  And when your son was arrested and taken to jail, you

3   actually -- as you said, you called the sheriff of the county

4   and said, "I got concerns for my safety.  Would you do me a

5   favor, would you move him to a different jail because of who I

6   am and I don't want to be at risk."

7        And the sheriff said "sure" and moved your son,

8   didn't he?

9   A.  No, that's not how it went.

10  Q.  Was your son moved?

11  A.  He was moved.  But it wasn't because of who I am.

12  Q.  You called up and asked the sheriff, "Could you move my

13  son for his safety?"  True?

14  A.  Yes.

15  Q.  And the sheriff moved your son; didn't he?

16  A.  I think that was as much for the Sheriff's Department as

17  it was for me or my son.  They certainly did not want my son

18  to be hurt in the jail.

19  Q.  Right.  No one wanted your son hurt.  And so the sheriff

20  moved your son for his safety; true?

21  A.  Yes.

22  Q.  Now, you've known Chuck Hale for a long time.

23  A.  Yes.

24  Q.  You had worked many cases with now lieutenant, but at the

25  time Detective Sergeant Hale; correct?

1   A.   Not many cases.  A few cases.

2   Q.   Well, I thought you had developed an understanding about

3   his MO and you thought he was, I think the term you used was

4   "aggressive."  So didn't you work a lot of cases with him so

5   you'd know what his demeanor and approach was to cases?

6   A.   Not personally.  Obviously I review or pay attention to

7   most of the cases that come over to the office that are major

8   crimes.

9   Q.   When you said "aggressive," Mr. Morse, you certainly

10  weren't implying aggressive on a physical basis, like he's

11  aggressive physically with people; right?

12  A.   No.

13  Q.   You agree.  You weren't saying that, right?

14  A.   No.  I wasn't saying that.  No, I wasn't saying that.

15  Q.   Okay.  Now, you would agree you had a good working

16  relationship, whatever the extent of that was, with Chuck

17  Hale.

18  A.   Yes.

19  Q.   You felt that Chuck Hale had a good work ethic.  True?

20  A.   Yes.

21  Q.   And you said -- I'm sorry, that's not fair.  Let me start

22  over.  You feel that Chuck Hale is relentless in terms of

23  working his cases, which you would agree is a good quality in

24  a homicide detective?

25  A.   Mostly.

1   Q.  Well, you agree that's a good quality, don't you?

2   A.  Mostly.

3   Q.  Do you remember discussing that at your deposition?  And

4   not using the term "mostly"?

5   A.  I don't recall.

6   Q.  Why don't I show -- may I show the deposition since he

7   doesn't recall, Your Honor, to refresh his recollection?

8          THE COURT:  You may.

9          MR. FOX:  Thank you, Your Honor.

10         THE COURT:  Does he have a copy up there?

11         MR. FOX:  He can borrow mine, Your Honor.  Just for

12  refreshing recollection, counsel, page 58, lines 15 through

13  18.  Just to refresh recollection.

14  Q.  Do me a favor, Mr. Morse, would you read those lines, 15

15  to 18, and let me know when you're done.

16  A.  Done.

17  Q.  Thanks.  Does that refresh your recollection that you

18  believe Chuck Hale has a good work ethic?

19  A.  Yes, I acknowledged he had a good work ethic.

20  Q.  And that he is relentless, which is a good quality in a

21  detective, and that you didn't qualify it with "sometimes"?

22  A.  I didn't say "sometimes."  I said "mostly."  But yes, I

23  said that.

24  Q.  Okay.  Where did you say "mostly"?

25         THE COURT:  No, he's saying just now.  Not then.  You

1    can stay on this.

2           MR. FOX:  That's okay.

3    Q.  Now, just a moment ago you were asked by counsel some

4    questions about polygraph tests.  I'm not going to spend too

5    much time on this.  But tell the jury or tell us, Mr. Morse,

6    polygraph tests are not admissible in a criminal case; are

7    they?

8    A.  No, sir.

9    Q.  And you never discussed whether your son should undergo a

10   polygraph test with Lieutenant Hale, Macias or anyone at the

11   Sheriff's Department; right?

12   A.  No.

13   Q.  I'm correct?

14   A.  Yes.

15   Q.  Now, Detective Sam Sanchez, you know him; correct?

16   A.  Yes.

17   Q.  You have no criticism of his work in the Easter homicide

18   case; true?

19   A.  No, that's not true.  I --

20   Q.  Okay.

21   A.  I can't say.

22          MR. FOX:  I'd like to read from his deposition, Your

23   Honor, page 163.

24          MR. GWILLIAM:  What lines, counsel, please?

25          MR. FOX:  163, lines 19 through 22.  All right.  May

1    I proceed, Your Honor?

2            THE COURT:  I'm going to trust you regarding the

3    context.  Because I'm not reading more.  But go ahead.

4            MR. FOX:  Question to Mr. Morse at his deposition of

5    January 31, 2017:

6            "All right.  I think you said with respect to -- with

7            respect to Sam Sanchez, you have no criticisms of a

8            substantive nature; correct?

9            "Answer:  Yes."

10           THE WITNESS:  You asked me about in connection with

11   the investigation of the Easter homicide, counsel.  Is that

12   what the question is?

13   BY MR. FOX:

14   Q.  I read it.  I'm fine.  If he wants to come back and ask

15   you questions, Mr. Morse, you know how this works, right?  He

16   can come up and clear it up if he wants to.  I'll move --

17           THE COURT:  Well, the witness can explain his

18   answers.

19           THE WITNESS:  I'm confused.

20   BY MR. FOX:

21   Q.  When I just read that passage, it asks you, "Do you have

22   any criticisms of Sam Sanchez"; did you hear that?

23   A.  Yes.  But your question to me was whether I had criticisms

24   of his work with regard to the Easter homicide.

25   Q.  Now, once you became aware that your son was driving the

1  car in which Mr. Tellez was a passenger and your son told you

2  Tellez had a gun and that your son was at the party where

3  three people were killed, you realized you had a conflict of

4  interest; correct?

5  A.  No.

6  Q.  And you recused your office; correct?

7  A.  No.

8       MR. FOX:  Your Honor, I'd like to read from the

9  deposition of the witness, page 71, lines 1 through 13.

10      THE WITNESS:  Your Honor, can I look at the

11  deposition transcript as well?

12      THE COURT:  Well, he's not asking you to refresh your

13  recollection.

14      MR. GWILLIAM:  Your Honor, I think I've got an extra

15  copy.

16      MR. FOX:  It's for impeachment purposes only.  I

17  didn't ask to refresh recollection.

18      THE COURT:  That's right.

19      MR. FOX:  Thank you, Your Honor.

20      THE COURT:  Hold on.  But let me find it so I can

21  tell whether I agree.

22      MR. FOX:  Okay.

23      THE COURT:  71?

24      MR. FOX:  1 through 13, Your Honor.

25      THE COURT:  I don't think that's impeachment.

1        MR. FOX:  I'll be -- I'll clarify --

2        THE COURT:  At least I'm not convinced that it is.

3   BY MR. FOX:

4   Q.  At some point you figured out that there was a conflict in

5   your office prosecuting anybody or anything having to do with

6   the Easter homicides; correct?

7   A.  Yes.

8   Q.  And that's when you referred the case and asked the

9   Attorney General's Office, the California State Attorney

10  General's Office to take over the prosecution of the Easter

11  homicides.

12  A.  It was four days after Ethan had told me, yes.

13  Q.  Right.  Okay.  Fair enough.  If I said the day after, I

14  didn't mean to limit it, sir.  Okay.  So four days after you

15  learned, what, of Ethan's involvement in the car and in being

16  at the party?

17  A.  No.

18  Q.  Four days after he's arrested?

19  A.  I'm confused, counsel.  Can you rephrase it?

20  Q.  Sure.  Four days after what?

21  A.  Four days after Ethan had told me and his mother that he

22  had been at the party that night, we referred the case to the

23  Attorney General's Office.  After Ethan had been interviewed

24  by detectives.

25  Q.  Fair enough.  So four days after he speaks to you and your

1    wife, you then say, "We're going to have the AG's office

2    prosecute."  Correct?

3    A.  After discussing it with my chief deputies, yes.

4    Q.  Okay.  Now, after that -- I'm going to say that time, four

5    days after -- let's just go four days after this conversation

6    with your son and he tells you what he told you, sometime

7    after that you spoke with Andrew Masengale; correct?

8    A.  I don't recall speaking to Andrew Masengale.  I may have.

9    Again, what time period are we talking about, counsel?

10   Q.  Any time after, that four days after you spoke with your

11   son and he told you what he told you.

12            MR. GWILLIAM:  I'm going to object.  I think that's

13   too vague.  Any time up until today?  That's vague.

14            THE COURT:  Overruled.  The witness can answer if he

15   is able.

16            THE WITNESS:  I've spoken to Andrew Masengale,

17   obviously, since this happened.  I'm not sure what time period

18   you're asking about, counsel.

19   BY MR. FOX:

20   Q.  I am saying, sir, any time.  I'll give you the window.

21   Any time between four days after your son comes and tells you

22   what he told you about the party, and prior to the preliminary

23   hearing in November 2014, did you have any discussions with

24   Andrew Masengale?

25   A.  I may have.  I don't recall specifically.

1   Q.   Okay.  In that same window that I just described, four

2   days -- from four days after your son tells you what he tells

3   you to the preliminary hearing in November 2014, you speak

4   with Robert Tern; don't you?

5   A.   Yes.

6   Q.   And in that window that I just described, before the

7   prelim and after you've referred the case to the Attorney

8   General's Office, you speak with Tony Gomes; correct?

9   A.   Yes.

10  Q.   Now, if I heard you right, what you told this jury is that

11  all you did with the people you spoke with, the people from

12  the car, was -- let me see if I've got this right.  If I'm

13  missing something, you tell me.  Was to encourage them to

14  cooperate, to come forward and to tell the truth.  Correct?

15  A.   That's what I told Tony Gomes.

16  Q.   Okay.  Perfect.  We'll get to that in a second.  And in

17  some of the conversations, if I heard you right, you also

18  said -- and it may have only been Tony Gomes, so maybe just

19  him.  You went through with him what your son had told you.

20  Right?

21  A.   Yes.

22  Q.   Okay.  And this was after you had referred the case to the

23  Attorney General's Office.

24  A.   For prosecution, yes.

25  Q.   Right.  All right.  Now, the phone conversation you have

1    with Tony Gomes, what you didn't realize when your son had

2    called Mr. Gomes and what you didn't know at the time when you

3    took the phone from Ethan and started talking to Tony Gomes,

4    was that he was in the middle of his interview by the

5    Sheriff's Department at that time.  True?

6    A.   True.

7    Q.   And the reason your call was recorded, Mr. Morse, was

8    because they were doing an interview of Mr. Gomes that was

9    being recorded; right?

10    A.   I presume so.

11    Q.   And as far as you know, what happened is Tony Gomes is

12    sitting there at his interview, he answers the call from your

13    son and puts it on speaker phone and leaves his phone in the

14    middle of the table while the recording is going on.  Right?

15    A.   The call was from my son, not me as you previously said.

16    Q.   I just said that.  Your son calls, Gomes answers it, puts

17    it on speaker and it has the speaker on while this interview

18    is going on.

19    A.   I have no idea what the logistics of it were.

20    Q.   And then eventually you take the phone and start talking

21    to Gomes.  And you know it's recorded.  Now you know it's

22    recorded.

23    A.   As I sit here today, I know it's recorded, yes.  I didn't

24    at the time, no.

25    Q.   Mr. Morse, you certainly wouldn't have said anything

1   different to Tony Gomes if you had known your call was being

2   recorded versus if you didn't know his call was being

3   recorded?

4   A.  No, I wouldn't.

5   Q.  Sorry?

6   A.  No, I wouldn't.

7   Q.  So it would have been the exact same thing, whether it was

8   recorded or not recorded; true?

9   A.  Yes.

10  Q.  All right.  So now, what I'd like to do, Your Honor,

11  the -- I'd like to play the portions of the Gomes --

12          THE COURT:  This would -- I think this would be a

13  good time to take a very brief recess.  I know we had the fire

14  alarm.

15          MR. FOX:  Sure.  No problem.

16          THE COURT:  We're going to take -- and I'm seeing

17  some nods over in the jury box that suggest they could use a

18  few too.  So, ladies and gentlemen, let's reconvene at 11:15.

19  Please heed the Court's admonition.  We'll probably go to at

20  least 12:15, maybe even until 12:30 when we come back.

21          MR. FOX:  Thank you, Your Honor.

22      (The jury left the courtroom.)

23          THE COURT:  Let the record reflect that we're outside

24  the presence of the jury.  Mr. Fox, if I want to speak briefly

25  about the sidebar conference, do you want the witness to step

1    outside?

2           MR. FOX:  Please, Your Honor.  Thank you.

3           THE COURT:  Let the record reflect the witness has

4    stepped outside.  We're outside the presence of the jury.  Mr.

5    Fox, I was not entirely enthralled with having a motion for

6    mistrial at sidebar because it was lengthy.  In the presence

7    of the jury.  It was going on, in my mind, for a long time.

8    In their presence.  I did not mean to cut you off in any way

9    in terms of the record that you wish to make in that regard.

10   Was there anything more that you wanted to say now that we're

11   outside the presence of the jury?

12          MR. FOX:  I appreciate the offer, Your Honor.  And I

13   didn't mean to frustrate you.  I was -- I'm in a little bit of

14   a Hobson's choice, I think the Court recognizes.  If I jump up

15   on my feet, I accentuate what I think is a problem.  If I wait

16   too long, a reviewing court might say I waited too long and

17   didn't try to cure the problem right away.

18          THE COURT:  For what it's worth, I thought you acted

19   very promptly.  I actually thought the first request for

20   sidebar was a little too promptly.  I thought it was

21   disrupting the direct examination.  I've said what I felt

22   about the testimony.  But I don't want to prevent you from

23   putting any argument that you want on the record about -- in

24   support of the defendant's motion for mistrial.

25          MR. FOX:  I believe I made my argument.  Thank you,

1    Your Honor, for that time.  I would just ask if counsel would

2    now please admonish this witness and all other witnesses, if

3    they haven't already, that that was excluded by the Court.

4            THE COURT:  Mr. Rutter.

5            MR. RUTTER:  Yes, Your Honor.  I'd like to add that I

6    believe California Penal Code Section 851.8 precluded the very

7    thing that just happened, the mention of a finding of factual

8    innocence.

9            THE COURT:  I've --

10           MR. RUTTER:  And *Humphries versus County of Los*

11   *Angeles*, a Ninth Circuit case which I am sorrowfully all too

12   familiar with, suggests the same.

13           THE COURT:  And I rejected that argument during

14   motions in limine.  For the reasons that we addressed, that I

15   addressed to the best of my ability at the time of the

16   hearing.  I think this case does present a unique situation.

17   I was struggling with it during motions in limine, trying to

18   decide exactly how to thread the needle.

19           Given the fact that we have both a malicious

20   prosecution and a judicial deception claim, I made my ruling

21   in an attempt to avoid giving a jury instruction that I

22   thought would be confusing potentially to a jury.  I have to

23   tell you that my greater concern was the -- my decision to

24   reject a plaintiff's request for judicial notice of the

25   specific factual finding by the Superior Court Judge that no

1    shots were fired from the car.

2           Because I thought that was the most dangerous in

3    terms of trying to instruct the jury that, yes, you should

4    accept that's what the Superior Court Judge did, but you

5    shouldn't accept it as binding upon your determination in that

6    regard with respect to probable cause.  I thought that got

7    really deep into the woods, we'd be asking a jury to do an

8    awful lot in terms of trying to figure out what their role

9    was.

10          I actually have and always did -- even if I never

11   expressed it this way, I've always had less concern about the

12   notion that the -- that a finding was made in the plaintiff's

13   favor that he was factually innocent of the charge.  A, it

14   wasn't all together clear to me that that specific finding --

15   it certainly wasn't exactly phrased that way, I don't think,

16   from my review of the transcript.  So I have that concern.

17   But B, it's essentially true.

18          It was -- the proceedings, everybody agrees the

19   proceedings were favorably terminated.  That there was a

20   finding of -- in the context of a preliminary examination,

21   based upon the evidence presented at preliminary examination,

22   that there was -- that probable cause to support the charges

23   against the plaintiff was lacking and that the charges were

24   therefore dismissed resulting in the defendants saying, yes,

25   we don't disagree that there was a favorable termination here.

1          It's a murky situation.  Should it have happened?
2    The testimony that was just given?  No.  Am I as troubled by
3    it as defense counsel?  Clearly not.  But if you either mid
4    trial, mid trial and end of trial, end of trial only, you want
5    some sort of limiting instruction to the jury, I'm happy to
6    consider it just as I said at sidebar.  That's a strategic
7    call on your part.
8          I know, Mr. Fox, you say, hey, they were all writing.
9    In my mind, most of them, many of them -- some of them have
10   not written a stitch.  And others have written fairly
11   continuously.  I did not notice anybody gasp when that
12   testimony was given or indicate anything else other than that
13   they were paying the same attention that they've been paying
14   throughout.  So that's the way I see it.  That's why I've
15   denied the motion.  But I'm certainly happy to hear from you.
16         There was one -- I mean, at the appropriate time.
17   You guys take some time to think about what, if anything,
18   you'd ask me to do.
19         I did, while we were going on, take a look at the
20   August 26, 2010 letter.  And I reviewed the deposition
21   transcript of Mr. Morse's testimony.  And Mr. Fox, my feeling
22   is that the August 26th, 2010 letter from Mr. Morse to the
23   sheriff, Mr. Pazin, does not fall within the not reasonably
24   anticipated exception of the final pretrial order in light of
25   the -- Mr. Morse's deposition testimony.

1    I don't think that the testimony -- I mean, he

2 testified at deposition.  "His flaw is that he zeros in often

3 times too quickly, locks in on a theory, that has -- beyond

4 this case, that has happened in a couple of other cases."

5 This is the criticism of him is that "He will sort of lock in

6 on a theory or a suspect and will push us to green light the

7 prosecution, the arrest, and he gets frustrated if we say that

8 we don't think we're there."  We being the District Attorney's

9 Office.  I think that's pretty darn close to exactly what he

10 testified to in his direct examination yesterday.

11    Now, that being said, for that reason I don't think

12 this is an appropriate belatedly discovered exhibit that

13 shouldn't have been reasonably anticipated prior to trial.

14 But I want to make clear.  I'm not -- I'm not allowing you to

15 use the exhibit as an exhibit.  But I'm not precluding you

16 from cross-examining the witness about whether he's ever said

17 some of the things that he may have said in that letter.  I'm

18 just saying that it's not -- I'm not going to allow it as an

19 exhibit at trial.

20    MR. FOX:  Understood, Your Honor.  I would just make

21 the one comment.  I understand you.  And I did read your

22 pretrial conference order and I understand what it says.  I

23 would submit there's no prejudice to the plaintiff by using

24 this since it was written by the plaintiff's father and the

25 witness on the stand and he was -- he's the author of it, so

1    there's no prejudice.

2         Second, I -- if the Court's saying it won't allow it

3    into evidence, I hear what you're saying.  I can ask

4    questions.  He says "I don't remember saying that," I can use

5    the letter to refresh recollection.

6         THE COURT:  Yes.  I would allow you to use it to

7    refresh his recollection.

8         MR. FOX:  And so what I should do, Your Honor, is I'm

9    going to give it an exhibit number now on the record and we'll

10   also lodge a copy.  Because I think so it's clear --

11        THE COURT:  For identification.

12        MR. FOX:  -- what we're talking about.

13        THE COURT:  For identification purposes only.

14        MR. FOX:  Thank you.  It will be Exhibit 191, Your

15   Honor, Defense Exhibit 191.

16      (Defendants' Exhibit 191 was marked for identification.)

17        MR. FOX:  And then sorry, Your Honor, I know why you

18   want to take a break.  Real fast.  What I want to do next --

19        THE COURT:  Oh, you do, do you?

20        MR. FOX:  They're all getting ready.  Here's what I

21   want to do, Your Honor.

22        THE COURT:  Mr. Rutter, he doesn't really understand,

23   does he?

24        MR. FOX:  I'm getting at that age, Your Honor.

25   Sorry, Karen.

1          THE COURT:  He looks so boyish.  Go ahead.

2          MR. FOX:  I'm older than you think.  What I want to

3     do, Your Honor, is play the portion of the Gomes interview

4     where it's Mr. Morse calling in talking to Gomes.  What they

5     did at his deposition is they had Mr. Morse look at a summary

6     of that, he said, "It sounds accurate.  Everything seems to be

7     accurate there."  We have a transcript of it.  I won't publish

8     the transcript, but we're going to play the portions that are

9     more -- Mr. Morse being recorded speaking to Mr. Gomes.

10         THE COURT:  Is there going to be any objection?

11         MR. GWILLIAM:  Yes.  I don't see any reason to play

12    something you're saying unless it's relevant.  I mean, if he

13    denies something, then bring it up.  But to start to play this

14    tape of a conversation with him out of court, I don't -- I

15    don't think that you can just stand up and play it like it's a

16    deposition or something.

17         THE COURT:  Is there going to be a question about it?

18    Is it -- has it been offered into evidence?

19         MR. FOX:  So what I'm going to do is I'm going to

20    offer the portion of the interview.  The audio is Exhibit 35.

21    I'm going to offer those portions of Exhibit 35 and we can cut

22    down and make a separate exhibit if you order me to, Your

23    Honor, I will.  We can make it 35-A.

24         THE COURT:  No.  Are you going to be moving 35 into

25    evidence?

1        MR. FOX:  I am, Your Honor.

2        THE COURT:  And is there going to be an objection?

3        MR. GWILLIAM:  Yes.

4        THE COURT:  And on what basis?

5        MR. GWILLIAM:  I think it's hearsay and we're talking

6   about the whole interview of the kid?

7        THE COURT:  The recorded interview, which is -- is it

8   Joint Exhibit 35?

9        MS. WALKER:  No.

10       THE COURT:  Or Defendants'?

11       MR. FOX:  It's Plaintiff's Exhibit 35.

12       THE COURT:  Plaintiff's Exhibit 35.

13       MR. FOX:  And we've had other interviews of the other

14  witnesses that were played and admitted into evidence, such as

15  Mr. Tern, his interview was admitted, the entire thing.  I

16  think the Court has made it clear.

17       MR. GWILLIAM:  I'll withdraw my objection.  I

18  think -- when I think more about it, I think it is relevant to

19  the information they relied on.  So for that purposes.

20       THE COURT:  When 35 is admitted -- or moved -- when

21  35 is offered into evidence, my plan -- my intention is to

22  admit it.  And at which point you can use it for whatever

23  purpose you want.

24       MR. FOX:  Thank you, Your Honor.

25       THE COURT:  Thank you.  See you in -- give us ten.

1           MR. FOX:  You got it.

2       (Recess.)

3           THE COURT:  Do we need the witness?

4           MR. FOX:  He can stay.  It's fine, Your Honor.

5           THE COURT:  What do you want to talk about outside

6   the presence?

7           MR. FOX:  Going to bring up scheduling.  And you're

8   going to say, well, you're taking up time, now, Mr. Fox,

9   bringing up scheduling.

10          THE COURT:  Go ahead.

11          MR. FOX:  But we've met and conferred.  At the

12  beginning of the trial, Your Honor, and before we started

13  trial.  I'm looking at my colleagues and asked them.  We let

14  plaintiff's counsel know that Lieutenant Hale --

15          THE COURT:  Yeah, I got a gist of this.  He's got

16  somewhere -- we got to get him on today.

17          MR. FOX:  That's right.  It's mandatory training.

18  It's only offered once a year.  Now, here's my concern.  I met

19  with Mr. Gwilliam.  And he and I both agreed, trials get

20  changed and things happen.  Fire alarms go off.

21          THE COURT:  Fire drills.

22          MR. FOX:  But I asked him.  I know Mr. Clark is here,

23  but I know Mr. Clark is a paid expert and probably could come

24  back another day.  I said, "If you're going to call Lieutenant

25  Hale, that's fine.  But we need to finish so I can get my

1   cross done today because he isn't here next week."  And we may

2   get done next week.  So if Mr. Gwilliam is going to put him up

3   today to do his -- I'll call it his cross, I need to do my

4   direct today too.

5       Here's the issue.  They want to put up Mr. Clark

6   second and then go to Lieutenant Hale.  And I have a serious

7   concern that come 4:30, even five o'clock, we won't be done

8   with Hale and then I don't get him back.  And the second thing

9   is I -- well, I'll leave it at that, Your Honor.

10      MR. GWILLIAM:  We tried very hard to accommodate.

11  First of all, we're taking Hale out of order before Macias.

12  We told him it was going to go that way.  We had our expert

13  lined up for some time.  He's come all the way from Los

14  Angeles.  We are paying for his time.  He's not going to be a

15  very long witness.  I will take some time with Hale.  I don't

16  know how long it's going to take.  I took a long time at his

17  deposition.

18      We're doing everything we can.  I wasn't sure until

19  just this morning what Hale's problems were.  I told -- I was

20  told that he was unavailable next week.  And now I've been

21  informed that apparently he has some training.  I don't know

22  if he's going to be back the week after that or what.  All I

23  can tell you is that we have tried to accommodate scheduling.

24  But now that we've got him here.  He's spent the night here.

25  Our expert's come up from Los Angeles.

1          THE COURT:  Let's -- how much more you got?

2          MR. FOX:  Playing this recording and then after that,

3     ten minutes after that.

4          THE COURT:  And how long for your expert?

5          MS. WALKER:  Probably not more than 30 minutes on

6     direct.

7          MR. GWILLIAM:  Maybe 40 minutes.

8          THE COURT:  You've got quite a bit for him.

9          MR. FOX:  No, I would say 30 to 45 minutes with Mr.

10    Clark.

11         THE COURT:  So that gets us an hour and a half.  How

12    long do you think you're going to be with Hale?

13         MR. GWILLIAM:  I might take two hours with him, Your

14    Honor.  It was a long deposition.  I'll do the best I can.

15    You know, it's -- I'm well planned where I want to go in the

16    place of his deposition, might move it along quickly.  But he

17    is a major witness and I can't --

18         THE COURT:  How much -- well, let's get going.  We'll

19    talk during our short lunch hour.

20         MR. FOX:  I just wanted to alert you of the issue.

21         MR. GWILLIAM:  Yeah.  And I really am trying to

22    accommodate.

23         MR. FOX:  When do you want to break for lunch?

24         THE COURT:  We'll break at about 12:30 and we'll take

25    an hour.

1          MR. FOX:  Because once they -- once they call Clark,

2     we're kind of -- the die is cast and now we've got a very

3     short window with Hale.  That's why I brought it up now.

4          THE COURT:  Okay.  Let's get --

5          MR. FOX:  Your Honor, I think the witness --

6          THE COURT:  Bring him in.

7          THE WITNESS:  Can I ask a question?

8          THE COURT:  Yeah.

9          THE WITNESS:  I know I have an appointment at three

10    o'clock.

11         THE COURT:  You're going to be done.

12         THE WITNESS:  Will I make it?  In Merced.

13         MR. FOX:  Absolutely.  Please.  Not a problem.

14      (The jury entered the courtroom.)

15         THE COURT:  Let the record reflect we're back in the

16    presence of the jury.  You may continue, Mr. Fox.

17         MR. FOX:  Thank you very much, Your Honor.

18         So at this point, Your Honor, I am offering into

19    evidence Exhibit 35.  This is the audio recording of the

20    interview by the sheriff's detectives of Tony Gomes, one of

21    the passengers in the vehicle.

22         THE COURT:  And is this Joint or Plaintiff's?

23         MR. FOX:  This is Plaintiff's Exhibit 35 I'm

24    offering.

25         THE COURT:  Any objection?

1        MR. GWILLIAM:  No, Your Honor.

2        MS. WALKER:  Just Your Honor, admitted the whole

3    thing or what section is he going to play?  Is some of it cut

4    out?

5        MR. FOX:  I handed counsel a transcript to show

6    them --

7        MS. WALKER:  I didn't see it.

8        THE COURT:  Exhibit -- no objection to the admission

9    of Plaintiff's 35.

10       MR. GWILLIAM:  No.

11       THE COURT:  35 -- Plaintiff's 35 is admitted.

12    (Plaintiff's Exhibit 35 was received.)

13       MR. FOX:  And Your Honor, at this time, we're going

14    to play the portion -- let me start again.  At this time, Your

15    Honor, we're going to play portions of Exhibit 35 and it's

16    portions where Mr. Morse is speaking with Mr. Gomes during the

17    interview of Mr. Gomes.  Right?  May I proceed, Your Honor?

18       THE COURT:  Go ahead.

19       MR. FOX:  Thank you.

20    (Playing audiotape.)

21    BY MR. FOX:

22    Q.  Do you hear the voice that's a little more fainter in the

23    call?

24    A.  Yes.

25    Q.  Is that your son?

1    A.  It is.

2    Q.  Okay.  And the voice that's a little bit louder in the

3    call is Mr. Gomes?

4    A.  I wouldn't recognize his voice.

5    Q.  Fair enough.

6         MR. FOX:  Let's please continue on.

7         (Playing audiotape.)

8    BY MR. FOX:

9    Q.  So now, when someone says "Tony, Tony, this is Mr. Morse."

10   That's you talking now; right?

11   A.  Yes.

12   Q.  So of the two voices we're going to hear now, the fainter

13   one in the sound is you.  Correct?

14   A.  Yes.

15   Q.  All right.  And you have taken over the phone from your

16   son when he had called Tony Gomes; right?

17   A.  Yes.

18   Q.  And so your understanding is you're now speaking with Tony

19   Gomes?

20   A.  Yes.

21         MR. FOX:  All right.  Let's continue please.

22         (Playing audiotape.)

23   BY MR. FOX:

24   Q.  Did you hear yourself --

25         MR. GWILLIAM:  Your Honor, I'm objecting.  This tape

1    has been edited and there are parts of the tape -- I've got

2    the transcript here -- that are not in here.

3              THE COURT:  That's fine.  You can play the whole

4    thing.

5              MR. GWILLIAM:  I don't --

6              THE COURT:  It's in evidence.

7              MR. FOX:  Thank you, Your Honor.

8              MR. GWILLIAM:  Okay.  All right.

9    BY MR. FOX:

10   Q.  Mr. Morse, did you hear yourself just there say "that's

11   going to make me look real bad and I've got to deal with cops

12   all the time"?

13   A.  Yes, I did.

14        (Playing audiotape.)

15   BY MR. FOX:

16   Q.  Did you hear in there where you said, "I'm going to

17   represent that to some people, so you guys can't hang me out

18   to dry."  Correct?

19   A.  Yes.

20             MR. FOX:  Please continue on.

21        (Playing audiotape.)

22   BY MR. FOX:

23   Q.  Mr. Morse, did you hear where you're kind of giving Mr.

24   Gomes tips or recommendations, I'll say recommendations about

25   what he should do when he gets interviewed?

1   A.  I was advising him of his constitutional rights.

2   Q.  Well, what you told him was "make sure a tape recorder is

3   on."  And you said, quote -- and I think you were basically

4   saying "this is what you should say."  Correct me if I'm

5   wrong.

6   A.  No.

7   Q.  "I want a tape recorder on.  And I'm here voluntarily or

8   I'll get up and leave if I don't like where this is going."

9   End quote.

10         You were telling him what he should say to the

11   detectives; true?

12   A.  I was telling him what the ground rules should be for an

13   interview, a voluntary interview based on my experience.  Yes.

14         MR. FOX:  Thank you.  Please continue.

15     (Playing audiotape.)

16   BY MR. FOX:

17   Q.  For the -- I can represent to you, Mr. Morse, the clips we

18   just played were 11 minutes and 39 seconds.  You know Mr.

19   Gomes was interviewed longer than 11 minutes and 39 second;

20   right?

21   A.  Yes.

22   Q.  And at some point the phone dies -- and then you're -- as

23   far as you know, the line goes dead.

24   A.  I don't recall.

25   Q.  Okay.  Do you remember any other parts of this

1   conversation?  Because I'll represent to you I haven't played

2   the entirety.  I played parts of it because it's 39 -- excuse

3   me, 35 is in evidence and the jury will have the whole

4   exhibit.

5            Is there any parts of that conversation that you

6   remember that stand out in your mind right now?

7   A.  Well, I know that I believe you represented that I had

8   called Tony Gomes.  I did not call Tony Gomes.  My son had

9   called Tony Gomes.  I did not know he was calling Tony Gomes.

10  And when I heard Ethan say to someone on the phone, "Just tell

11  the truth," I asked Ethan, "Who are you talking to?"  And he

12  said "Tony."  And I said, "Let me talk to Tony."

13  Q.  Mr. Morse, if I said you made the call.  I apologize.

14  You're right, I'm wrong.

15  A.  Thank you.

16  Q.  I think you clarified me.  That your son made the call and

17  you took the phone from him at some point.

18  A.  That's correct.

19  Q.  Okay.  Now, let me ask you a couple more questions.  Let

20  me go back to your relationship with Sergeant Hale a little

21  bit.  And then some of your experience as a prosecutor and

22  then I'll be done.

23           You had occasion to work a murder case that

24  sergeant -- Detective Sergeant Hale at the time was working,

25  that was a murder of someone named Ray Sabala, S-A-B-A-L-A.

113

1  Correct?

2  A.  Yes, he was a detective at that time, not detective

3  sergeant.

4  Q.  And you tried that case; didn't you?

5  A.  I did.

6  Q.  And that was one of the most difficult cases and trials

7  you've ever had in your career?

8  A.  Very challenging.

9  Q.  All right.  And the lead detective on that case, on that

10  challenging case, was Detective Hale?

11  A.  True.

12  Q.  And you agree with me that you were able to work side by

13  side with him on a lot of that trial in that case; weren't

14  you?

15  A.  Yes.

16  Q.  In fact, there's a common reference in trials, you have

17  lead counsel and you have what's called a second chair,

18  someone who assists and helps you with the trial.

19  A.  Sometimes.

20  Q.  And you had a second chair teed up, but right before or

21  shortly before that trial the Deputy District Attorney who was

22  going to be your second chair left the District Attorney's

23  Office.  Correct?

24  A.  I don't specifically recall that, counsel.

25  Q.  Okay.

1    A.   But it's possible.

2    Q.   Do you remember you had originally planned to try that

3    case with Chief Deputy District Attorney Mark Bacciarini or --

4    A.   Bacciarini.   He was appointed to the bench, you're right.

5    Q.   You're right.   He got appointed to be a judge so he's no

6    longer with the DA's Office.   And when you tried that case,

7    you're -- I'll use the term, in essence, your second chair who

8    helped you try that case and assisted you through that

9    difficult trial was Chuck Hale.

10   A.   He was the investigating officer.

11   Q.   Sat with you at counsel table?

12   A.   They always do.

13   Q.   All right.   Now, you would agree with me that on this

14   difficult murder case, Detective Hale did some of the finest

15   investigative work you've ever seen in a criminal case?

16   A.   Yes, he did.   He did fine work.

17   Q.   And you felt that two of the skills that Sergeant Hale has

18   are he is skillful and he is patient.   Correct?

19   A.   In that case he was, yes.

20   Q.   And you said that in that case, working with you, he was

21   tenacious, intelligent, analytical and a consummate

22   professional.   True?

23   A.   In that case he was, yes.

24   Q.   Now, you've been a prosecutor for how many years?

25   A.   25.

1    Q.  As a prosecutor for 25 years, you have reviewed a lot of

2    interviews of witnesses and suspects conducted by police

3    officers.  Correct?

4    A.  Yes.

5    Q.  You would agree with me that there are certain techniques

6    that police officers are allowed to use to try to probe a

7    suspect or a witness to find out about their story?

8    A.  Yes.

9    Q.  You would agree that some of those techniques that are

10   allowed may seem unseemly or heavy-handed to people who are

11   not in law enforcement or working in the prosecutorial

12   process.

13   A.  Yes.  We usually discourage them.

14   Q.  And they're commonly used; aren't they?

15   A.  I hope less commonly used.

16   Q.  And I don't just mean at the Merced County Sheriff's

17   Department.  You work with Merced PD; right?

18   A.  Yes, I do.

19   Q.  And other law enforcement agencies you've had experience

20   dealing with for your 25 years.

21   A.  Yes, sir.

22   Q.  Okay.  You would agree that if a detective was required to

23   accept the word of a suspect, there would be very few arrests.

24   A.  Very true.

25   Q.  Criminals often don't tell the truth in an interview by a

1   detective; true?

2   A.   Very true.

3   Q.   Often, someone who's committed a crime will give a story

4   that they didn't do it and be very consistent in that story.

5   They never waver even though it turns out they did the crime.

6   A.   It's true.

7   Q.   When questioning the friends of a suspect, you agree a

8   detective, a well trained detective should recognize that the

9   friends of the suspect sometimes do not want to incriminate

10  their friend.

11  A.   Yes.   Could be.

12  Q.   And that the friends of the suspect may color or change or

13  slant their testimony some way to try to avoid incriminating

14  their friend.

15  A.   That can happen.

16  Q.   Sometimes witnesses -- not even a suspect, witnesses will

17  lie to protect their friends.

18  A.   That happens.

19  Q.   And that a good detective has to be aware of all of those

20  things we've just covered and ask questions to try to deal

21  with those conditions, those things; right?

22  A.   Yes.

23  Q.   And a good detective should consider whether a witness is

24  trying to change his or her testimony to protect a suspect in

25  a crime.

1   A.  Yes.

2            MR. FOX:  Okay.  Thank you Mr. Morse, I have no

3   further questions.  Thank you for your time.

4            MR. GWILLIAM:  I'll be brief, Your Honor.

5            THE COURT:  I've got to ask Mr. Rutter though.

6            MR. GWILLIAM:  Oh, sorry.

7            THE COURT:  Mr. Rutter, do you have any questions?

8            MR. RUTTER:  I have no questions.

9            THE COURT:  I'm sorry, Mr. Gwilliam.  Go ahead.

10                       REDIRECT EXAMINATION

11  BY MR. GWILLIAM:

12  Q.  Let me touch on this subject of -- I'd like you to

13  elaborate a little bit for the jury on some of these

14  interrogation tactics you feel you'd like to see less of and

15  you're, quote, discouraging?

16  A.  In my experience, although it is permissible for a police

17  officer to lie to a suspect or a person that they're

18  interviewing, my experience is that juries don't like it.  And

19  that they frown on it.  And I have consistently encouraged

20  detectives not to do that in conducting interviews.

21           MR. FOX:  Your Honor, I'm going to move to strike.

22  That's nonresponsive to the question.

23           THE COURT:  Overruled.

24  BY MR. GWILLIAM:

25  Q.  You may proceed with your answer about why you

1  discourage -- the kinds of tactics you're discouraging and

2  why.

3  A.   The best detectives I have worked with are -- treat

4  suspects with respect, they talk to them as human beings,

5  they, you know, come at them from different -- you know,

6  different vantage points.  Screaming at them, yelling at them,

7  threatening them and lying to them, in my experience, and I've

8  tried probably at least 18 homicides, is not very effective.

9  Q.   Okay.  Thank you.  Now, could you turn to Exhibit 37

10  there.  That's the Tony Gomes interview.  Your Honor, I don't

11  know if this actual report is in evidence.  If it's not, I

12  would offer it.  This is Plaintiff's Exhibit 37.

13         THE COURT:  What is it?

14         MR. GWILLIAM:  It's the Tony Gomes interview, the

15  police report of the interview.  It's report number 85.

16  It's --

17         THE COURT:  I only work off of exhibit numbers.

18  Plaintiff's Exhibit 37.

19         MR. GWILLIAM:  Right.

20         THE COURT:  You wish to move it into evidence?

21         MR. GWILLIAM:  I do.

22         THE COURT:  Do you have any objection?

23         MR. FOX:  I do, Your Honor.  There are parts -- yes,

24  Your Honor.  And I could explain.  Not to all of it, but there

25  are some parts I think the Court has in its in limine rulings

1    would exclude.  So --

2              MR. GWILLIAM:  Well, I --

3              MR. FOX:  I think there's parts that would

4    require -- parts that are okay and parts that are not.

5              MR. GWILLIAM:  We just introduced the whole tape of

6    the interview.  I think the entire report needs to come in,

7    Your Honor.

8              THE COURT:  I haven't reviewed the entire report.  I

9    don't know if it was the subject of a motion in limine.  Is

10   this a purported transcript or is it a report?

11             MR. FOX:  It is a report.  It's not a transcript.

12             THE COURT:  Sustained.

13             MR. GWILLIAM:  Okay.

14   Q.  Would you -- would you at least look at -- may I use this

15   to refresh his recollection?

16             THE COURT:  You may.

17   BY MR. GWILLIAM:

18   Q.  Would you look at Exhibit 37, at the bottom there's a 257

19   note.  It's -- and this is part of the transcript of the Tony

20   Gomes interview that we were just listening to?

21             MR. FOX:  Judge, that is not what this is.  And I

22   didn't hear that he didn't remember something.  Objection,

23   Your Honor.  Sorry.

24             THE COURT:  Don't look at the transcript.  Ask a

25   question.

1           MR. GWILLIAM:  All right.

2           THE COURT:  Or don't look at the report, ask a

3    question.

4    BY MR. GWILLIAM:

5    Q.  In the interview that you just heard counsel play of Tony

6    Gomes, was that -- were there other things that you talked to

7    him about that were not in that interview that you recall?

8    A.  The only thing, as I mentioned, was that I did not call

9    Tony Gomes.  I didn't know Ethan had called Tony Gomes.  It

10   was only when I heard Ethan say "just tell the truth" that I

11   asked him who he was speaking to.  And he said it was Tony and

12   I said, "Let me talk to him."

13   Q.  Do you recall whether or not you spoke with Tony Gomes

14   about whether or not he should take a polygraph?

15   A.  I don't.

16   Q.  Can you look at the report at page 257 and see if that

17   refreshes your recollection that you discussed that with him.

18           MR. FOX:  Your Honor, 24 is not the transcript, so

19   I'm going to object to the use of this to refresh his

20   recollection.

21           THE COURT:  It looks like a transcript to me.  At

22   257.  I don't know what else it is because I'm not going to

23   take the time to look at every page.  But that looks like a

24   transcript.  What are you telling me?

25           MR. FOX:  The transcript -- the transcript, I

1 | believe, is Exhibit 36.

2 |       THE COURT:  I'm at 37.

3 |       MR. FOX:  Right.

4 |       THE COURT:  257.  And it appears to me to be a

5 | transcript.

6 |       MR. FOX:  Maybe some cut and paste possibly.  I don't

7 | know if that's accurate.  But the transcript is 36.

8 |       THE COURT:  It says L colon, T colon, L colon, T

9 | colon.  I'm looking at 257 of Plaintiff's Exhibit 37.  It

10 | looks like a transcript.

11 |       MR. FOX:  You know what, Your Honor, I think I'm

12 | wrong anyway.  You can use anything to refresh recollection.

13 | Go ahead.

14 |       THE COURT:  Okay.

15 |       MR. FOX:  Thank you.

16 |       THE COURT:  I know I'm not understanding what you're

17 | trying to tell me.  Look at Plaintiff's Exhibit 37, page 257.

18 | Let Mr. Gwilliam know when you're done reviewing that page.

19 |       THE WITNESS:  Yes, sir.  Yes, I see what

20 | you're -- what you've asked me.  Yes, sir.

21 |       THE COURT:  What is the question, Mr. Gwilliam?

22 | BY MR. GWILLIAM:

23 | Q.  Does this refresh your recollection that you did discuss

24 | polygraph with him?

25 | A.  Well, yes, I said it --

Larry Moose - R9

1            MR. FOX:  Object.

2   BY MR. GWILLIAM:

3   Q.  Tell me --

4   A.  Yes.

5           THE COURT:  Do you recall?

6           THE WITNESS:  Yes, sir.

7   BY MR. GWILLIAM:

8   Q.  What did you say to him about the polygraph or the lie

9   detector test?

10          THE COURT:  Without reading it.

11          THE WITNESS:  Oh, I said, "If somebody told you they

12   wanted to give you a lie detector test, would you take one?"

13   BY MR. GWILLIAM:

14   Q.  Okay.  And what did he respond, as you recall?

15   A.  Yes.

16          MR. FOX:  Hearsay, Your Honor.

17          MR. GWILLIAM:  Okay.

18          MR. FOX:  Fine.

19          THE COURT:  Overruled.

20   BY MR. GWILLIAM:

21   Q.  And would you look at the next page of what I thought was

22   the transcript also of the -- this is 258, and see if you

23   discussed again the question of encouraging him to take a lie

24   detector test.

25   A.  Yes, I did.

1    Q.  And once again, what's your recollection now, in looking

2    at that, in terms of what you told him a second time about why

3    you would encourage him to do that?

4    A.  I think I was saying that if all these kids that were in

5    the car had agreed to do a polygraph, that I was going to

6    suggest to someone that they do that.  And hopefully he would

7    be released.

8    Q.  Okay.  And that part was not played to you in the tape you

9    just listened to; correct?

10   A.  No, I didn't hear that.

11         MR. GWILLIAM:  Thank you.  That's all I have.

12         THE COURT:  Any redirect?

13                      RECROSS-EXAMINATION

14   BY MR. FOX:

15   Q.  Mr. Morse, you and I already covered that polygraph is

16   inadmissible in a criminal case; true?

17   A.  Yes, sir.

18   Q.  All right.  Now, you can go down and ask the police, if

19   you want to, "Would you give me a polygraph test?"  Right?

20   That's one way you can do it, right?

21   A.  Yes.

22   Q.  Or you can go out -- and if the police say, "No, we're not

23   going to do one," you can go out and do your own polygraph

24   test if you want to; right?

25   A.  I don't know that I've ever heard of that being done, but

1    I guess that's possible.

2    Q.  You've never heard of someone saying, "I'm going to try to

3    clear my name, I'm going to go hire someone who administers

4    polygraph tests.  I'm going to sit and do one and then I'm

5    going to take the results to the police or DA and show them

6    the results."  You never heard of that?

7    A.  I guess, but almost never.

8    Q.  Did your son do that?

9    A.  My son?

10   Q.  Did your son ever go out and say, "If the police won't

11   give me a polygraph, I'm going to go hire someone to do my

12   own"?

13   A.  No, he was in custody.

14   Q.  When he got out of custody, did he ever do one?

15   A.  He had been --

16          THE COURT:  Careful.

17   BY MR. FOX:

18   Q.  Even after the prelim hearing, did he go out and do one?

19   A.  There wasn't any need for him to do one after the prelim,

20   counsel.

21          MR. FOX:  Thank you very much.  No further questions,

22   thanks.

23          MR. GWILLIAM:  Nothing further, Your Honor.

24          THE COURT:  Mr. Rutter?

25          MR. RUTTER:  Nothing further.

1            THE COURT:  May this witness be excused?

2            MR. FOX:  Yes, Your Honor.

3            MR. GWILLIAM:  Yes.

4            THE COURT: Yes?

5            MR. GWILLIAM:  Yes, Your Honor.

6            THE COURT:  Thank you very much, sir.

7            THE WITNESS:  Thank you, sir.

8       (The proceedings were concluded at 12:01 p.m.)

9

10           I, KAREN HOOVEN, Official Reporter, do hereby certify

11  that the foregoing transcript as true and correct.

12

13  DATED:  25th of April, 2018        /s/  Karen Hooven
                                     KAREN HOOVEN, RMR-CRR
14

15

16

17

18

19

20

21

22

23

24

25